**THIS PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT FOR DISSEMINATION, UNTIL APPROVED, IT SHOULD NOT BE RELIED UPON BY ANY PERSON OR ENTITY, NOR MAY IT BE USED IN CONNECTION WITH ANY SOLICITATION OF VOTES.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Penson Worldwide, Inc., | : | Case No. 13 – 10061 (PJW) |
| et al., | : | |
| | : | |
| | : | |
| Debtors.[1] | : | Jointly Administered |

------------------------------------------------------x

---

**FOURTH AMENDED JOINT LIQUIDATION PLAN OF PENSON WORLDWIDE, INC., AND ITS AFFILIATED DEBTORS**

---

Dated: Wilmington, Delaware
     June 6, 2013

| YOUNG CONAWAY STARGATT & TAYLOR, LLP | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP |
|---|---|
| Pauline K. Morgan | |
| M. Blake Cleary | Andrew N. Rosenberg |
| Rodney Square | Oksana Lashko |
| 1000 North King Street | 1285 Avenue of the Americas |
| Wilmington, Delaware 19801 | New York, New York 10019 |
| Telephone: (302) 571-6600 | Telephone: (212) 373-3000 |
| *Co-Counsel for the Debtors and the Debtors in Possession* | *Co-Counsel for the Debtors and the Debtors in Possession* |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Penson Worldwide, Inc. (6356); SAI Holdings, Inc. (3657); Penson Financial Services, Inc. (3990); Penson Financial Futures, Inc. (6207); Penson Holdings, Inc. (4821); Penson Execution Services, Inc. (9338); Nexa Technologies, Inc. (7424); GHP1, Inc. (1377); GHP2, LLC (1374), Penson Futures (6207).

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND CONSTRUCTION OF TERMS ............................................. 1

ARTICLE II TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND
           PRIORITY TAX CLAIMS .............................................................. 17

2.01.    Administrative Expense Claims ................................................................ 17
2.02.    Time for Filing Administrative Expense Claims ..................................... 17
2.03.    Professional Compensation and Reimbursement Claims .......................... 17
2.04.    Priority Tax Claims ................................................................................. 18

ARTICLE III CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ........................ 18

ARTICLE IV CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND
           EQUITY INTERESTS IN PWI (DEBTOR 1) ...................................... 22

4.01.    CLASS 1A - NON-TAX PRIORITY CLAIMS ....................................... 22
4.02.    CLASS 2A - OTHER SECURED CLAIMS ............................................ 22
4.03.    CLASS 3A - GENERAL UNSECURED CLAIMS .................................. 23
4.04.    CLASS 4A – SECOND LIEN NOTE CLAIMS ...................................... 23
4.05.    CLASS 5A – CONVERTIBLE NOTE CLAIMS ..................................... 23
4.06.    CLASS 6A – INTERCOMPANY CLAIMS ............................................ 24
4.07.    CLASS 7A – SECURITIES LAW CLAIMS ........................................... 24
4.08.    CLASS 8A - EQUITY INTERESTS ....................................................... 24

ARTICLE V CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND
           EQUITY INTERESTS IN PFSI (DEBTOR 2) ...................................... 25

5.01.    CLASS 1B - NON-TAX PRIORITY CLAIMS ....................................... 25
5.02.    CLASS 2B - OTHER SECURED CLAIMS ............................................ 25
5.03.    CLASS 3B - GENERAL UNSECURED CLAIMS .................................. 25
5.04.    CLASS 4B – SUBORDINATED LOAN CLAIMS .................................. 26
5.05.    CLASS 5B – INTERCOMPANY CLAIMS ............................................ 26
5.06.    CLASS 6B - EQUITY INTERESTS ....................................................... 26

ARTICLE VI CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND
           EQUITY INTERESTS IN GUARANTOR DEBTORS - SAI and PHI
           (DEBTORS 3 AND 4) .......................................................................... 27

6.01.    CLASS 1C - NON-TAX PRIORITY CLAIMS ....................................... 27
6.02.    CLASS 2C - OTHER SECURED CLAIMS ............................................ 27
6.03.    CLASS 3C - GENERAL UNSECURED CLAIMS .................................. 28
6.04.    CLASS 4C – SECOND LIEN NOTE GUARANTEE CLAIMS ................ 28
6.05.    CLASS 5C – INTERCOMPANY CLAIMS ............................................ 28
6.06.    CLASS 6C - EQUITY INTERESTS ....................................................... 28

ARTICLE VII CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND
           EQUITY INTERESTS IN NEXA (DEBTOR 5) .................................... 29

7.01.    CLASS 1D - NON-TAX PRIORITY CLAIMS ....................................... 29
7.02.    CLASS 2D - OTHER SECURED CLAIMS ............................................ 29

i

7.03.    CLASS 3D - GENERAL UNSECURED CLAIMS ....................................................30
7.04.    CLASS 4D – INTERCOMPANY CLAIMS...................................................30
7.05.    CLASS 5D - EQUITY INTERESTS ........................................................30

ARTICLE VIII CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND
       EQUITY INTERESTS IN REMAINING FILED SUBSIDIARY
       DEBTORS (DEBTORS 6 THROUGH 10) ........................................................31

8.01.    CLASS 1E - NON-TAX PRIORITY CLAIMS.............................................31
8.02.    CLASS 2E - OTHER SECURED CLAIMS .................................................31
8.03.    CLASS 3E - GENERAL UNSECURED CLAIMS......................................31
8.04.    CLASS 4E – INTERCOMPANY CLAIMS ...............................................32
8.05.    CLASS 5E - EQUITY INTERESTS...........................................................32

ARTICLE IX IMPLEMENTATION OF THE PLAN ...............................................32

9.01.    No Substantive Consolidation of the Debtors.................................................32
9.02.    Limited Liability Company and Liquidation Trust.......................................33
9.03.    Approval of Plan Documents .......................................................................37

ARTICLE X CORPORATE GOVERNANCE AND ACTIONS ................................38

10.01. Post-Effective Date Corporate Existence......................................................38
10.02. Corporate Action.........................................................................................39
10.03. Officers and Boards of Managers.................................................................39
10.04. Payment of Wind-Down Expenses ..............................................................40
10.05. Cancellation of Existing Securities and Agreements ...................................40
10.06. Second Lien Notes.......................................................................................40
10.07. Rights of the Indenture Trustee...................................................................40

ARTICLE XI PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER
       THE PLAN...................................................................................................42

11.01. Nonconsensual Confirmation.......................................................................42
11.02. Elimination of Vacant Classes .....................................................................42
11.03. Voting Classes.............................................................................................43
11.04. Distributions................................................................................................43
11.05. Insurance Claims.........................................................................................43
11.06. Timing of Distributions................................................................................44
11.07. Holders as of the Distribution Record Date .................................................44
11.08. Distributions to Address of Record...............................................................44
11.09. Minimum Distributions................................................................................44
11.10. Unclaimed Distributions ..............................................................................45
11.11. Setoffs.........................................................................................................45
11.12. Allocation of Plan Distributions Between Principal and Interest ..................45
11.13. Estimation of Claims; Certain Reserves.......................................................45
11.14. No Recourse ................................................................................................45
11.15. Satisfaction of Claims and Equity Interests .................................................46
11.16. Withholding and Reporting Requirements....................................................46

ARTICLE XII PROCEDURES RELATING TO DISPUTED CLAIMS .....................46

ii

12.01. Objections to Administrative Expense Claims and Claims ...........................................46
12.02. Amendments to Claims ...................................................................................................46
12.03. No Distributions Pending Allowance.............................................................................47
12.04. Resolution of Disputed Claims ......................................................................................47
12.05. Resolution of Disputed Insurance Claims ......................................................................47

ARTICLE XIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES...........................47

13.01. Rejection or Assumption and Retention or Assignment .................................................47
13.02. Cure of Defaults .............................................................................................................48
13.03. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
       Unexpired Leases Rejected Pursuant to the Plan .........................................................49

ARTICLE XIV EFFECT OF CONFIRMATION & INDEMNIFICATION, RELEASE,
       INJUNCTIVE AND RELATED PROVISIONS .................................................49

14.01. Binding Effect ................................................................................................................49
14.02. Vesting of Assets............................................................................................................49
14.03. Term of Pre-Confirmation Injunctions or Stays............................................................49
14.04. Injunction Against Interference with Plan .....................................................................49
14.05. Injunction .......................................................................................................................49
14.06. Releases..........................................................................................................................50
14.07. Exculpation and Limitation of Liability.........................................................................52
14.08. Limitation on Releases and Exculpation ........................................................................53
14.09. Injunction Related to Releases and Exculpation ...........................................................53
14.10. Release of Liens and Encumbrances...............................................................................53
14.11. Satisfaction of Subordination Rights .............................................................................54

ARTICLE XV CONDITIONS PRECEDENT .......................................................................54

15.01. Conditions to Confirmation............................................................................................54
15.02. Effectiveness ..................................................................................................................55
15.03. Waiver of Conditions .....................................................................................................55
15.04. Withdrawal of Plan.........................................................................................................55
15.05. Waiver of Rule 3020(e) Stay..........................................................................................56

ARTICLE XVI RETENTION OF JURISDICTION.................................................................56

16.01. Scope of Bankruptcy Court Jurisdiction ........................................................................56

ARTICLE XVII MISCELLANEOUS PROVISIONS ..............................................................57

17.01. Authorized Post-Petition Date Payments .......................................................................57
17.02. Payment of Fees and Expenses of Certain Creditors .....................................................57
17.03. Effectuating Documents and Further Transactions.........................................................57
17.04. Exemption from Transfer Taxes .....................................................................................57
17.05. Termination of Professionals .........................................................................................58
17.06. Access.............................................................................................................................58
17.07. Books and Records .........................................................................................................58
17.08. Putative Class Action .....................................................................................................58
17.09. Payment of Statutory Fees.............................................................................................58
17.10. Post-Effective Date Fees and Expenses .........................................................................59

iii

17.11. Amendment or Modification of this Plan.................................................................59
17.12. SunGard Settlement Agreement....................................................................................59
17.13. Confirmation Order......................................................................................................59
17.14. Severability..................................................................................................................60
17.15. Expedited Tax Determination ......................................................................................60
17.16. Governing Law.............................................................................................................60
17.17. Binding Effect ..............................................................................................................60
17.18. Exhibits/Schedules .......................................................................................................60
17.19. Notices..........................................................................................................................60

## INTRODUCTION

Penson Worldwide, Inc., and the other debtors and debtors in possession in the above-captioned cases, as set forth on Exhibit A hereto propose the following joint Chapter 11 Plan of liquidation for the resolution of the outstanding Claims against and Equity Interests in the Debtors. Reference is made to the Disclosure Statement for a summary and analysis of the Plan, and certain related matters including, among other things, establishment of a limited liability company and a trust for the benefit of creditors, as set forth herein, and certain tax matters related to the consideration to be issued and/or distributed under this Plan. The Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan.

Parties are encouraged to read the Plan and the Disclosure Statement and their respective exhibits and schedules in their entirety before voting to accept or reject the Plan. No materials other than the Disclosure Statement and the respective schedules and exhibits attached thereto and referenced therein have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

A.     Definitions.  As used herein, the following terms have the respective meanings specified below:

1.01.    Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases[2] under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors and, any actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their business (including postpetition intercompany transfers), but not including Fee Claims or U.S. Trustee Fees.

1.02.    Affiliate shall have the meaning ascribed to such term in section 101(2) of the Bankruptcy Code, and when used with reference to any Debtor, shall include, but not be limited to, each of the other Debtors.

1.03.    Allowed means, with reference to any Claim or Administrative Expense Claim against the Debtors: (i) any Claim that has been listed by the Debtors in their respective Schedules, as such Schedules have been or may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; provided, however, that any such Claim listed in the Schedules that has been paid by the Debtors after the Petition Date pursuant to an order of the Bankruptcy Court shall not be considered an Allowed Claim; (ii) any Claim or Administrative Expense Claim allowed pursuant to the Plan; (iii) any Claim or Administrative Expense Claim that is not Disputed; (iv) any Claim or Administrative Expense Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors

---

[2]     All capitalized terms used but not defined herein shall have the meanings set forth in Article I herein.

pursuant to a Final Order of the Bankruptcy Court or under the Plan; or (v) any Claim or Administrative Expense Claim that has been Allowed by Final Order. Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date. Any Distribution to the Holder of an Allowed Claim under this Plan shall be net of any setoff amount of any Cause of Action that may be asserted by any Debtor against the Holder of such Claim.

1.04.    Amended SunGard Claim means SunGard Financial Systems LLC's general unsecured claim in the aggregate amount of $16.0 million, as set forth in the SunGard Settlement Agreement, which is classified and treated in Class 3B of this Plan.

1.05.    Apex Avoidance Action means any Avoidance Action arising as a result of or in connection with the Apex Transaction.

1.06.    Apex Clearing means Apex Clearing Corporation.

1.07.    Apex Holding means Apex Clearing Holdings LLC, the parent company of Apex Clearing.

1.08.    Apex Transaction means that certain transaction, and all documents, agreements and transactions related thereto, pursuant to which, among other things, on June 5, 2012, PFSI's customer and correspondent accounts, related contractual rights, and other related assets were sold and transferred to Apex Clearing and net assets were contributed towards the regulatory capital of Apex Clearing in consideration for, among other things, the issuance of membership interests in Apex Holding to PFSI.

1.09.    Assigned Causes of Action means any and all Causes of Action other than those released under the Plan, including, without limitation, the Apex Avoidance Action, the Knight Avoidance Action, all patent infringement claims, and the Debtors' claims against their auditors, underwriters, officers, directors, and agents relating to the Debtors' financial statements and securities offerings.

1.10.    Avoidance Action means any avoidance or equitable subordination or recovery actions under (i) sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code or (ii) any other applicable similar state or federal law concerning the avoidance of fraudulent transfers, fraudulent conveyances, preferential transfers, or prohibited distributions.

1.11.    Ballot means the form distributed to each Holder of an impaired Claim that is entitled to vote to accept or reject the Plan, on which is to be indicated acceptance or rejection of the Plan and which shall be in form and substance reasonably acceptable to the Required Consenting Second Lien Noteholders and the Required Consenting Convertible Noteholders.

1.12.    Bankruptcy Code means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

2

1.13.   Bankruptcy Court means the United States Bankruptcy Court for the District of Delaware, or any other court exercising jurisdiction over the Chapter 11 Cases or any proceeding therein.

1.14.   Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any local rules of the Bankruptcy Court.

1.15.   Bar Date means any deadline for filing proofs of Claim and administrative expense request forms against a Debtor with respect to (a) Claims that arose on or prior to the Petition Date, or (b) Administrative Expense Claims, including 503(b)(9) Claims, as established by an order of the Bankruptcy Court.

1.16.   Bar Date Order means the order entered by the Court approving the Bar Dates (as defined in the Bar Date Order) and form and manner of notice thereof.

1.17.   Board of Managers shall have the meaning set forth in Article IX of this Plan.

1.18.   Books and Records shall have the meaning set forth in Article XVII of this Plan.

1.19.   Business Day means any day other than a Saturday, Sunday, or any "legal holiday" as defined in Bankruptcy Rule 9006(a).

1.20.   Canadian Debtor means Penson Financial Services Canada, Inc.

1.21.   Canadian Proceeding means the Canadian Debtor's liquidation proceeding under applicable Canadian law.

1.22.   Cash means legal tender of the United States of America and equivalents thereof.

1.23.   Causes of Action means, without limitation, any and all actions, causes of action, Avoidance Actions, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever owned by any of the Debtors, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, whether assertable directly, indirectly, derivatively or in any representative or other capacity, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act, failure to act, error, omission, transaction, occurrence or other event arising or occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.24.   Chapter 11 Cases means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, which are being jointly administered under case caption Penson Worldwide, Inc., et al., Chapter 11 Case No. 13-10061 (PJW), which are currently pending before the Bankruptcy Court.

1.25.   Charging Lien means any Lien or priority granted to, and held by, (i) the Second Lien Notes Indenture Trustee, for payment on account of the Second Lien Notes Indenture

3

Trustee Fee Claim; and (ii) the Convertible Notes Indenture Trustee, for payment on account of the Convertible Notes Indenture Trustee Fee Claim.

1.26.    Chief Officer means an individual designated by the Board of Managers, who shall serve as a manager of PTL, from and after the Effective Date in accordance with the terms of the PTL LLC Agreement.

1.27.    Claim means "claim" as defined in section 101(5) of the Bankruptcy Code.

1.28.    Claims and Voting Agent means Kurtzman Carson Consultants LLC.

1.29.    Class means a class of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

1.30.    Class A Units means a class of membership interests created pursuant to the PTL LLC Agreement.  Class A Units will be distributed to and held by the Holders of Second Lien Notes in exchange for their (A) Second Lien Note Secured Claims; (B) Second Lien Note Deficiency Claims; (C) Second Lien Notes Guarantee Secured Claims; and (D) Second Lien Notes Guarantee Deficiency Claims, in each case, as set forth in this Plan.

1.31.    Class Action Stipulation means the Stipulation of Settlement dated as of December 28, 2012 entered by the parties to the Putative Class Action to resolve the Putative Class Action.

1.32.    Class B Units means a class of membership interests created pursuant to the PTL LLC Agreement.  Class B Units will be distributed to and held by (A) the Holders of Convertible Notes in exchange for their Convertible Note Claims; and (B) the Holders of General Unsecured Claims against PWI in exchange for such General Unsecured Claims against PWI, in each case, as set forth in this Plan.

1.33.    Class C Units means a class of membership interests created pursuant to the PTL LLC Agreement.  Class C Units will be held by the Liquidation Trust for the benefit of Holders of General Unsecured Claims of any Debtor other than PWI.  Any recoveries with respect to Class C Units will be distributed by the Liquidation Trust to the Holders of Allowed General Unsecured Claims against any Debtor other than PWI in exchange for such General Unsecured Claims against any Debtor other than PWI, as set forth in this Plan.

1.34.    Class D Expiration Date shall mean the fifth anniversary of the Effective Date, on which date all Class D Units and all rights and interests of the Holders of Class D Units shall expire; provided, however, that if all Claims of the Holders of Class A Units, Class B Units, and Class C Units are paid in full on or prior to such fifth anniversary, then the Class D Expiration Date shall mean the date on which a certificate of cancellation for PTL is filed with the Secretary of State of the State of Delaware.

1.35.    Class D Units means a class of membership interests created pursuant to the PTL LLC Agreement.  Class D Units will be held by the Liquidation Trust for the benefit of Holders of Securities Law Claims and Equity Interests in PWI.  Any recoveries with respect to Class D

4

Units will be distributed by the Liquidation Trust to the Holders of Allowed Securities Law Claims and Allowed Equity Interests in PWI, as set forth in this Plan.

1.36.    Collateral means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.01.    Committee means the statutory committee of creditors appointed pursuant to section 1102(a) of the Bankruptcy Code in the Chapter 11 Cases.

1.37.    Company means PWI and its direct and indirect subsidiaries as set forth on Exhibit C annexed hereto.

1.38.    Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.39.    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.40.    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and which shall be in form and substance reasonably acceptable to the Required Consenting Second Lien Noteholders and the Required Consenting Convertible Noteholders.

1.41.    Consenting Convertible Noteholders means (a) those Holders of Convertible Note Claims that are signatories to the Restructuring Support Agreement as of the Petition Date and (b) any Holders of Convertible Note Claims that become parties to the Restructuring Support Agreement (in accordance with the terms thereof) prior to the Confirmation Date.

1.42.    Consenting Second Lien Noteholders means (a) those Holders of Second Lien Note Claims that are signatories to the Restructuring Support Agreement as of the Petition Date and (b) any Holders of Second Lien Note Claims that become parties to the Restructuring Support Agreement (in accordance with the terms thereof) prior to the Confirmation Date.

1.43.    Convertible Notes means those certain notes issued pursuant to the Convertible Notes Indenture.

1.44.    Convertible Note Claim means any Claim arising from, or related to, the Convertible Notes, which Claims shall be deemed Allowed in the aggregate amount of $63,017,400.00 through the Petition Date; provided, however, that no Distribution shall be made under this Plan on account of the Convertible Note Claims held by any Holder until any Claims or Causes of Action arising out of or related to the Apex Transaction that have been asserted by the Debtors or PTL on or prior to the applicable Distribution Date against such Holder or any of its affiliates or subsidiaries have been resolved.

1.45.    Convertible Noteholders Committee means the informal committee of certain Holders of Convertible Notes who are parties to the Restructuring Support Agreement.

5

1.46.    Convertible Notes Indenture means that certain indenture dated June 3, 2009, as may have been amended, supplemented or modified from time to time, pursuant to which PWI issued 8.0% unsecured Convertible Notes due 2014, which are unsecured obligations, in the principal amount of $60 million, and all documents ancillary thereto.

1.47.    Convertible Notes Indenture Trustee Fee Claim means the claim of the Convertible Notes Indenture Trustee for compensation and reimbursement of fees, expenses and indemnity claims pursuant to the terms of the Convertible Notes Indenture, whether prior to or after the Petition Date and whether prior to or after the Effective Date.

1.48.    Convertible Notes Trustee means Wells Fargo N.A. as successor to U.S. Bank National Association, as indenture trustee pursuant to the Convertible Notes Indenture.

1.49.    Corporate Transactions shall have the meaning set forth in Section 10.02 of this Plan.

1.50.    Creditor Sub-Trust shall have the meaning set forth in Section 9.02(e) of this Plan.

1.51.    Debtors means each of the debtors and debtors in possession listed on Exhibit A annexed hereto.

1.52.    Deficiency Claim means, with respect to a Claim that is partially secured by a Lien on, or security interest in, property of any of the Debtors, or that has the benefit of partial rights of setoff under § 553 of the Bankruptcy Code, the amount by which the Allowed amount of such Claim exceeds the value of the property of the Debtors securing such Claim or the amount subject to setoff, as applicable, as determined by the Bankruptcy Court pursuant to §§ 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code.

1.53.    Disclosure Statement means the disclosure statement relating to the Plan, either in its present form or as the same may be altered, amended, or modified from time to time, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, and which shall be in form and substance reasonably acceptable to the Required Consenting Second Lien Noteholders and the Required Consenting Convertible Noteholders.

1.54.    Disclosure Statement Order means the order of the Bankruptcy Court approving the Disclosure Statement and which shall be in form and substance reasonably acceptable to the Required Consenting Second Lien Noteholders and the Required Consenting Convertible Noteholders.

1.55.    Disputed means, with reference to any Claim or Administrative Expense Claim that is not an Allowed Claim, (i) any Claim or Administrative Expense Claim proof of which was timely and properly filed, and which is disputed under the Plan or as to which the Debtors or PTL have interposed a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and (ii) any Claim or

6

Administrative Expense Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.

1.56.    <u>Distribution</u> means a distribution of Cash or other property pursuant to the Plan.

1.57.    <u>Distribution Date</u> means any date that is (a) the Effective Date, (b) the Initial Distribution Date, (c) any Interim Distribution Date, or (d) the Final Distribution Date.

1.58.    <u>Distribution Record Date</u> means the Confirmation Date, or such other date as shall be set forth in the Confirmation Order.

1.59.    <u>Effective Date</u> means such day that is the business day as soon as reasonably practicable after all conditions to the occurrence of the effective date set forth in Section 15.02 hereof have been satisfied or waived.

1.60.    <u>Equity Interest</u> means any share of common or preferred stock or other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.61.    <u>Equity Interest Sub-Trust</u> shall have the meaning set forth in Section 9.02(e) of this Plan.

1.62.    <u>Estate</u> means each estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

1.63.    <u>Fee Claim</u> means any request for allowance and payment of claims for Professional Fees.

1.64.    <u>Filed Subsidiary Debtors</u> means, individually or collectively, the Debtors listed on <u>Exhibit B</u> annexed hereto.

1.65.    <u>Final Distribution Date</u> means the date on which the final Distributions are made under the Plan to the Holders of Allowed Claims.

1.66.    <u>Final Order</u> means an order, ruling or judgment that (a) is in full force and effect, (b) is not stayed, and (c) is no longer subject to review, reversal and modification or amendment, by appeal or writ of certiorari; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or the Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

1.67.    <u>General Unsecured Claim</u> means an unsecured nonpriority claim against a Debtor (including an Insurance Claim) that is not an Administrative Expense Claim, Fee Claim, Priority Tax Claim, Subordinated Loan Claim, Second Lien Note Claim, Second Lien Note Guarantee Claim, Convertible Note Claim, Securities Law Claim, or Intercompany Claim.

1.68.    <u>Guarantor Debtors</u> means, individually or collectively, SAI and PHI, each of whom guaranteed PWI's obligations under the Second Lien Notes Indenture.

7

1.69.    <u>Holder</u> means any Person that holds a Claim or Equity Interest.

1.70.    <u>Illiquid Instruments</u> means the 9.70% Cambridge Student Housing Series C Finance Bonds, the 9.70% Cambridge Student Housing Series D Finance Bonds, the 10.25% Dade County Housing Junior Finance Bonds, the 7.625% Leon County Educational Facility Series B Bonds, the 6.625% Will County Student Housing Series A Revenue Bonds, and the 7.75 % Will County Student Housing Series B Revenue Bonds held by SAI.

1.71.    <u>Indentures</u> means the Second Lien Notes Indenture and the Convertible Notes Indenture.

1.72.    <u>Indenture Trustees</u> means the Second Lien Notes Indenture Trustee and the Convertible Notes Indenture Trustee.

1.73.    <u>Indenture Trustee Fee Claims</u> means the claims of the Indenture Trustees for compensation and reimbursement of fees, expenses and indemnity claims pursuant to the terms of the Indentures and/or documents ancillary thereto, whether prior to or after the Petition Date and whether prior to or after the Effective Date.

1.74.    <u>Initial Distribution Date</u> means the first Business Day that is 20 days after the Effective Date, or such later date as may be reasonably selected by the Chief Officer or Board of Managers of PTL or the Liquidation Trustee, as applicable, to make the initial Distributions under the Plan to Holders of Allowed Claims.

1.75.    <u>Insurance Claim</u> means any Claim arising from an incident or occurrence that is covered under one or more of the Debtors' insurance policies, and is: (a) asserted or which can be asserted against the Debtors and/or the Debtors' insurers; or (b) asserted or which can be asserted against any current or former officer, director or employee of the Debtors, any insureds or any additional insureds (to the extent the Claim against such officer, director or employee and additional insured, as applicable, is covered under such insurance policies).

1.76.    <u>Intercompany Claim</u> means, prior to the Petition Date, (a) any account reflecting intercompany book entries by one Debtor with respect to any other Debtor, the non-Debtor Affiliates or the Canadian Debtor; and (b) any Claim that is not reflected in such book entries and is held by a Debtor against any other Debtor, any non-Debtor Affiliates or the Canadian Debtor, but excluding the Subordinated Loans.

1.77.    <u>Intercompany Claims Settlement</u> shall have the meaning set forth in Section 9.04(b) of this Plan.

1.78.    <u>Interim Distribution Date</u> means any date, other than the Final Distribution Date, after the Initial Distribution Date on which the Chief Officer or the Board of Managers of PTL, or the Liquidation Trustee, as applicable, determines that an interim Distribution should be made to Holders of Allowed Claims in light of, *inter alia*, resolutions of Disputed Claims and the administrative costs of such a Distribution.

1.79.    <u>Knight Avoidance Action</u> means any Avoidance Action arising as a result of or in connection with the Knight Transaction.

8

1.80.   <u>Knight Transaction</u> means that certain transaction, and all documents, agreements and transactions related thereto, pursuant to which, among other things, on May 31, 2012 (i) PFSI sold certain assets of PFSI's futures clearing business, including but not limited to, customer contracts, segregated customer account assets, assets relating to the foreign currency exchange business, certain membership seats and licenses for clearing exchanges, and other related assets to Knight Execution & Clearing Services LLC; and (ii) Knight Execution & Clearing Services LLC assumed, subject to specified exceptions, certain liabilities and obligations under customer contracts in the futures clearing business.

1.81.   <u>Lead Plaintiff</u> shall have the meaning set forth in Article XVII of this Plan.

1.82.   <u>Lien</u> shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

1.83.   <u>Liquidation Trust</u> means the trust created pursuant to the Plan and Liquidation Trust Agreement.

1.84.   <u>Liquidation Trust Agreement</u> means the agreement governing, among other things, the retention and duties of the Liquidation Trustee, as described in Article IX of the Plan, which shall be in substantially the form and substance filed in the Plan Supplement.

1.85.   <u>Liquidation Trust Assets</u> means collectively, the Class C Units and Class D Units, issued by PTL to the Liquidation Trust on the Effective Date, together with all Distributions from PTL received in connection with such Units and any other proceeds received by the Liquidation Trust in connection with such Units.

1.86.   <u>Liquidation Trust Beneficiaries</u> mean (i) with respect to the Creditor Sub-Trust, the Holders of General Unsecured Claims of any Debtor other than PWI, and (ii) with respect to the Equity Interest Sub-Trust, the Holders of Securities Law Claims and the Holders of Equity Interests, in each case that are entitled to a Distribution under this Plan, solely to the extent that such Claims or Equity Interests have not been Paid in Full.

1.87.   <u>Liquidation Trustee</u> means the trustee appointed by the Debtors, in consultation with Second Lien Noteholders Committee and the Convertible Noteholders Committee, to administer the Liquidation Trust.

1.88.   <u>Nexa</u> means Nexa Technologies, Inc., an indirect subsidiary of PWI.

1.89.   <u>Net Distributable Assets</u> means the net proceeds received by PTL from the disposition of any PTL Asset, that is available for Distribution to the Holders of Allowed Claims, including Allowed Deficiency Claims, after the payment in full of Allowed Administrative Expense Claims, Allowed Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, Allowed Other Secured Claims, Allowed Second Lien Note Secured Claims, Allowed Second Lien Note Guarantee Secured Claims, and the Wind-Down Expenses of PTL.

1.90.   <u>Non-Tax Priority Claim</u> means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

9

1.02.    <u>Notes</u> mean, collectively, the Convertible Notes and the Second Lien Notes.

1.91.    <u>Other Secured Claim</u> against a Debtor means any Secured Claim other than a Second Lien Note Secured Claim or Second Lien Note Guarantee Secured Claim.

1.92.    <u>Paid in Full, Payment in Full, or Pay in Full</u> means, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

1.93.    <u>Person</u> means an individual, a corporation, a partnership, a limited liability company, an association, a trust, a governmental authority, a labor union or other entity or organization.

1.94.    <u>Petition Date</u> means January 11, 2013.

1.95.    <u>PFSC</u> means Penson Financial Services Canada, Inc., an indirect subsidiary of PWI and a Canadian Debtor.

1.96.    <u>PFSI</u> means Penson Financial Services, Inc., an indirect subsidiary of PWI.

1.97.    <u>PHI</u> means Penson Holdings, Inc., an indirect subsidiary of PWI.

1.98.    <u>Plan</u> means this Chapter 11 liquidation plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as the same may be altered, amended, or modified from time to time and which shall be in form and substance reasonably acceptable to the Required Consenting Second Lien Noteholders and the Required Consenting Convertible Noteholders.

1.99.    <u>Plan Documents</u> means those documents necessary to effectuate the Plan following entry of the Confirmation Order, and to be contained in the Plan Supplement (which shall be subject to revision and modification prior to the Effective Date), each of which shall be in form and substance reasonably acceptable to the Debtors, the Required Consenting Second Lien Noteholders, and the Required Consenting Convertible Noteholders.

1.100.    <u>Plan Supplement</u> means the supplemental appendix to this Plan, to be filed on or prior to the date that is five (5) days prior to the Voting Deadline, which will contain, as the case may be and to the extent applicable under the Plan as of the Confirmation Date, draft forms or signed copies, or the material terms, of the following:  the PTL LLC Agreement, the Liquidation Trust Agreement, and list of executory contracts and unexpired leases, if any, to be assumed by the Debtors.

1.101.    <u>Plan Support Parties</u> means each of the Consenting Second Lien Noteholders, each of the Consenting Convertible Noteholders, and any other Person who has executed the Restructuring Support Agreement with the Debtors.

1.102.    <u>PTL Assets</u> means all rights, title and interest in the Debtors' assets (including Nexa assets to the extent not sold during the Chapter 11 Cases) as of the day prior to the Effective Date, including, without limitation, the Debtors' Cash, the Assigned Causes of Action,

10

and the transferred Third-Party Securities Laws Causes of Action; provided, however, that at the discretion of the Debtors or the Chief Officer, the PTL Assets may include the stock of a reorganized Debtor and specific assets of such Debtor shall remain in such reorganized Debtor. The PTL Assets shall be transferred by the Debtors to PTL on the Effective Date, free and clear of all liens, claims and encumbrances.

1.103.  PTL shall have the meaning set forth in Section 9.02(a) of this Plan.

1.104.  PTL LLC Agreement shall have the meaning set forth in Section 9.02(a) of this Plan.

1.105.  PTL Reserve means any reserve established by PTL on account of Claims that are Disputed.

1.106.  Prepetition Restructuring means the Apex Transaction, the Knight Transaction and all agreements, documents and transactions related thereto.

1.107.  Priority Tax Claim means any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.108.  Professional(s) means each Person retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases pursuant to sections 327, 328, 330, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to an order of the Bankruptcy Court.

1.109.  Professional Fees means fees and expenses for legal, financial advisory, accounting and other services and reimbursement of expenses related thereto that are awardable and allowable under sections 328, 330(a), 331, 503(b) or 1103(a) of the Bankruptcy Code or otherwise and that are rendered (a) prior to the Effective Date, or (b) thereafter in connection with applications filed pursuant to section 330, 331, 503(b) or 1103(a) of the Bankruptcy Code. To the extent that the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Professional Fees.

1.110.  Promissory Note means the promissory note, dated as of May 15, 2012, between SAI, as the borrower, and PFSI, as the lender thereunder, in the principal amount of $5,500,000.

1.111.  Promissory Note Claim means a claim arising from, or related to, the Promissory Note.

1.112.  Pro Rata means proportionate as determined on a Debtor by Debtor basis, so that, for example, the ratio of (A)(x) the amount of all consideration distributed on account of an Allowed Claim to (y) the amount of such Allowed Claim as against any Debtors is the same as the ratio of (i) the amount of all consideration distributed on account of all Allowed Claims in the Class in which such Claim is classified with respect to such Debtor to (ii) the amount of all Allowed Claims in such Class with respect to such Debtor or (B) (x) the amount of all consideration distributed from Net Distributable Assets of any Debtor on account of all Allowed Claims in a Class of such Debtor to (y) the amount of such Allowed Claims in a Class of such Debtor is the same as the ratio of (i) the amount of all consideration distributed from Net

11

Distributable Assets of such Debtor to all Classes of Allowed Claims against such Debtor which are pari passu with respect to such Class with respect to such Debtor to (ii) the amount of all Allowed Claims in each of such Classes with respect to such Debtor.

1.113.  Putative Class shall have the meaning set forth in Article XVII of this Plan.

1.114.  Putative Class Action means the securities litigation entitled *Friedman v. Penson Worldwide, Inc., et al.*, Case No. 11-cv-2098-O, pending in the United States District Court for the Northern District of Texas.

1.115.  PWI means Penson Worldwide, Inc., which is the direct or indirect parent of each of the other Debtors.

1.116.  PWI Assets means assets of PWI transferred to PTL.

1.117.  PWI Subordinated Loan means the five-year loan in the aggregate amount of $70 million made pursuant to that certain Subordinated Loan Agreement dated as of May 6, 2010 between PWI, as the lender, and PFSI, as the borrower.

1.118.  PWI Subordinated Loan Claim means any Claim arising from, or related to, the PWI Subordinated Loan, which Claim shall be deemed Allowed in the aggregate amount of $45 million.

1.119.  Released Parties means, collectively:  (a) the Debtors, the Company, and their directors, officers, employees, agents, members, liquidators, monitors, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Persons), each solely in its capacity as such, and only if such Persons occupied such positions at any time on or after the Petition Date; (b) the Second Lien Noteholders Committee, the Second Lien Notes Indenture Trustee and each of their respective advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by the Second Lien Noteholders Committee or the Second Lien Notes Indenture Trustee), each solely in its capacity as such; (c) the Convertible Noteholders Committee, the Convertible Notes Indenture Trustee, and each of their respective advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by the Convertible Noteholders Committee or the Convertible Notes Indenture Trustee), each solely in its capacity as such; and (d) the Plan Support Parties (including, without limitation, each Consenting Second Lien Noteholder and each Consenting Convertible Noteholder) and each of their respective officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Persons), each solely in its capacity as such; and (e) the Committee, each of the Committee's members, and each of their directors, officers, employees, agents, members, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by the Committee or the Committee's members), each solely in their capacities as such.

1.120.  Required Consenting Convertible Noteholders means the Consenting Convertible Noteholders holding greater than 50% of the aggregate amount of Convertible Note Claims held by all of the Convertible Noteholders.

12

1.121.  Required Consenting Second Lien Noteholders means the Consenting Second Lien Noteholders holding greater than 50% of the aggregate amount of Second Lien Note Claims held by all of the Second Lien Noteholders.

1.122.  Restructuring Support Agreement means the agreement, including all exhibits and supplements annexed thereto, dated as of January 10, 2013 (as it may be amended, supplemented or otherwise modified from time to time, in accordance with the terms thereof, both as to substance and parties thereto) by and between the Debtors and the Plan Support Parties, a copy of which is attached to the Disclosure Statement.

1.123.  Restructuring Support Agreement Professional Fees means the reasonable and documented fees and expenses due and owing to (i) Fried, Frank, Harris, Shriver & Jacobson LLP, counsel to the Second Lien Noteholders Committee and one (1) local counsel for the Second Lien Noteholders Committee, and (ii) Sidley Austin LLP, counsel to the Convertible Noteholders Committee and one (1) local counsel for the Convertible Noteholders Committee, in each case, in accordance with their existing engagement or fee letters.

1.124.  SAI Subordinated Loan means collectively, the loans made through certain assignment agreements between SAI, as the lender, and PFSI, as the borrower, under that certain Subordinated Loan Agreement, dated as of June 29, 2011, in the principal amount of $5 million and that certain Subordinated Loan Agreement, dated as of June 30, 2011, in the principal amount of $10 million, which matured on June 29 and June 30, 2012, respectively.  As of the Petition Date, the principal amount outstanding under the SAI Subordinated Loan is $13.5 million plus accrued interest.

1.125.  SAI Subordinated Loan Claim means any Claim arising from, or related to, the SAI Subordinated Loan, which Claim shall be deemed Allowed in the aggregate amount of $12 million.

1.126.  Schedules means the schedules of assets and liabilities, the lists of Holders of Equity Interests, and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.127.  Second Lien Notes means those certain notes issued pursuant to the Second Lien Notes Indenture.

1.128.  Second Lien Note Claim means any Claim arising from, or related to, the Second Lien Notes, other than a Securities Law Claim, which Claims shall be deemed Allowed in the aggregate principal amount of $216,940,625.00 through the Petition Date; provided, however, that the Holders of Second Lien Note Claims shall also be entitled to receive post-petition interest on account of the Second Lien Note Secured Claims to the extent permitted under section 506(b) of the Bankruptcy Code.

1.129.  Second Lien Note Collateral means (i) with respect to PWI, 100% of the Equity Interests in SAI, (ii) with respect to SAI, 100% of the Equity Interests in PFSI, GHP1, Inc., and PHI, and (iii) with respect to PHI, 65% of the Equity Interests in PFSC.

13

1.130.  <u>Second Lien Note Deficiency Claim</u> means with respect to each applicable Debtor, the Unsecured Claims or Deficiency Claims of Second Lien Noteholders arising from, or related to the Second Lien Notes.

1.131.  <u>Second Lien Note Guarantee Claim</u> means the Second Lien Note Claim against each applicable Guarantor Debtor arising from, or related to, SAI's and PHI's guarantee of PWI's obligations under the Second Lien Notes Indenture.

1.132.  <u>Second Lien Note Guarantee Deficiency Claim</u> means with respect to each applicable Guarantor Debtor, the Unsecured Claims or Deficiency Claims of Second Lien Noteholders arising from, or related to SAI's and PHI's guarantee of PWI obligations under the Second Lien Notes Indenture.

1.133.  <u>Second Lien Note Guarantee Secured Claim</u> means with respect to each applicable Guarantor Debtor, the Second Lien Note Secured Claim against Guarantor Debtors arising from, or related to, SAI's and PHI's guarantee of PWI's obligations under the Second Lien Notes Indenture.

1.134.  <u>Second Lien Note Secured Claim</u> means that portion of the Second Lien Note Claim against a Debtor that is secured by the Second Lien Note Collateral granted by such Debtor, to the extent of the value thereof.

1.135.  <u>Second Lien Noteholders Committee</u> means the informal committee of certain Holders of Second Lien Notes who are parties to the Restructuring Support Agreement.

1.136.  <u>Second Lien Notes Indenture</u> means that certain indenture dated May 6, 2010, as may have been amended, supplemented or modified from time to time, pursuant to which PWI issued 12.5% Senior Second Lien Secured Notes due 2017 in the aggregate principal amount of $200 million, and all documents ancillary thereto.

1.137.  <u>Second Lien Notes Indenture Trustee</u> means U.S. Bank National Association, as trustee and collateral agent under the Second Lien Notes Indenture.

1.138.  <u>Second Lien Notes Indenture Trustee Fee Claim</u> means the claim of the Second Lien Notes Indenture Trustee for compensation and reimbursement of fees, expenses, and indemnity claims pursuant to the terms of the Second Lien Notes Indenture and/or documents ancillary thereto, whether prior to or after the Petition Date and whether prior to or after the Effective Date.

1.139.  <u>Second Lien Pledge Agreement</u> means that certain pledge agreement dated as of May 6, 2010 by and among PWI and certain subsidiaries thereof and U.S. Bank National Association, as collateral agent, as it may have been amended, supplemented or modified from time to time.

1.140.  <u>Secured Claim</u> means any Claim that is: (a) secured by a valid, perfected and enforceable lien on property in which the Estates have an interest and that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, to the extent of the value of the Claim Holder's interest in the Estate, interest in such property as of the Confirmation Date; or (b)

14

subject to setoff under section 553 of the Bankruptcy Code, or to the extent of the amount subject to setoff, each as determined pursuant to sections 506(a) and 1111(b) of the Bankruptcy Code.

1.141.  Securities Law Claim means any Claim against a Debtor, whether or not the subject of an existing lawsuit (a) arising from rescission of a purchase or sale of any shares, notes or any other securities of any Debtor or an affiliate of any Debtor, (b) for damages arising from the purchase or sale of any such security, (c) for violations of the securities laws, misrepresentations, or any similar Claims against a Debtor, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims against a Debtor, or (d) except as otherwise provided for in this Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim against a Debtor, including, without limitation (i) any prepetition indemnification, reimbursement or contribution obligations of the Debtors, pursuant to the Debtors' corporate charters, by-laws, agreements entered into any time prior to the Petition Date, or otherwise, and relating to Claims against a Debtor otherwise included in the foregoing clauses (a) through (c), and (ii) Claims against a Debtor based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the sale of equity securities, or otherwise subject to section 510(b) of the Bankruptcy Code.

1.142.  Settlement shall have the meaning set forth in Section 9.04(a) of this Plan.

1.143.  Subordinated Loan Claims means collectively, the PWI Subordinated Loan Claim and the SAI Subordinated Loan Claim.

1.144.  SunGard Settlement Agreement means that certain settlement agreement by and among the Debtors and SunGard Financial Systems LLC, which, among other things, fully and finally allows for all purposes, the Amended SunGard Claim.

1.145.  Third-Party Cause of Action means any actions, causes of action, or suits, owned by any Holder of a Claim, whether assertable directly, indirectly, or in any representative or other capacity, occurring prior to the Effective Date, arising in law, equity, or otherwise, other than against the Debtor or released under Section 14.06(b) against a Released Party, (a) for damages arising from the purchase or sale of any security of the Debtor or the Debtor's affiliates or (b) for violations of the securities laws, misrepresentations, or any similar actions or liabilities arising from the purchase or sale of any such security.

1.146.  Third-Party Cause of Action Transferor shall have the meaning set forth in Section 9.02(k) of this Plan.

1.147.  Units shall have the meaning set forth in Section 9.02(a) of this Plan.

1.148.  Unsecured Claim means a Claim that is not an Other Secured Claim, Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Second Lien Note Secured Claim, or Second Lien Note Guarantee Secured Claim, provided that Unsecured Claims shall include, without limitation, any Deficiency Claims.

1.149.  U.S. Trustee Fees means fees arising under 28 U.S.C. § 1930(a)(6) or accrued interest thereon arising under 31 U.S.C. § 3717.

1.150.  Voting Deadline means the date specified in the Disclosure Statement, the Disclosure Statement Order, the ballots, or related solicitation documents approved by the Bankruptcy Court as the last date, as such date has been, and may be further, extended for Holders of impaired Claims entitled to vote to submit their ballots with respect to this Plan.

1.151.  Wind-Down Expenses means:  (a) any costs and expenses of winding down the Estates and/or the Debtors after the Effective Date and until the entry of a final decree closing the Chapter 11 Cases, including, without limitation, any compensation paid to the Chief Officer, professionals and consultants retained by the Chief Officer, and payment of statutory fees and taxes required to be paid in connection with dissolving each of the former Debtors; (b) any costs and expenses of PTL and the Liquidation Trust, including, without limitation, any compensation paid to the Chief Officer and the Liquidation Trustee, professionals and consultants retained by PTL and the Liquidation Trust, and any fees and expenses associated with maintaining the PTL Assets and the Liquidation Trust Assets, making Distributions in accordance with this Plan, and otherwise administering PTL and the Liquidation Trust; (c) the reasonable fees and expenses (including reasonable attorneys' fees and costs) that are incurred by PTL; and (d) fees and expenses of professional Persons incurred by PTL in connection with the implementation and consummation of this Plan, and incurred by PTL and any official committee of creditors in preparing, prosecuting or objecting to final fee applications, as provided in Section 17.07 of the Plan.

B.      Interpretation; Application of Definitions and Rules of Construction.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.  Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  Except for the rule contained in section 102(5) of the Bankruptcy Code, which shall not apply, the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.  To the extent there is any inconsistency between any of the provisions of this Plan and any of the provisions contained in the Plan Documents to be entered into as of the Effective Date, the Plan Documents shall control.

C.      Appendices and Plan Documents.  All Plan Documents and appendices to the Plan are incorporated into this Plan by reference and are a part of this Plan as if set forth in full herein.  The documents contained in the exhibits and the Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Equity Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or at http://www.kccllc.net/penson, or obtain a

16

copy of the Plan Documents by sending a written request to the following address: Kurtzman Carson Consultants, 2335 Alaska Avenue, El Segundo, CA 90245.

## ARTICLE II

## TREATMENT OF ADMINISTRATIVE
## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.01.    Administrative Expense Claims.  Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

2.02.    Time for Filing Administrative Expense Claims.  The Holder of an Administrative Expense Claim accruing on or after January 11, 2013, other than: (a) a Fee Claim; (b) an Administrative Expense Claim that has been Allowed on or before the Effective Date; and (c) a claim for U.S. Trustee Fees, must submit to the Claims and Voting Agent and serve on PTL and its counsel and the Liquidation Trustee and counsel to the Liquidation Trust, a request for such Administrative Expense Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the date that is forty (40) days after service of notice of occurrence of the Effective Date.  Such request must include at a minimum: (i) the name of the Debtor(s) that are purported to be liable for the Administrative Expense Claim; (ii) the name of the Holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim.  For the avoidance of doubt, this Section 2.02 of the Plan shall not be applicable to any claims arising under section 503(b)(9) of the Bankruptcy Code, or Indenture Trustee Fee Claims or any Restructuring Support Agreement Professional Fees, which Fee Claims shall be paid pursuant to Sections 10.07 and 17.02 of the Plan, respectively. **FAILURE TO FILE AND SERVE SUCH NOTICE OR REQUEST TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND EXTINGUISHED.**

2.03.    Professional Compensation and Reimbursement Claims.

All requests for allowance of Fee Claims on a final basis must be filed with the Bankruptcy Court and served on PTL and its counsel, and the U.S. Trustee, no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court.  For the avoidance of doubt, this Section 2.03 of the Plan shall not be applicable to any Indenture Trustee Fee Claim or any Restructuring Support Agreement Professional Fees, which Fee Claims shall be paid pursuant to Sections 10.07 and 17.02 of the Plan, respectively.  FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND EXTINGUISHED.

17

Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Bankruptcy Court.

Upon final allowance by the Bankruptcy Court of any Fee Claim, PTL shall pay from the PTL Assets the amount of all Allowed but unpaid Professional Fees promptly and directly to the applicable Professional.

2.04.   Priority Tax Claims.  Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the sole option of PTL, either (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount (plus post-petition interest due thereon, to the extent legally entitled thereto) of such Priority Tax Claim. Any Claim or demand for fines or penalties related to a Priority Tax Claim shall be disallowed and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect any such fine or penalty from PTL, the Chief Officer or the Liquidation Trustee.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

All Claims and Equity Interests, other than Administrative Expense Claims, Fee Claims, and Priority Tax Claims, are classified in the Classes set forth below for all purposes, including voting, confirmation, and distributions pursuant to the Plan, as follows:

### Identification of Classes Against PWI (Debtor 1)

| Class[3] | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1A | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2A | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3A | General Unsecured Claims | Impaired | Yes |
| Class 4A | Second Lien Note Claims | Impaired | Yes |
| Class 5A | Convertible Note Claims | Impaired | Yes |

---

[3] The following chart assigns letter "A" to each Class of Claims and Interests against PWI for purposes of identifying each separate Class of Claims and Interests against PWI.

| Class 6A | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 7A | Securities Law Claims | Impaired | No (deemed to reject) |
| Class 8A | Equity Interests | Impaired | No (deemed to reject) |

### Identification of Classes Against PFSI (Debtor 2)

| Class[4] | Designation | Impairment | Entitled to Vote |
| --- | --- | --- | --- |
| Class 1B | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2B | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3B | General Unsecured Claims | Impaired | Yes |
| Class 4B | Subordinated Loan Claims | Impaired | Yes |
| Class 5B | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 6B | Equity Interests | Impaired | No (deemed to reject) |

### Identification of Classes Against Guarantor Debtors SAI and PHI (Debtors 3 and 4)

| Class[5] | Designation | Impairment | Entitled to Vote |
| --- | --- | --- | --- |
| Class 1C | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2C | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3C | General Unsecured Claims | Impaired | Yes |
| Class 4C | Second Lien Note Guarantee Claims | Impaired | Yes |
| Class 5C | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 6C | Equity Interests | Impaired | No (deemed to reject) |

---

[4] The following chart assigns letter "B" to each Class of Claims and Interests against PFSI for purposes of identifying each separate Class of Claims and Interests against PFSI.

[5] The following chart assigns letter "C" to each Class of Claims and Interests against Guarantor Debtors SAI and PHI for purposes of identifying each separate Class of Claims and Interests against SAI and PHI.

19

**Identification of Classes Against Nexa (Debtor 5)**

| Class[6] | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1D | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2D | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3D | General Unsecured Claims | Impaired | Yes |
| Class 4D | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 5D | Equity Interests | Impaired | No (deemed to reject) |

**Identification of Classes Against Remaining Filed Subsidiary Debtors (Debtors 6 through 10)**

| Class[7] | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1E | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2E | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3E | General Unsecured Claims | Impaired | Yes |
| Class 4E | Intercompany Claims | Impaired | No (deemed to reject) |
| Class 5E | Equity Interests | Impaired | No (deemed to reject) |

The Claims and Equity Interests against the Debtors shall be classified as specified above (other than Administrative Claims, Fee Claims and Priority Tax Claims). Consistent with § 1122 of the Bankruptcy Code, a Claim or Equity Interest is classified by the Plan in a particular Class

---

[6] The following chart assigns letter "D" to each Class of Claims and Interests against Nexa for purposes of identifying each separate Class of Claims and Interests against Nexa.

[7] The following chart assigns letter "E" to each Class of Claims and Interests against the remaining Filed Subsidiary Debtors for purposes of identifying each separate Class of Claims and Interests against the remaining Filed Subsidiary Debtors. The remaining Filed Subsidiary Debtors are Penson Execution Services, Inc., Penson Financial Futures, Inc., GHP1, Inc., GHP2, LLC, and Penson Futures.

20

only to the extent the Claim or Equity Interest is within the description of the Class, and a Claim or Equity Interest is classified in a different Class to the extent it is within the description of that different Class. This Plan does not effect a substantive consolidation of the Debtors.

The treatment in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each entity holding an Allowed Claim or an Allowed Equity Interest may have in or against PTL or the PTL Assets or the Liquidation Trust or the Liquidation Trust Assets, as applicable, contributed by the applicable Debtor. This treatment supersedes and replaces any agreements or rights those entities have in or against the applicable Debtor or its property. To the extent that asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Claims or Equity Interests that is not entitled to retain anything under the Plan prior to the Class D Expiration Date, the Liquidation Trustee shall give effect to the priority scheme under the Bankruptcy Code and file a motion on notice to interested Holders of Claims or Equity Interests to effectuate such Distributions. All Distributions under the Plan will be tendered to the Person holding the Allowed Claim or Allowed Equity Interest in accordance with the terms of this Plan. EXCEPT AS SPECIFICALLY SET FORTH IN THIS PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF (I) ANY CLAIM THAT IS NOT AN ALLOWED CLAIM; (II) SECURITIES LAW CLAIMS; AND (III) EQUITY INTERESTS, EXCEPT AS SET FORTH IN THIS PLAN.

ALLOWED CLAIMS AGAINST ANY ONE DEBTOR WILL BE SATISFIED SOLELY FROM THE ASSETS OF SUCH DEBTOR AND THAT DEBTOR'S ESTATE AND PAID BY SUCH DEBTOR AND ITS ESTATE, PTL OR THE LIQUIDATION TRUST, AS APPLICABLE. NOTHING IN THE PLAN OR THE DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ANY ONE OF

21

THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST ANY OTHER

DEBTOR.  A CLAIM AGAINST MULTIPLE DEBTORS CO-LIABLE ON SUCH CLAIM,

TO THE EXTENT ALLOWED IN EACH DEBTOR'S CASE, WILL BE TREATED AS A

SEPARATE CLAIM AGAINST EACH DEBTOR'S ESTATE FOR ALL PURPOSES

(INCLUDING, BUT NOT LIMITED TO, VOTING AND DISTRIBUTION).  NO HOLDER OF

A CLAIM AGAINST MULTIPLE DEBTORS CO-LIABLE ON SUCH CLAIM SHALL

RECEIVE MORE THAN 100% OF THE ALLOWED AMOUNT OF SUCH CLAIM, EXCEPT

AS OTHERWISE PROVIDED IN THIS PLAN.

### ARTICLE IV

### CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN PWI (DEBTOR 1)

4.01.    CLASS 1A - NON-TAX PRIORITY CLAIMS.

(a)    Impairment and Voting.  Class 1A is unimpaired by the Plan.  Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Allowed Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

4.02.    CLASS 2A - OTHER SECURED CLAIMS.

(a)    Impairment and Voting.  Class 2A is unimpaired by the Plan.  Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the

Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

4.03.   CLASS 3A - GENERAL UNSECURED CLAIMS.

(a)   Impairment and Voting.  Class 3A is impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)   Treatment.  Subject to the terms of this Plan and the PTL LLC Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Class B Units, in full and final satisfaction, settlement, release, and compromise of and in exchange for its Allowed General Unsecured Claim against the PWI Estate, payable from the Net Distributable Assets of the PWI Estate. Distributions under Section 4.03(b), 4.04(b)(ii) and 4.05(b) shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Deficiency Claims, and Allowed Convertible Note Claims.

4.04.   CLASS 4A – SECOND LIEN NOTE CLAIMS.

(a)   Impairment and Voting.  Class 4A is impaired by the Plan. Each Holder of a Second Lien Note Claim is entitled to vote to accept or reject the Plan.

(b)   Treatment.  On or as soon as practicable after the applicable Distribution Date, subject to the terms of this Plan and the PTL LLC Agreement, each Holder of an Allowed Second Lien Note Claim against PWI shall receive its Pro Rata share of Class A Units, in full and final satisfaction, settlement, release and compromise of and in exchange for, (i) its Allowed Second Lien Note Secured Claim against the PWI Estate, to the extent of the value of the security granted by PWI, and (ii) its Allowed Second Lien Note Deficiency Claim, payable from the Net Distributable Assets of the PWI Estate. Distributions under Section 4.03(b), 4.04(b)(ii) and 4.05(b) shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Deficiency Claims, and Allowed Convertible Note Claims.

4.05.   CLASS 5A – CONVERTIBLE NOTE CLAIMS.

(a)   Impairment and Voting.  Class 5A is impaired by the Plan. Each Holder of a Convertible Note Claim is entitled to vote to accept or reject the Plan.

(b)   Treatment.  On or as soon as practicable after the applicable Distribution Date, subject to the terms of this Plan and the PTL LLC Agreement, each Holder of an Allowed Convertible Note Claim against PWI shall receive its Pro Rata share of Class B Units, in full and final satisfaction, settlement, release and compromise of and in exchange for its Allowed Convertible Note Claim against the PWI Estate, payable from the Net Distributable Assets of the PWI Estate. Distributions under Section 4.03(b), 4.04(b)(ii) and 4.05(b) shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Deficiency Claims, and Allowed Convertible Note Claims.

23

4.06.   CLASS 6A – INTERCOMPANY CLAIMS.

(a)   Impairment and Voting.  Class 6A is impaired by the Plan.  Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

(b)   Treatment.  On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

4.07.   CLASS 7A – SECURITIES LAW CLAIMS.

(a)   Impairment and Voting.  Class 7A is impaired by the Plan.  Each Holder of a Securities Law Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions.  Each holder of an Allowed Securities Law Claim as of the Distribution Record Date shall not receive any distributions on account of such Allowed Securities Law Claims, provided, however, that, to the extent that asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Securities Law Claims, then after the payment in full of all Allowed Claims of the Holders of the Class A Units and the Class B Units (plus, where applicable, post-petition interest due thereon until payment in full), PTL will distribute amounts then available to the Liquidation Trust as the Holder of the Class D Units for the benefit of the Holders of Securities Law Claims against the PWI Estate, payable from the Net Distributable Assets of the PWI Estate.  Notwithstanding the foregoing proviso, if distributions on account of the Class D Units do not commence prior to the Class D Expiration Date, the Class D Units shall be cancelled and the Net Distributable Assets of the PWI Estate shall continue to be distributed to the Holders of Class A Units and Class B Units in proportion to the Allowed Unsecured Claims of such Holders after payment of any applicable secured claims.  Distributions to holders of Securities Law Claims on account of such Holders' Class D Units shall be in accordance with the priorities of the Bankruptcy Code.

4.08.   CLASS 8A - EQUITY INTERESTS.

(a)   Impairment and Voting.  Class 8A is impaired by the Plan.  Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions.  The holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, to the extent that asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests, then after the payment in full of all Allowed Claims of the Holders of the Class A Units and the Class B Units (plus, where applicable, post-petition interest due thereon until payment in full, PTL will distribute amounts then available to the Liquidation Trust as the holder of the Class D Units for the benefit of the Holders of Equity Interests against the PWI Estate, payable from the Net Distributable Assets of the PWI Estate.  Notwithstanding the foregoing proviso, if distributions on account of the Class D Units do not commence prior to

24

the Class D Expiration Date, the Class D Units shall be cancelled and the Net Distributable Assets of the PWI Estate shall continue to be distributed to the Holders of Class A Units and Class B Units in proportion to the Allowed Unsecured Claims of such holders after payment of any applicable secured claims.  On the Effective Date, all Equity Interests in PWI shall be deemed cancelled.  Distributions to Holders of Equity Interests on account of such Holders' Class D Units shall be in accordance with the priorities of the Bankruptcy Code.

## ARTICLE V

## CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN PFSI (DEBTOR 2)

### 5.01.    CLASS 1B - NON-TAX PRIORITY CLAIMS.

(a)    Impairment and Voting.  Class 1B is unimpaired by the Plan.  Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

### 5.02.    CLASS 2B - OTHER SECURED CLAIMS.

(a)    Impairment and Voting.  Class 2B is unimpaired by the Plan.  Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

### 5.03.    CLASS 3B - GENERAL UNSECURED CLAIMS.

(a)  <u>Impairment and Voting</u>. Class 3B is impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)  <u>Treatment</u>. Subject to the terms of this Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust, plus, to the extent solvent (excluding the Subordinated Note Claims and Intercompany Claims), post-Effective Date interest on the amounts outstanding on such Allowed General Unsecured Claims as of six months after the Effective Date at a rate equal to 5% per annum, such interest to begin accruing six months after the Effective Date, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim against the PFSI Estate. Distributions shall be payable from the Net Distributable Assets of the PFSI Estate.

5.04.  <u>CLASS 4B – SUBORDINATED LOAN CLAIMS</u>.

(a)  <u>Impairment and Voting</u>. Class 4B is impaired by the Plan. Each Holder of an Allowed Subordinated Loan Claim is entitled to vote to accept or reject the Plan.

(b)  <u>Treatment</u>. Subject to the terms of this Plan and the PTL LLC Agreement, and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Subordinated Loan Claim, each Holder of an Allowed Subordinated Loan Claim shall receive, after payment in full of all Allowed General Unsecured Claims against the PFSI Estate (including post-Effective Date interest), its Pro Rata share of the Net Distributable Assets of the PFSI Estate. Such Distributions will constitute property of the PWI Estate and the SAI Estate, as applicable, and will be distributed in accordance with Article IV and Article VI of this Plan, respectively, and the PTL LLC Agreement.

5.05.  <u>CLASS 5B – INTERCOMPANY CLAIMS</u>.

(a)  <u>Impairment and Voting</u>. Class 5B is impaired by the Plan. Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

(b)  <u>Treatment</u>. On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

5.06.  <u>CLASS 6B - EQUITY INTERESTS</u>.

(a)  <u>Impairment and Voting</u>. Class 6B is impaired by the Plan. Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>. The Holders of Equity Interests shall not receive any distributions on account of such interests, <u>provided</u>, <u>however</u>, that, to the extent that, after payment in full of all Allowed General Unsecured Claims and Allowed Subordinated Loan Claims against the PFSI Estate, asset recoveries exceed expectations in an amount that would

26

permit a Distribution to a Class of Equity Interests in PFSI, such Distributions will be paid to the SAI Estate (on account of its Equity Interests in PFSI), and will otherwise constitute property of the SAI Estate, and will be distributed in accordance with Article VI of this Plan.

## ARTICLE VI

## CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN GUARANTOR DEBTORS - SAI AND PHI (DEBTORS 3 AND 4)[8]

### 6.01.    CLASS 1C - NON-TAX PRIORITY CLAIMS.

(a)    Impairment and Voting. Class 1C is unimpaired by the Plan. Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment. Except to the extent that a Holder of an Allowed Non-Tax Priority Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Allowed Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, or as soon thereafter as is practicable.

### 6.02.    CLASS 2C - OTHER SECURED CLAIMS.

(a)    Impairment and Voting. Class 2C is unimpaired by the Plan. Each Holder of an Other Secured Claim, including a Promissory Note Claim, is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment. Except to the extent that a Holder of an Allowed Other Secured Claim, including a Holder of an Allowed Promissory Note Claim, agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim and Allowed Promissory Note Claim, each Holder of an Allowed Other Secured Claim and Allowed Promissory Note Claim, shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Claim; (ii) the collateral securing any such Allowed Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, provided, that in full satisfaction of the Promissory Note Claim, 40% of all proceeds from the Illiquid Instruments, up to $3,500,000, shall be distributed to the PFSI Estate and no further distributions on account of the Promissory Note Claim will be made.

---

[8] The inclusion of SAI and PHI in the same class is for convenience purposes only. Notwithstanding the inclusion of SAI and PHI in the same class, nothing herein shall be deemed to substantively consolidate these Debtors. All votes shall be tabulated on a Debtor by Debtor basis and all claims shall be paid only from the assets of the applicable Debtor that is obligated on account of such Allowed Claim.

6.03.    CLASS 3C - GENERAL UNSECURED CLAIMS.

(a)    Impairment and Voting.  Class 3C is impaired by the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  Subject to the terms of this Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim against the SAI and PHI Estates.  PTL shall make Pro Rata Distributions to the Liquidation Trust as the Holder of the Class C Units from the Net Distributable Assets of the SAI and PHI Estates, as applicable.  Distributions under Section 6.03(b) and 6.04(b)(ii) shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims and Allowed Second Lien Note Guarantee Deficiency Claims.

6.04.    CLASS 4C – SECOND LIEN NOTE GUARANTEE CLAIMS.

(a)    Impairment and Voting.  Class 4C is impaired by the Plan.  Each Holder of a Second Lien Note Guarantee Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  On or as soon as practicable after the applicable Distribution Date, subject to the terms of this Plan and the PTL LLC Agreement, each Holder of an Allowed Second Lien Note Guarantee Claim against SAI and PHI shall receive its Pro Rata share of Class A Units, in full and final satisfaction, settlement, release and compromise of and in exchange for, (i) its Allowed Second Lien Note Guarantee Secured Claim against the SAI and PHI Estates, to the extent of the value of the security granted by SAI and PHI, and (ii) its Allowed Second Lien Note Guarantee Deficiency Claim against the SAI and PHI Estates, payable from the Net Distributable Assets of the SAI and PHI Estates, as applicable.  Distributions under Sections 6.03(b) and 6.04(b)(ii) shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims and Allowed Second Lien Note Guarantee Deficiency Claims.

6.05.    CLASS 5C – INTERCOMPANY CLAIMS.

(a)    Impairment and Voting.  Class 5C is impaired by the Plan.  Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

(b)    Treatment.  On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

6.06.    CLASS 6C - EQUITY INTERESTS.

(a)    Impairment and Voting.  Class 6C is impaired by the Plan.  Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

28

(b)    Distributions.  The Holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, to the extent that, after payment in full of all Allowed General Unsecured Claims and Allowed Second Lien Note Guarantee Claims against the SAI and PHI Estates, asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests in SAI and PHI, such Distributions will be paid to the PWI Estate (on account of its Equity Interests in SAI) and the SAI Estate (on account of its Equity Interests in PHI), will constitute property of the PWI Estate and SAI Estate, as applicable, and will be distributed in accordance with Article IV and Article VI of this Plan, respectively.

## ARTICLE VII

## CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN NEXA (DEBTOR 5)

### 7.01.    CLASS 1D - NON-TAX PRIORITY CLAIMS.

(a)    Impairment and Voting.  Class 1D is unimpaired by the Plan.  Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

### 7.02.    CLASS 2D - OTHER SECURED CLAIMS.

(a)    Impairment and Voting.  Class 2D is unimpaired by the Plan.  Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

29

7.03.   CLASS 3D - GENERAL UNSECURED CLAIMS.

(a)    Impairment and Voting.  Class 3D is impaired by the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  Subject to the terms of this Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim against the Nexa Estate.  Distributions shall be payable from the Net Distributable Assets of the Nexa Estate within thirty (30) days of the Effective Date or as reasonably practicable thereafter.

7.04.   CLASS 4D – INTERCOMPANY CLAIMS.

(a)    Impairment and Voting.  Class 4D is impaired by the Plan.  Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

(b)    Treatment.  On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

7.05.   CLASS 5D - EQUITY INTERESTS.

(a)    Impairment and Voting.  Class 5D is impaired by the Plan.  Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  The Holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, after payment in full of all Allowed General Unsecured Claims against the Nexa Estate, asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests in Nexa, such Distributions will be paid to the SAI Estate (on account of its Equity Interests in Nexa), will constitute property of the SAI Estate, and will be distributed in accordance with Article VI of this Plan.

30

## ARTICLE VIII

## CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN REMAINING FILED SUBSIDIARY DEBTORS (DEBTORS 6 THROUGH 10)[9]

8.01.    CLASS 1E - NON-TAX PRIORITY CLAIMS.

(a)    Impairment and Voting.  Class 1E is unimpaired by the Plan.  Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

8.02.    CLASS 2E - OTHER SECURED CLAIMS.

(a)    Impairment and Voting.  Class 2E is unimpaired by the Plan.  Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of this Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

8.03.    CLASS 3E - GENERAL UNSECURED CLAIMS.

---

[9] Remaining Filed Subsidiary Debtors are Penson Execution Services, Inc., Penson Financial Futures, Inc., GHP1, Inc., GHP2, LLC, and Penson Futures.  The inclusion of the remaining Filed Subsidiary Debtors in the same class is for convenience purposes only.  Notwithstanding the inclusion of the remaining Filed Subsidiary Debtors in the same class, nothing herein shall be deemed to substantively consolidate these Debtors.  All votes shall be tabulated on a Debtor by Debtor basis and all claims shall be paid only from the assets of the applicable Debtor that is obligated on account of such Allowed Claim.

31

(a)  Impairment and Voting. Class 3E is impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)  Treatment. Subject to the terms of this Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim. Distributions shall be payable from the Net Distributable Assets of the Estate against which the Holder's claim is Allowed.

8.04.  CLASS 4E – INTERCOMPANY CLAIMS.

(a)  Impairment and Voting. Class 4E is impaired by the Plan. Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

(b)  Treatment. On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

8.05.  CLASS 5E - EQUITY INTERESTS.

(a)  Impairment and Voting. Class 5E is impaired by the Plan. Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions. The Holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, after payment in full of all Allowed General Unsecured Claims against Estates of the Filed Subsidiary Debtors, asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests in the remaining Filed Subsidiary Debtors, such Distributions will be paid to SAI Estate, as the parent of the remaining Filed Subsidiary Debtors, will constitute property of the SAI Estate, and will be distributed in accordance with Article VI of this Plan.

**ARTICLE IX**

**IMPLEMENTATION OF THE PLAN**

9.01.  No Substantive Consolidation of the Debtors.

Notwithstanding anything to the contrary set forth herein, although the Plan is presented as a joint plan of liquidation, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and that Debtor's Estate, even after such Debtor's assets are transferred to PTL. Except as specifically set forth herein, nothing in the Plan, the Plan Documents or the Disclosure Statement shall constitute or

32

be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate and the secured portion of such Claim will be determined based on the value of the assets pledged by that Debtor, for all purposes including, but not limited to, voting and distributions made by PTL or the Liquidation Trust; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim except upon the Class D Expiration Date if there are sufficient Distributions to provide for such recovery.

9.02.   Limited Liability Company and Liquidation Trust.

(a)   Formation of Limited Liability Company. On or before the Effective Date, PTL will be formed as a Delaware limited liability company and all assets of the Debtors will be conveyed and transferred to PTL. In connection with the vesting and transfer of the PTL Assets, including the Causes of Action, any attorney-client privilege, work-product protection, common interest privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to PTL shall vest in PTL. The Debtors and the Chief Officer are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. The Limited Liability Company Agreement of PTL (the "PTL LLC Agreement") will provide for the creation of four classes of membership interests: (i) Class A Units, (ii) Class B Units, (iii) Class C Units, and (iv) Class D Units (collectively "Units"). The PTL LLC Agreement shall be in form and substance reasonably acceptable to the Required Consenting Second Lien Noteholders, the Required Consenting Convertible Noteholders and the Committee. PTL will be managed by a board of managers (the "Board of Managers") selected by the Holders of Class A Units, Class B Units and the Committee in accordance with the terms of the PTL LLC Agreement. The initial Board of Managers will consist of one member appointed by the Committee, one member appointed by the Convertible Noteholders Committee, and two members appointed by the Second Lien Noteholders Committee. Class A Units will be distributed to the Second Lien Notes Indenture Trustee, or if the Second Lien Notes Indenture Trustee consents to the direct distribution to Holders through the facilities of the DTC, to each Holder of an Allowed Second Lien Note Claim, in exchange for their Second Lien Note Claims; provided, that without constituting a waiver of its Charging Lien, the Second Lien Notes Indenture Trustee Fee Claim shall be paid in accordance with Section 10.07 of the Plan. Class B Units will be distributed to and held by (A) the Holders of Convertible Notes in exchange for their Convertible Note Claims; and (B) the Holders of General Unsecured Claims against PWI in exchange for such General Unsecured Claims. Class C Units will be distributed to and held by the Liquidation Trust for the benefit of Holders of General Unsecured Claims of any Debtor other than PWI in exchange for such General Unsecured Claims. Class D Units will be distributed to and held by the Liquidation Trust for the benefit of (i) the Holders of Equity Interests in PWI, in exchange for such Equity Interests, and (ii) the Holders of Securities Law Claims, in exchange for such Claims. All rights of the Holders of Class D Units and the Class D Units themselves shall expire on the Class D Expiration Date and no distributions shall be made by PTL on account of such Units after that date.

(b)   Management of PTL.

33

(i)     PTL will be managed by the Chief Officer and a Board of Managers consisting of four managers, two of whom, after the initial appointment, shall be elected by the Holders of Class A Units, one of whom shall be elected by the Holders of Class B Units, and a fourth member shall be elected by the Committee, in accordance with the terms of the PTL LLC Agreement. After payment in full of all amounts payable to the Holders of the Class A Units and Class B Units in connection with such Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full), the Board of Managers of PTL will be appointed by the Liquidation Trust in accordance with the PTL LLC Agreement; provided, however, that the Liquidation Trust shall have no rights to appoint the Board of Managers if such power does not vest prior the Class D Expiration Date. With the exception of amounts distributable to the Holders of Class C Units, which amounts shall be distributed as soon as reasonably practicable after receipt by PTL, the Chief Officer shall have the discretion to determine the timing and amount of any Distributions to the various Holders of Units and to determine the amount of any reserves or other amounts to be retained to fund operating and other expenses of PTL; provided, however, that the Chief Officer shall make Distributions at the timing and in the amount as directed by majority vote of the Board of Managers, as provided in the PTL LLC Agreement. PTL will have authority to retain, on behalf of PTL, any counsel, financial advisors, claims agents, auditors, or other such professionals as PTL deems appropriate at all times. PTL may select any of the foregoing professionals in PTL's sole discretion, and prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtors and the Debtors' estates shall not preclude PTL's retention of such professionals. The relative duties and responsibilities of the Board of Managers and the Chief Officer shall be set forth in the PTL LLC Agreement.

(ii)    After the Effective Date, all property of PTL shall be managed and administered by PTL in a manner reasonably designed to maximize values. PTL is authorized to prosecute the Assigned Causes of Action for the benefit of any Holders of Allowed Claims who shall be entitled to receive a Distribution hereunder. If PTL, in the discretion of the Chief Officer, decides not to sell any non-Cash property or if such property cannot, in the judgment of the Chief Officer, be sold or liquidated in a commercially reasonable manner prior to the Final Distribution Date, PTL shall have the right to abandon or otherwise dispose of such property with the prior approval of the Bankruptcy Court. Absent willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against PTL, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, or the Debtors, or their respective directors, officers, employees, consultants, trustees or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 9.02(b)(ii).

(c)     Distributions With Respect to PTL Units. The PTL LLC Agreement will provide that:

(i)     Subject to the allocation of those amounts payable in connection with (A) the Class B Units and (B) the Class C Units, the Holders of Class A Units will be entitled to receive from PTL, out of amounts available for Distributions, their Pro Rata share from the liquidation of applicable PTL Assets in an amount not to exceed the Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full);

34

provided, however, that upon the occurrence of the Class D Expiration Date, Holders of the Class A Units shall be entitled to additional distributions as provided herein;

(ii)   Subject to the allocation of those amounts payable in connection with (A) the Class A Units and (B) the Class C Units, the Holders of Class B Units will be entitled to receive from PTL, out of amounts available for Distributions, their Pro Rata share from the liquidation of applicable PTL Assets in an amount not to exceed the Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full); provided, however, that upon the occurrence of the Class D Expiration Date, Holders of the Class B Units shall be entitled to additional distributions as provided herein;

(iii)   Subject to the allocation of those amounts payable in connection with (A) the Class A Units and (B) the Class B Units, the Holders of the Class C Units will be entitled to receive from PTL, out of amounts available for Distributions and payable to the Liquidation Trust on each Holders' behalf, their Pro Rata share from the liquidation of applicable PTL Assets in an amount not to exceed the Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full); and

(iv)   The Holders of Class D Units will be entitled to receive any amounts received by PTL from the liquidation of PTL Assets after the payment in full of all Allowed Claims of the Holders of the Class A Units and the Class B Units; provided, however, that after the Class D Expiration Date, any amounts received by PTL from the liquidation of the PTL Assets shall be distributed to the Holders of Class A Units and Class B Units in proportion to the Allowed Unsecured Claims of the Holders of Class A Units and the Holders of Class B Units after payment of any applicable secured claims.

(d)   Creation of the Liquidation Trust.   On or before the Effective Date, the Liquidation Trust shall be formed pursuant to the Liquidation Trust Agreement and the filing of a certificate of trust with the Delaware Secretary of State. The Liquidation Trustee will have authority to retain, on behalf of the Liquidation Trust, any counsel, financial advisors, claims agent, auditors, or other such professionals as it deems appropriate at all times. The Liquidation Trust may select any of the foregoing professionals in the Liquidation Trustee's sole discretion, and prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtors and the Debtors' estates shall not preclude the Liquidation Trust's retention of such professionals. The Liquidation Trust Beneficiaries' interests in the Liquidation Trust shall be uncertificated and, subject to applicable law, shall only be transferrable upon the death of the applicable Liquidation Trust Beneficiary or pursuant to applicable law.

(e)   Purpose of the Liquidation Trust.   On the Effective Date, (i) the Claims of Holders of General Unsecured Claims against the Debtors other than PWI shall be deemed to be transferred to the Liquidation Trust and the Liquidation Trust shall, in turn, exchange such Claims for the Class C Units in PTL; and (ii) all Securities Claims and Claims with respect to Equity Interests in PWI shall be deemed to be transferred to the Liquidation Trust and the Liquidation Trust shall, in turn, exchange such Claims for the Class D Units in PTL.  The Liquidation Trust shall be established as a liquidation trust for the primary purpose of monetizing and distributing the Liquidation Trust Assets to the Liquidation Trust Beneficiaries. Under the terms of the Liquidation Trust, the Liquidation Trustee will establish two sub-trusts:

35

(i) a sub-trust to hold the Class C Units of PTL (the "Creditor Sub-Trust") and (ii) a sub-trust to hold the Class D Units of PTL (the "Equity Interest Sub-Trust"). Amounts held in the Creditor Sub-Trust will be distributed in accordance with the Liquidation Trust Agreement to Liquidation Trust Beneficiaries who formerly held unsecured claims against Debtors other than PWI. The Liquidation Trust shall not distribute any Class C Units thereunder but will only distribute the applicable Distributions received on account of such Class C Units to the applicable Holders of the beneficial interest in the Creditor Sub-Trust. Amounts held in the Equity Interest Sub-Trust, if any, shall be distributed in accordance with the Liquidation Trust Agreement, with payments first made Pro Rata to the Holders of Securities Claims, until Paid in Full, and thereafter Pro Rata to the former Holders of Equity Interests in PWI. The Liquidation Trust shall not distribute any Class D Units thereunder but will only distribute the applicable Distributions received on account of such Class D Units to the applicable Holders of the beneficial interest in the Equity Interest Sub-Trust.

      (f)   Transfer Taxes. Any transfer of the PTL Assets to PTL or the Liquidation Trust Assets to the Liquidation Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code.

      (g)   Federal Income Tax Treatment.

      (i)   PTL shall be taxable as a partnership for all federal and state income tax purposes and no member or manager of PTL shall be permitted to make any election inconsistent with such treatment.

      (ii)   The Liquidation Trust will be established for the sole purpose of distributing the Liquidation Trust Assets, and any proceeds therefrom, in accordance with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust is intended to qualify as a liquidation trust for U.S. federal income tax purposes. In general, a liquidation trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, i.e., pass-through entity. All parties must treat the transfer of the portion of the Liquidation Trust Assets attributable to the Liquidation Trust Beneficiaries as a transfer of such assets directly to the Liquidation Trust Beneficiaries. Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Subject to the terms of the Liquidation Trust Agreement, the Liquidation Trustee will determine the fair market value of the Liquidation Trust Assets as soon as possible after the Effective Date, and the Liquidation Trust Beneficiaries and the Liquidation Trustee must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis.

      (h)   Reserves. PTL shall establish a PTL Reserve on account of Claims against any Debtor that are Disputed. PTL may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the PTL Reserve as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the PTL Reserve, with respect to any given taxable year (but only for the portion of the taxable

year with respect to which such Claims are Disputed), and (iii) distribute assets from the PTL Reserve as, when, and to the extent, such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved. Unit Holders shall be bound by such election, if made by the Board of Managers of PTL, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

   (i) <u>Dissolution</u>.

    (i) PTL shall continue in existence until such time as PTL is dissolved in accordance with the terms of the PTL LLC Agreement.

    (ii) The Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date; <u>provided</u>, <u>however</u>, that the term of the Liquidation Trust may be extended if the Class D Unit Expiration Date does not occur on the fifth anniversary of the Effective Date.

   (j) <u>Securities Law Matters</u>. To the extent the interests in PTL or the Liquidation Trust are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

   (k) <u>Transferred Third-Party Securities Laws Cause of Action</u>. Any Holder of a Claim may elect to assign to PTL, by written instrument executed by such Holder, any Third-Party Cause of Action that such Holder may have (such Holder a "<u>Third-Party Cause of Action Transferor</u>"). A Third-Party Cause of Action Transferor executing such instrument shall be deemed to transfer any Third-Party Cause of Action such Holder may have to PTL as of the date of such transfer. PTL shall not be obligated to pursue any transferred Third-Party Cause of Action and, as assignee of such transferred Third-Party Causes of Action, all decisions with respect to such transferred Third-Party Causes of Action, including, without limitation, decisions with respect to the prosecution and settlement of such transferred Third Party Causes of Action, shall belong solely to PTL. For purposes of distributions, the proceeds of any transferred Third-Party Causes of Action shall be deemed general property of PWI's estate and any proceeds thereof shall be distributed in accordance with Article IV herein without regard to the identity or status of the Third-Party Cause of Action Transferor. For avoidance of doubt, after the transfer of a Third-Party Cause of Action, Transferor shall have no direct interest in such transferred Third-Party Cause of Action, and any right to distributions of proceeds from such transferred Third-Party Cause of Action by a Third-Party Cause of Action Transferor will be solely by virtue of the terms of this Plan and such Third-Party Cause of Action Transferor's status as a Unit holder in PTL.

  9.03. <u>Approval of Plan Documents</u>. The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder. Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions. On the Effective Date, the PTL shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in

connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

9.04    Settlement of Claims and Controversies.

(a)    Settlement Under the Plan: Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all released claims against the Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve such compromise and settlement, to release all of the released claims belonging to the Debtors' Estates and any other Person that is deemed to have given a release pursuant to Section 14.06 of this Plan against each and every and all Released Parties (the "Settlement"). Distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Settlement. Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Settlement and the Bankruptcy Court's finding that the Settlement is in the best interests of the Debtors, their respective Estates, PTL, the Liquidation Trust, and the Holders of Claims and interests, and is fair, equitable and reasonable.

(b)    Intercompany Claims Settlement Under the Plan. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Intercompany Claims, including, without limitation, the PWI Subordinated Loan Claim, the SAI Subordinated Loan Claim, and the Promissory Note Claim (the "Intercompany Claims Settlement"), and the Plan constitutes a request to authorize and approve the Intercompany Claims Settlement. Pursuant to the Intercompany Claims Settlement, in full satisfaction of the Promissory Note Claim 40% of all proceeds from the Illiquid Instruments, up to $3,500,000, shall be distributed to the PFSI Estate. No further distributions on account of the Promissory Note Claim will be made. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Intercompany Claims Settlement and the Bankruptcy Court's finding that the Intercompany Claims Settlement is in the best interests of the Debtors, their respective Estates, PTL, the Liquidation Trust and the Holders of Claims and interests, and is fair, equitable and reasonable.

## ARTICLE X

## CORPORATE GOVERNANCE AND ACTIONS

10.01.   Post-Effective Date Corporate Existence. On the later of the Effective Date and the transfer of all the Debtors' assets to PTL as provided in Section 9.02 of this Plan, except to the extent that the Debtors or the Chief Officer determine otherwise, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that each Debtor shall file with the Office of the Secretary of State for the state of its incorporation or formation a certificate of dissolution which may be executed by an officer of such Debtor or the Chief Officer on behalf of such Debtor without the need for approval by any board of directors, stockholders, members, or managers, as applicable. From and after the

38

Effective Date, the Debtors shall not be required to file any document, or take any other action, or obtain any approval from any Debtor's board of directors, stockholders, members, or managers to withdraw such Debtor's business operations from any states in which the Debtors previously conducted the Company's business operations.

10.02. <u>Corporate Action</u>. On or prior to the Effective Date, any Debtor and, after the Effective Date, PTL, may enter into or undertake any corporate transactions or other entity transactions (collectively, "<u>Corporate Transactions</u>") and may take such actions as may be determined by such Debtor or PTL to be necessary or appropriate to effect such corporate transactions. The actions to effect the corporate transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms herein and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms herein and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such Corporate Transactions. The Corporate Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Chief Officer to be necessary or appropriate to effect the purposes of such Corporate Transactions for the benefit of PTL. In each case in which the surviving, resulting or acquiring Person in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring Person will perform the obligations of the applicable Debtor pursuant to this Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Person, which may provide that another Debtor will perform such obligations. Implementation of the Corporate Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in this Plan. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or PTL may take such steps as the Debtors or PTL may deem necessary or appropriate to effectuate any Corporate Transactions that satisfy the requirements set forth in this Section 10.02. The Corporate Transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and Title 6 and 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order or process of any kind, except as otherwise set forth herein or in the Confirmation Order.

10.03. <u>Officers and Boards of Managers</u>. Effective as of the Effective Date, the Board of Managers of PTL shall be comprised of two members appointed by the Second Lien Noteholders Committee, one member appointed by the Convertible Noteholders Committee and one member appointed by the Committee. The Chief Officer may be removed by majority vote of the Board of Managers. The relative duties and responsibilities of the Board of Managers and the Chief Officer shall be set forth in the PTL LLC Agreement. Effective as of the Effective Date, members of the board of directors of each Debtor prior to the Effective Date, in their capacities

39

as such, shall have no continuing obligations to the Debtor(s) or PTL on or after the Effective Date.

10.04.  Payment of Wind-Down Expenses.  PTL Wind-Down Expenses shall be paid by the Chief Officer from the PTL Assets, as set forth in the PTL LLC Agreement, and Liquidation Trust Wind-Down Expenses shall be paid by the Liquidation Trustee from the Liquidation Trust Assets, as set forth in the Liquidation Trust Agreement.

10.05.  Cancellation of Existing Securities and Agreements.  On the Effective Date, any document, agreement or instrument evidencing any Claim (including, but not limited to, the Indentures and the Notes (except to the extent otherwise provided in this Plan)) or Equity Interests in PWI and Filed Subsidiary Debtors shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged.

10.06.  Second Lien Notes and Convertible Notes.  Notwithstanding anything herein to the contrary, the applicable provisions of the Indentures shall continue in effect solely for the purposes of permitting the Indenture Trustees to: (i) make the distributions to be made to Holders of Allowed Second Lien Note Claims and Allowed Convertible Note Claims, as contemplated by Article IV and Article VI of the Plan; and (ii) preserving the rights of the applicable Indenture Trustee under the applicable Indenture, including, without limitation: (a) such Indenture Trustee's rights to pursue claims or actions against non-Debtors, (b) such Indenture Trustee's Charging Lien, and (c) such Indenture Trustee's rights with respect to compensation, reimbursement of expenses (including attorney's fees), and indemnity under the applicable Indenture; provided, however, that, except as set forth in Section 10.07 of the Plan, such rights against the Debtors and Charging Liens are limited to the distributions, if any, to the Holders of the Allowed Second Lien Note Claims and Allowed Convertible Note Claims, as applicable. The Holders of or parties to such cancelled (or converted, as applicable) instruments, securities and other documentation will have no rights against the Debtors arising from or relating to such instruments, securities and other documentation or the cancellation (or conversion, as applicable) thereof, except the rights provided pursuant to the Plan.

10.07.  Rights of the Indenture Trustees.

(a)    In full satisfaction of any Allowed Indenture Trustee Fee Claims for fees and expenses incurred through the Effective Date, including to the extent such Allowed Indenture Trustee Fee Claims are secured by any Charging Liens under the Indentures, PTL will distribute to the Indenture Trustees on the Effective Date, or as soon thereafter as practicable, Cash equal to the amount of the Allowed Indenture Trustee Fee Claims; provided, however, that with respect to Claims to which the Debtors or PTL shall have objected as set forth in subsection 10.07(b) hereof, no distribution, solely in respect of the disputed portion of such Claim, shall be payable by the Debtors or PTL hereunder until such objection has been resolved. To the extent the Indenture Trustees incur fees or expenses after the Effective Date, the Indenture Trustees shall be compensated and reimbursed for such fees and expenses as Wind-Down Expenses, subject to the conditions set forth in subsection 10.07(b) hereof.

40

(b)    As a condition to receiving payment thereof from the Debtors or PTL, each Holder of an Indenture Trustee Fee Claim shall deliver to the Debtors (or, if after the Effective Date, the Chief Officer), written copies of invoices in respect of such claims, with narrative descriptions of the services rendered (including appropriate redactions to preserve privileged matters) and itemization of expenses incurred in such detail and with supporting documentation as is customary for an Indenture Trustee. An Indenture Trustee Fee Claim shall be deemed Allowed and shall be promptly paid, except to the extent the Debtors (or, if after the Effective Date, the Chief Officer) object within fifteen (15) business days after receipt of such invoices and supporting documentation based upon a "reasonableness" standard in accordance with the applicable Indenture. If the Debtors or the Chief Officer timely object to the request for payment of any Indenture Trustee Fee Claim, the undisputed amount of any Indenture Trustee Fee Claims with respect to which such objection(s) are pending shall be Allowed and paid by PTL on the Effective Date or as soon thereafter as reasonably practicable. PTL shall not be required to make any payments with respect to the disputed portion of an Indenture Trustee Fee Claim as to which the Debtors (or the Chief Officer) have objected until resolved or determined by the Bankruptcy Court. In the event such objector(s) are unable to resolve a dispute as to an Indenture Trustee Fee Claim, each Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Bankruptcy Court for resolution by application requesting payment of the disputed portion of the Indenture Trustee Fee Claims in accordance with the reasonableness standards set forth in the applicable Indenture (and not subject to the requirements of sections 503(b)(3) and (4) of the Bankruptcy Code, which shall not apply) or (ii) assert its Charging Lien to obtain payment of a disputed portion of the Indenture Trustee Fee Claim in lieu of Bankruptcy Court resolution described in subsection (i).

(c)    As soon as practicable after the Effective Date, the applicable Indenture Trustee or the Claims and Voting Agent shall transmit a notice to holders of Notes via DTC, advising such holders of the effectiveness of this Plan and providing instructions to such holders to tender their Notes in accordance with the applicable Indenture in exchange for the Distributions to be made pursuant to this Plan. Delivery of any Note will be effected, and risk of loss and title thereto shall pass, only upon delivery of such Note to the applicable Indenture Trustee in accordance with the terms and conditions of such notice to holders of Notes, such notice to holders of Notes to be in such form and have such other provisions as the Debtors may reasonably request. Each holder of any Note shall surrender such Note to the applicable Indenture Trustee. No Distribution hereunder shall be made to or on behalf of any such holder unless and until such Note is received by the relevant Indenture Trustee, or the loss, theft or destruction of such Note is established to the satisfaction of the relevant Indenture Trustee, including requiring such holder (i) to submit a lost instrument affidavit and an indemnity bond, and (ii) to hold the Debtors and the relevant Indenture Trustee harmless in respect of such Note and any Distributions made in respect thereof. Upon compliance with this Section by a holder of any Note, such holder shall, for all purposes under this Plan, be deemed to have surrendered such Note. Any such holder that fails to surrender such Note or satisfactorily explain its non-availability to the applicable Indenture Trustee within three (3) months of the Effective Date shall be deemed to have no further Claim against the Debtors, the Debtors' estates, the Debtors' property, PTL or the applicable Indenture Trustee in respect of such Claim and shall not participate in any Distributions under this Plan, and the Distribution that would otherwise have been made to such holder shall be distributed by the applicable Indenture Trustee to all

41

applicable holders who have surrendered their Notes or satisfactorily explained their non-availability to the applicable Indenture Trustee within three (3) months of the Effective Date.

(d)    All Distributions to be made under the Plan (i) to Holders of Allowed Convertible Note Claims shall be made to the Convertible Notes Indenture Trustee and (ii) to Holders of Allowed Second Lien Note Claims shall be made to the Second Lien Notes Indenture Trustee, unless the applicable Indenture Trustee consents to the direct distribution through DTC, and, subject at all times to the applicable Indenture Trustee's Charging Lien, the Indenture Trustees shall transmit such Distributions to their respective Holders of such Allowed Claims, to be applied as follows:  first, to any principal or premium then outstanding on the relevant Notes, and second, to any interest or other amounts then outstanding on such Notes. Notwithstanding the foregoing, nothing herein shall modify or impair any Indenture Trustee's rights relating to such Indenture Trustee's Indenture Trustee Fee Claims.  All payments to such Holders shall only be made after the surrender by each such holder of the Note certificates representing such Claim, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the holder's compliance with the requirements set forth in §10.07(c) above. Upon surrender of such Note certificates, the applicable Indenture Trustee shall cancel and destroy such Notes. As soon as practicable after surrender of Note certificates evidencing such Allowed Note Claims, the applicable Indenture Trustee shall distribute to the holder thereof such holder's pro rata share of the Distribution, but subject to the rights of such Indenture Trustee to assert its Charging Lien against such Distribution.

(e)    Consistent with Bankruptcy Rule 3003(c), the Debtors shall recognize a proof of claim filed by any Indenture Trustee (or if no proof of claim is filed, the applicable Allowed Claims described herein), in respect of any of the Notes, and any proof of claim which is filed by the registered or beneficial holder of such Notes may be disallowed as duplicative of the Claim of the applicable Indenture Trustee without need for any further action or order by the Bankruptcy Court.

## ARTICLE XI

### PROVISIONS REGARDING VOTING
### AND DISTRIBUTIONS UNDER THE PLAN

11.01.  Nonconsensual Confirmation.  If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors shall have the right to amend the Plan in accordance with Section 17.09 hereof or to ask the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to impaired Classes of Claims and Equity Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

11.02.  Elimination of Vacant Classes.  Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for

42

purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

11.03. <u>Voting Classes</u>. Except for Holders of Claims or Interests in Classes that are deemed to have accepted or rejected this Plan pursuant to the terms of this Plan, if, at the time of the Confirmation Hearing, there are any Holders of Claims or Interests in a particular Impaired Class of Claims or Interests that were given the opportunity to vote to accept or reject this Plan and were notified that a failure of any Holders of Claims or Interests in such Impaired Class of Claims or Interests to vote to accept or reject this Plan would result in such Impaired Class of Claims or Interests being deemed to have accepted this Plan, but no Holders of Claims or Interests in such Impaired Class of Claims or Interests voted to accept or reject this Plan, then the Debtors reserve the right to seek, on reasonable notice to parties in interest with an opportunity to object and be heard, to have such Class of Claims or Interests deemed to have accepted this Plan. If there is no impaired accepting Class with respect to any of the Filed Subsidiary Debtors 6 through 10, the Debtors reserve the right to effect mergers and dissolutions with respect to Filed Subsidiary Debtors 6 through 10 and to take and cause to be taken such actions in order to carry out such mergers and dissolutions, on such terms and conditions the Debtors may deem necessary or desirable.

11.04. <u>Distributions</u>. Pursuant to the terms and provisions of the Plan, PTL or the Liquidation Trustee or, with respect to Second Lien Note Claim, the Second Lien Notes Indenture Trustee and with respect to Convertible Note Claim, the Convertible Notes Indenture Trustee, shall make the required Distributions specified under the Plan, on or as soon as practicable the Initial Distribution Date, Interim Distribution Date, or Final Distribution Date, as the case may be, under the Plan. Any payment of Cash made by PTL or the Liquidation Trustee pursuant to the Plan shall, at the option of PTL or the Liquidation Trustee, as applicable, be made by check drawn on a domestic bank or wire transfer.

11.05. <u>Insurance Claims</u>. That portion of each Allowed Claim that is an Insurance Claim shall be paid by PTL solely and exclusively: (a) from the proceeds of insurance relating to such Insurance Claim as and when such proceeds are received; or (b) by the applicable insurance carrier to the extent of such insurance. Notwithstanding the foregoing, an Allowed Claim, or any portion thereof, for which insurance coverage may be available shall not be treated as an Insurance Claim under the Plan until the Holder of such Allowed Claim has actually received payment from the applicable insurance carrier, its assignee, successor or affiliate (collectively, the "<u>Insurer</u>"), in respect of such Claim or portion thereof. If the Holder of an Allowed Claim does not receive payment from the applicable Insurer for any reason (other than as a result of the Holder's willful misconduct or gross negligence), distributions under the Plan to such Holder, if any, shall not be reduced on account of the insured portion of such Claim; <u>provided</u>, <u>that</u>, as a condition to any distribution from PTL to the Holder of an Allowed Claim, all or some of which may be covered by insurance, the Holder of such Claim shall be deemed to have assigned to PTL such Holder's right to receive payments on the Claim from the Insurer to the extent of the distribution under the Plan and shall pay to PTL any amounts paid by the Insurer to or on behalf of such Holder to the extent of the distribution (except to the extent such amounts have been paid by the Insurer to PTL). If a Holder reasonably determines to abandon attempts to collect insurance from an Insurer, the Holder shall give 10 Business Days' notice thereof to PTL, and at the expiration of such notice period may abandon attempts to collect such amounts from the

43

Insurer and PTL shall thereupon be entitled to all rights of the Holder against the Insurer with respect to such amounts.

11.06. <u>Timing of Distributions</u>. In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Any requirement under the Plan that PTL or Liquidation Trustee make a payment or distribution on a date shall mean that such party is required to commence the process of making a payment or distribution on such date or as soon as reasonably practicable thereafter.

11.07. <u>Holders as of the Distribution Record Date</u>. As of the close of business on the Distribution Record Date: (i) the claims register maintained in the Chapter 11 Cases shall be closed; (ii) the transfer of books and records of the Notes as maintained by the applicable Indenture Trustee or its agent shall be closed; and (iii) any transfer of any Claim or any interest therein, including, without limitation, any of the Notes, shall be prohibited. Neither the Debtors, PTL, nor the Indenture Trustees, if applicable, shall have any obligation to recognize any transfer of any Claim or any interest therein, including, without limitation, any of the Notes, occurring after 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, and instead may, in their sole discretion, recognize and deal for all purposes under this Plan with only those holders of record as of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date.

11.08. <u>Distributions to Address of Record</u>. Subject to Bankruptcy Rule 9010, and except as set forth in this Section 11.08 of the Plan, all distributions under the Plan to Holders of Allowed Claims shall be made to the Holder of each Allowed Claim at the address of such Holder as listed on the Schedules as of the Distribution Record Date, unless the Debtors or, on and after the Effective Date, PTL and the Liquidation Trustee, have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such Holder that provides an address for such Holder different from the address reflected on the Schedules. In the event that any distribution to any such Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the appropriate PTL or the Liquidation Trustee, as applicable, has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such Holder without interest; <u>provided</u>, <u>however</u>, that, at the later of the expiration of one (1) year from the Effective Date and the date a Claim becomes an Allowed Claim, such distributions shall be deemed unclaimed property and shall revest in PTL or the Liquidation Trust, as applicable, and be distributed to other Holders of Allowed Claims, in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

11.09. <u>Minimum Distributions</u>. PTL or the Liquidation Trustee shall not be obligated to make any payment of Cash of less than one hundred dollars to any Holder of an Allowed Claim. Notwithstanding anything contained herein to the contrary, if, on any Distribution Date there remains $10,000 or less available for distribution to Holders of Allowed General Unsecured Claims, in lieu of making any further distributions to the Holders of such Claims, PTL or the Liquidation Trust may distribute such Cash to the charity of its choice.

44

11.10. <u>Unclaimed Distributions</u>. All distributions to Holders of Allowed Claims under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and any entitlement of any Holder of any Claim to such distributions shall be extinguished and forever barred. All such unclaimed property shall revest in PTL or the Liquidation Trust and be distributed to other Holders of Allowed Claims or donated in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

11.11. <u>Setoffs</u>. PTL may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Causes of Action of any nature whatsoever that the Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or PTL of any such Causes of Action that the Debtors or PTL may have against the Holder of such Claim.

11.12. <u>Allocation of Plan Distributions Between Principal and Interest</u>. To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

11.13. <u>Estimation of Claims; Certain Reserves</u>. For purposes of calculating and making distributions under the Plan, PTL shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims that are contingent and/or unliquidated and the maximum dollar amount of Allowed and Disputed Claims that are contingent and/or unliquidated Claims in a particular class. PTL also shall be entitled to seek one or more estimation orders from the Bankruptcy Court for such purposes, which requests may be joined with objections to the Claims that are subject to any such request. Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought. With respect to Insurance Claims, PTL shall not be required to establish a PTL Reserve on account of any portion of an Insurance Claim that in Chief Officer's good faith will be paid from available insurance coverage. Notwithstanding the foregoing or anything else in this Plan or the Confirmation Order: (i) neither PTL nor the Chief Officer shall be obligated to physically segregate and maintain separate accounts for PTL Reserves; and (ii) unless otherwise ordered by the Bankruptcy Court, PTL Reserves shall not be required to be established or maintained with respect to Claims or Administrative Expense Claims filed after the applicable Bar Date. The PTL Reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time and evergreen in nature, as appropriate.

11.14. <u>No Recourse</u>. Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by this Plan there is insufficient value to provide a recovery equal to that received by other Holders of Allowed Claims in the respective Class, no Claim Holder shall have recourse against PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, the Debtors, or any of their respective professionals, consultants, officers, directors, employees or members or their

45

successors or assigns, or any of their respective property. THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

11.15. <u>Satisfaction of Claims and Equity Interests</u>. Unless otherwise provided in the Plan or the Confirmation Order, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and release of any right to distributions from the Debtors' Estates on account of such Allowed Claims.

11.16. <u>Withholding and Reporting Requirements</u>. In connection with this Plan and all distributions thereunder, PTL and the Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. PTL and the Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms PTL or the Liquidation Trustee believe are reasonable and appropriate, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution, and (b) no Distributions shall be required to be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to PTL and the Liquidation Trustee for the payment and satisfaction of such tax obligations or has, to the PTL's and the Liquidation Trustee's satisfaction, established an exemption therefrom.

## ARTICLE XII

## PROCEDURES RELATING TO DISPUTED CLAIMS

12.01. <u>Objections to Administrative Expense Claims and Claims</u>. Following the Effective Date, PTL, through the Chief Officer, shall be entitled to object to Administrative Expense Claims and Claims. Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of (i) one hundred and twenty (120) days after the Effective Date, and (ii) such later date as may be fixed by the Bankruptcy Court, which later date may be fixed before or after the date specified in clause (i) above. No objection shall be required with respect to a proof of Claim or proof of Administrative Expense Claim filed after the applicable Bar Date, and any and all such Claims and Administrative Expense Claims shall be deemed disallowed unless otherwise ordered by the Bankruptcy Court after notice and a hearing. Any objections to Administrative Expense Claims and Claims shall be handled solely by PTL through the Chief Officer.

12.02. <u>Amendments to Claims</u>. After the Confirmation Date, a proof of Claim or Administrative Expense Claim may not be amended without the authorization of the Bankruptcy

Court. Any amendment to a proof of Claim or Administrative Expense Claim submitted after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtors or PTL, unless the Holder of the Claim or Administrative Expense Claim has obtained prior Bankruptcy Court authorization to file the amendment.

12.03. <u>No Distributions Pending Allowance</u>. Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be required to be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Administrative Expense Claim becomes Allowed in its entirety.

12.04. <u>Resolution of Disputed Claims</u>. On and after the Effective Date, PTL, through the Chief Officer, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims without approval of the Bankruptcy Court. The reasonable fees and expenses (including reasonable attorneys' fees and costs) that are incurred by PTL and the Chief Officer shall be borne by PTL.

12.05. <u>Resolution of Disputed Insurance Claims</u>. All Insurance Claims not previously Allowed shall be considered to be Disputed Claims as of the Effective Date such that no objection to an Insurance Claim is required to be filed. All Insurance Claims shall be litigated to an order of a court of competent jurisdiction over such claim except to the extent that PTL, through the Chief Officer, in conjunction with the Debtors' applicable insurer, and the Holder of the Disputed Insurance Claim compromise, settle or otherwise resolve the respective Insurance Claim or agree to another method of claim resolution such as mediation or arbitration, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court or any other court.

## ARTICLE XIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

13.01. <u>Rejection or Assumption and Retention or Assignment</u>.

(a)    <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code:

(i)    all executory contracts and unexpired leases of the Debtors shall be deemed to be rejected by the applicable Debtor as of the Confirmation Date, subject to the occurrence of the Effective Date, except for any executory contract or unexpired lease: (a) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (b) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (c) that is specifically designated as a contract or lease to be assumed and/or assigned or retained on Schedule 13.01, which schedule shall be contained in the Plan Supplement and shall list corresponding Cure Amounts;

(ii)    notwithstanding anything otherwise herein to the contrary, the Debtors reserve the right, on or prior to the Effective Date, to amend Schedule 13.01 to delete

47

any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as applicable, rejected, assumed and/or assigned or retained. The Debtors shall provide notice of any amendments to Schedule 13.01 to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 13.01 shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(b)    Approval of Assumptions, Retentions and Rejections by Confirmation Order. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to Section 13.01(a) shall vest in and be fully enforceable by PTL in accordance with its terms, except as modified by the provisions of this Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease.

13.02.  Cure of Defaults.

(a)    Generally. Except as may otherwise be agreed to by the Debtors or the Chief Officer, as the case may be, and the non-Debtor party to the contract or lease, within thirty (30) days after the Effective Date, PTL shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. Subject to the last sentence of Section 13.02(b) of the Plan, all disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of PTL's liability with respect thereto, or as may otherwise be agreed to by the parties.

(b)    Notice of Proposed Cure. The Debtors shall, prior to the conclusion of the Confirmation Hearing, file and serve on parties to executory contracts and unexpired leases that may be assumed pursuant to Section 13.01 of the Plan a notice (the "Cure Notice") listing the proposed Cure Amount to be paid in connection with the executory contracts and unexpired leases that may be Assumed, retained, assumed and/or assigned pursuant to Section 13.01(a) of the Plan. The non-Debtor parties to such contracts and leases shall have until fifteen (15) days following service of the Cure Notice to object in writing to the proposed cure and to propose an alternative cure. In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the cure proposed by the Debtors (including amounts of compensation for actual pecuniary loss) and shall be forever enjoined and barred from seeking from the Debtors, PTL, the Chief Officer and the Liquidation Trustee any additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code. If an objection is timely filed with respect to the Cure Amount proposed by the Debtors for an executory contract or unexpired lease, the Bankruptcy Court shall hold a hearing to determine the amount of any disputed cure amount not settled by the parties. Notwithstanding anything otherwise to the contrary, at all times through the date that is thirty (30) days after the entry of a Final Order resolving and fixing the amount of a disputed cure amount, whether such date is before or after the Effective Date, each of the Debtors and PTL shall be authorized to reject

48

such executory contract or unexpired lease by notice to the non-debtor party to such executory contract or unexpired lease.

13.03.  Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 13.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors in accordance with the Bar Date Order.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates, and PTL.

## ARTICLE XIV

## EFFECT OF CONFIRMATION & INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

14.01.  Binding Effect.  From and after the Confirmation Date, but subject to the occurrence of the Effective Date, this Plan shall be binding and inure to the benefit of the Debtors, all present and former Holders of Claims and Equity Interests, and their respective assigns, including PTL.

14.02.  Vesting of Assets.  Upon the Effective Date and the transfer of the PTL Assets to PTL and the Liquidation Trust Assets to the Liquidation Trust, as applicable, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, any assets of the Debtors and Estates shall vest in PTL or the Liquidation Trust, as applicable, in each case free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided herein or in the Confirmation Order.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and the terms of this Plan, PTL shall retain and shall have the exclusive rights, in its discretion to enforce against any Person any and all Causes of Action that constitute PTL Assets.

14.03.  Term of Pre-Confirmation Injunctions or Stays.  Unless otherwise provided in this Plan, the Confirmation Order, or a separate order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of (i) the Effective Date, (ii) the date indicated in such applicable order, (iii) the dissolution of PTL, or (iv) the dissolution of the Liquidation Trust.

14.04.  Injunction Against Interference with Plan.  Upon the entry of the Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan.

14.05.  Injunction.  Except as otherwise expressly provided in this Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Liens, Claims, liabilities or encumbrances against or Equity Interests in, any or all of the Debtors, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, with

respect to any such Liens, Claims, liabilities or encumbrances or Equity Interests, as of the Confirmation Date but subject to the occurrence of the Effective Date, from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (b) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, or any of their property (including, without limitation, the PTL Assets and the Liquidation Trust Assets, as applicable), or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, or any of their property (including, without limitation, the PTL Assets and the Liquidation Trust Assets, as applicable), or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; (e) taking any actions to interfere with the implementation or consummation of this Plan; and (f) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan, such as commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to this Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights arising under and consistent with the terms of this Plan.

14.06. Releases.

(a)    **Releases by the Debtors. Except as otherwise provided in this Plan or the Confirmation Order, as of the Effective Date, the Debtors, in their individual capacities and as debtors in possession, and PTL shall be deemed to forever release and waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, which are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, PTL, the Canadian Debtor, the Chapter 11 Cases, this Plan or the Disclosure Statement, the Canadian Proceeding and that could have been asserted by or on behalf of the Debtors, or PTL, whether directly, indirectly, derivatively or in any representative or any other capacity, against any Released Party; provided, however, that in no event shall anything in this Section be construed as (i) a release of any Person's fraud, willful misconduct or gross negligence, (ii) a release or waiver of the Debtors' or PTL's right or ability to assert or raise certain claims against**

50

any Released Party as defense to a claim or suit brought against them or their assets by any Released Party, (iii) with respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates, a release or waiver of any claims, causes of action, or culpability arising out of or relating to the Apex Transaction or the Knight Transaction, (iv) with respect to Knight Execution & Clearing Services LLC and its affiliates, a release or waiver of any claims, causes of action, or culpability arising out of or relating to the Knight Transaction, or (v) with respect to the Debtors and their subsidiaries, a release or waiver of claims, causes of action, or culpability arising out of or related to the improper disclosure, the failure to disclose, or insufficient disclosures of certain nonaccrual receivables collateralized by certain illiquid assets pledged to PFSI by Call Now, Inc. in relation to Call Now, Inc.'s margin trading account at PFSI, including, among other assets, the so-called Retama Park Development Corporation Bonds.

(b)      <u>Releases by Holders of Claims</u>.  Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all Holders of Claims, in consideration for the obligations of the Debtors and PTL under this Plan, and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim, as applicable, will be deemed to have consented to this Plan for all purposes and the restructuring embodied herein and will be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan), including as a result of this Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise from the beginning of time through and including the Effective Date in any way relating to the Debtors, PTL, the Canadian Debtor, the Chapter 11 Cases, this Plan or the Disclosure Statement, the Canadian Proceeding against the Released Parties in their respective capacities as such; <u>provided</u>, <u>however</u>, that the foregoing releases shall apply only to any Holder of a Claim that (a) is entitled to vote on the Plan and (b) "opts-in" to the releases provided in this Section 14.06(b) in a timely and properly submitted Ballot.  Notwithstanding the foregoing, in no event shall anything in this Section be construed as (i) a release of any Person's fraud, willful misconduct or gross negligence; (ii) a release or waiver of any Released Party's right or ability to assert or raise claims against any Released Party as defense to a claim or suit brought against them or their assets by any Released Party, (iii) with respect to the Debtors and their subsidiaries, a release or waiver of claims, causes of action, or culpability arising out of or related to the improper disclosure, the failure to disclose, or insufficient disclosures of certain nonaccrual receivables collateralized by certain illiquid assets pledged to PFSI by Call Now, Inc. in relation to Call Now, Inc.'s margin trading account at PFSI, including, among other assets, the so-called Retama Park Development Corporation Bonds, (iv) with respect to Knight Execution & Clearing Services LLC and its affiliates, a release or waiver of any claims, causes of action, or culpability arising out of or relating to the Knight Transaction, or (v) with respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates, a release or waiver of any claims,

51

causes of action, or culpability arising out of or relating to the Apex Transaction or the Knight Transaction.

(c)    Notwithstanding anything otherwise to the contrary, no provision of this Plan or of the Confirmation Order, including any release or exculpation provision, shall modify, release or otherwise limit the liability of any Person not specifically released hereunder, including any Person that is a co-obligor or joint tortfeasor of a Released Party, that otherwise is liable under theories of vicarious or other derivative liability.

(d)    Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or Confirmation Order, no provision of the Plan or of the Confirmation Order shall preclude the U.S. Securities and Exchange Commission from enforcing its police or regulatory powers and no provision shall release any non-Debtor from liability in connection with any legal action or claim brought by the U.S. Securities and Exchange Commission.

(e)    Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or Confirmation Order, to the extent the Class Action Stipulation is not approved by entry of final, non-appealable orders of this Court and the United States District Court for the Northern District of Texas, nothing in the Plan or the Confirmation Order shall or is intended to (i) affect, release, enjoin or impact in any way the prosecution of the claims of the Lead Plaintiff or the Putative Class asserted or to be asserted against any non-Debtor in the Putative Class Action, or (ii) preclude Lead Plaintiff or the Putative Class from seeking discovery from the Debtors, PTL, the Liquidation Trust or any transferee of the Debtors' assets.

14.07.    Exculpation and Limitation of Liability.  None of the Debtors, PTL, the Board of Managers, the individual members of the Board of Managers, the Committee, the Indenture Trustees, the individual members of the Committee, or any of their respective current members, partners, officers, directors, employees, advisors, professionals, affiliates, or agents and advisors of any of the foregoing (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons, but solely in their capacities as such) shall have or incur any liability to any Holder of any Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the Canadian Proceeding, the Prepetition Restructuring, the negotiation and execution of this Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan, and the property to be distributed under this Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of this Plan except fraud, willful misconduct or gross negligence as determined by a Final Order.  Notwithstanding the foregoing, nothing in this Section 14.07 shall: (i) be construed as a release of any Person's or entity's fraud, gross negligence or willful misconduct with respect to matters set forth in this Section 14.07; (ii) limit the liability of attorneys for the Debtors, the Indenture Trustees, PTL, the Chief Officer or the Liquidation Trust to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility; (iii) be construed as a release or waiver of the Debtors' or PTL's right or ability to assert or raise certain claims against any party as a defense to a claim or suit brought against them by such party; or

52

(iv) constitute a release, waiver, or exculpation of any claims, causes of action, or culpability arising out of or relating to the Prepetition Restructuring with respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates. As consideration for, and as an express condition of, the exculpation provided in this Section 14.07, each officer and director of the Debtors receiving exculpation under this Section 14.07 agrees to provide reasonable cooperation and assistance to the Debtors, PTL, and the Chief Officer, as applicable, and their successors and assigns, in connection with the chapter 11 cases and the pursuit of any claims, causes of action, or liabilities. Such cooperation and assistance shall not involve or require any out-of-pocket expense by such officer or director. In the event any officer or director of the Debtors fails to provide reasonable cooperation or assistance as requested by the Debtors, PTL, or the Chief Officer, as applicable, or their successors and assigns, the remedy shall be that all exculpations provided to such Person under this Plan with respect to the Prepetition Restructuring shall be null and void.

14.08. <u>Limitation on Releases and Exculpation</u>. Notwithstanding anything to the contrary in this Plan, nothing in Sections 14.06 or 14.07 of the Plan shall waive or release (i) any claims, causes of action, or culpability of any Person based upon or arising out of such Person's knowingly or willfully failing to disclose, knowingly or willfully improperly disclosing, or intentionally or willfully providing insufficient disclosure of, any material fact, including, without limitation, disclosures arising out of or related to any Debtor's nonaccrual receivables or disclosures arising out of or relating to the value of the so-called Retama Park Development Corporation, Cambridge, Dade County, and Will County municipal bonds; (ii) without limiting the foregoing, any claims, causes of action, or culpability of any Person arising out of or relating to any Debtor's nonaccrual receivables or disclosures arising out of or related to the so-called Retama Park Development Corporation, Cambridge, Dade County, and Will County municipal bonds to the extent that after January 2, 2013, any Holder of a claim discovers any fact or circumstance not previously known to such Holder, which materially affects such claim, cause of action or culpability; or (iii) any claims, causes of action, or culpability of any Person arising out of or related to such Person's knowingly or intentionally providing false or misleading financial information to the Holder of any claim to the extent not included in clause (i) or (ii) above.

14.09. <u>Injunction Related to Releases and Exculpation</u>. Except as otherwise provided in this Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities satisfied, released or discharged pursuant to this Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in Sections 14.06 and 14.07 of this Plan.

14.10. <u>Release of Liens and Encumbrances</u>.

(a)    Each Lien or encumbrance on the Debtors' assets, other than a permitted encumbrance (excluding a permitted encumbrance securing a financial obligation that is not an Assumed Liability), including Liens or encumbrances securing: (w) any Second Lien Note Claim, Second Lien Note Guarantee Claim, Convertible Note Claim, Other Secured Claim or Administrative Expense Claim arising under or related to the Debtors' Indentures; (x) any Claim that is purportedly secured; or (y) any judgment, personal property or ad valorem tax, or

53

other tax of any kind or character, mechanic's or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, regardless of whether such Claim has been scheduled or proof of such Claim has been filed:

(i)    if such Lien or encumbrance secures a Priority tax Claim or Other Secured Claim, upon payment of the consideration set forth in Article IV-VIII, as the case may be, automatically, and without further action by the Debtors or PTL, be deemed released; or

(ii)    in all other cases, automatically, and without further action by the Debtors or PTL, be deemed released immediately upon the occurrence of the Effective Date, and without further action by the Debtors or PTL, be deemed released.

(b)    The Holder of any such Lien or encumbrance shall execute such documents and instruments as PTL, the Chief Officer or the Liquidation Trustee, as the case may be, require to evidence such Claim Holder's release of such property or Lien or encumbrance, and if such Holder refuses to execute appropriate documents or instruments, the Debtors, PTL, or the Chief Officer (as applicable) may, in their discretion, file a copy of the Confirmation Order in the appropriate recording office, which shall serve to release any Claim Holder's rights in such property; and

(c)    On the Effective Date, except as expressly provided in the Plan, all right, title and interest in Estate property subject to a Lien or an encumbrance immediately prior to the Effective Date shall be transferred as a PTL Asset to PTL.

14.11.    Satisfaction of Subordination Rights.

All Claims against the Debtors and all rights and Claims between or among claimholders relating in any manner whatsoever to Claims against the Debtors, based upon any claimed subordination rights (if any), shall be deemed satisfied by the distributions under this Plan, and such subordination rights shall be deemed waived, released, and terminated as of the Effective Date.

**ARTICLE XV**

**CONDITIONS PRECEDENT**

15.01.    Conditions to Confirmation.  The following are conditions precedent to confirmation of this Plan that may be satisfied or waived in accordance with Section 15.03 of this Plan:

(a)    the Bankruptcy Court shall have approved the Disclosure Statement with respect to this Plan in an order in form and substance reasonably acceptable to the Debtors, the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders;

(b)    the Confirmation Order and Plan Documents shall be in form and substance reasonably acceptable to the Debtors, the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders;

(c)    in each case subject to the occurrence of the Effective Date, to the extent necessary or appropriate, the Plan Documents, including the PTL LLC Agreement and the Liquidation Trust Agreement, to be entered into by PTL shall have been entered and delivered, all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed and the Debtors shall have received all material authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are reasonably necessary to implement the Plan and that are required by law, regulation, or order.

15.02.  Effectiveness.  The Plan shall not become effective unless and until: (i) the Confirmation Order shall have been entered by the Bankruptcy Court and become final and non-appealable; (ii) the Plan Documents shall have been executed and become effective; and (iii) the order approving the SunGard Settlement Agreement shall have become final and non-appealable.

15.03.  Waiver of Conditions.  The Debtors, with the consent of the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders (in each case, such consent not to be unreasonably withheld or delayed), to the extent not prohibited by applicable law, may waive one or more of the conditions precedent: (i) to effectiveness of the Plan set forth in Section 15.02 hereof in whole or part, upon five Business Days' notice to the Bankruptcy Court without a hearing, provided, however, that waiver of the condition precedent to effectiveness of the Plan set forth in Section 15.02(iii) of this Plan shall also require the consent of SunGard Financial Systems LLC (such consent not  be unreasonably withheld or delayed); or (ii) to confirmation of the Plan set forth in Section 15.01 hereof prior to the Confirmation Date without any hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such conditions to be satisfied (including any action or inaction by the Debtors in their sole discretion).  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

15.04.  Withdrawal of Plan.

(a)    Right to Revoke or Withdraw.  The Debtors, with the consent of the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders, reserve the right to jointly revoke or withdraw the Plan at any time prior to the Effective Date.

(b)    Effect of Withdrawal, Revocation or Non-Consummation.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void.  In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interest in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

15.05.  Waiver of Rule 3020(e) Stay.  Pursuant to Bankruptcy Rule 3020(e), the Confirmation Order shall be immediately effective upon its entry and shall not be subject to the stay provided in Bankruptcy Rule 3020(e).

## ARTICLE XVI

## RETENTION OF JURISDICTION

16.01.  Scope of Bankruptcy Court Jurisdiction.  The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine pending applications for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom or from the assumption, assumption and assignment or rejection of executory contracts or unexpired leases pursuant to this Plan;

(b)    To hear and determine any and all adversary proceedings, applications, and contested matters, and to order appropriate relief in connection therewith (including issuance and/or enforcement of releases);

(c)    To hear and determine any objection to Administrative Expense Claims, Claims or Equity Interests;

(d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)    To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any amendments to, or modifications of, the Plan and the Plan Supplement, and any dispute or controversy relating to execution, delivery or compliance with any document included in the Plan Supplement, and to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(g)    To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan;

(i)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, any transaction to be

56

consummated in accordance herewith, the PTL LLC Agreement, the Liquidation Trust Agreement, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)     To recover all assets of the Debtors and property of the Debtors, PTL, and Liquidation Trust, wherever located;

(k)     To hear and determine matters concerning state, local, and federal taxes, including as provided by sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)     To resolve any Disputed Claims or Equity Interests;

(m)     To hear any other matter not inconsistent with the Bankruptcy Code; and

(n)     To enter a final decree closing the Chapter 11 Cases; provided, however, with respect to a governmental unit's exercise of its police or regulatory powers other than the enforcement of a money judgment, the jurisdiction of any other tribunal shall not be reduced or impaired from that as set forth in any applicable, valid statutory grant of jurisdiction.

## ARTICLE XVII

## MISCELLANEOUS PROVISIONS

17.01.  Authorized Post-Petition Date Payments.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by one or more of the Debtors pursuant to an order of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules are hereby amended and reduced to reflect that such payments were made.  Nothing in this Plan shall preclude PTL, the Chief Officer or the Liquidation Trustee from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

17.02.  Payment of Fees and Expenses of Certain Creditors.  All Restructuring Support Agreement Professional Fees payable under the Restructuring Support Agreement and the Plan shall be paid by the Debtors prior to or on the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

17.03.  Effectuating Documents and Further Transactions.  Each of the Debtors and PTL is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to this Plan.

17.04.  Exemption from Transfer Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of

57

consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall constitute a "transfer under a plan" and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

17.05. Termination of Professionals. On the Effective Date, the engagement of each Professional retained by the Debtors shall be terminated without further order of the Bankruptcy Court or act of the parties. All final requests for compensation or reimbursement of the fees of any professional employed pursuant to sections 327 or 1103 of the Bankruptcy Code or otherwise in the Chapter 11 Cases must be filed and served on PTL and its counsel, the Liquidation Trustee and counsel for the Liquidation Trust, and the Office of the United States Trustee, not later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such professionals or other entities for compensation or reimbursement of expenses must be filed and served on the parties specified above in this Section 17.05 and the requesting professional or other entity not later than twenty (20) days after the date on which the applicable application for compensation or reimbursement was served.

17.06. Access. From and after the Effective Date, PTL and the Liquidation Trust shall cooperate with any Person that served as a director or officer of a Debtor at any time prior to the Effective Date, and make available to any such party such documents, books, records or information relating to the Debtors' activities prior to the Effective Date that such party may reasonably require relating to any action taken in connection with such party's role as a director or officer of a Debtor, any action taken in connection with the negotiation, execution and implementation of this Plan, and the Chapter 11 Cases.

17.07. Books and Records. For five (5) years from the Effective Date, the Debtors, PTL, the Liquidation Trust, and/or any transferee of the Debtors' books, records, documents, files, and electronic data (in whatever format, including native format) (collectively, the "Books and Records"), (i) shall preserve and maintain all of the Books and Records, and (ii) shall not destroy, abandon, transfer or otherwise render unavailable such Books and Records absent further order of this Court or any court of competent jurisdiction, on 60 days-notice to parties in interest (including, but not limited to the Securities and Exchange Commission) with an opportunity to be heard.

17.08. Putative Class Action. To the extent that the Class Action Stipulation is not approved by entry of final, non-appealable orders of this Court and the United States District Court for the Northern District of Texas, such non-approval shall not affect, impact, waive or prejudice any Claims against the Debtors to the extent of available insurance coverage and proceeds by the lead plaintiff, Reid Friedman (the "Lead Plaintiff"), in the Putative Class Action, individually and on behalf of all persons or entities who purchased publicly traded common stock of PWI between March 30, 2007 and August 4, 2011 (the "Putative Class"), or the Putative Class, arising out of, related to, or asserted in the Putative Class Action.

17.09. Payment of Statutory Fees. On the Effective Date, and thereafter as may be required, the Debtors and/or PTL, as applicable, shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code through the entry of a final decree closing the applicable Debtor's cases.

58

17.10.  Post-Effective Date Fees and Expenses.  From and after the Effective Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the Chief Officer or the Liquidation Trustee shall pay, from the PTL Assets or the Liquidation Trust Assets, as applicable, the reasonable fees and expenses of professional Persons thereafter incurred by PTL, including those fees and expenses incurred in connection with the implementation and consummation of this Plan, and fees incurred in preparing, prosecuting and objecting to final fee applications, which fees and expenses shall constitute Wind-Down Expenses.  The Liquidation Trust shall report all disbursements to PTL for inclusion in the Wind-Down expenses.

17.11.  Amendment or Modification of this Plan.  Alterations, amendments, or modifications of or to the Plan (including to provide for treatment different than that set forth herein with respect to any class of Claim or Equity Interest, including establishment of subclasses of Classes of Claims or Equity Interests to the extent required if so elected by the Debtors, the unimpairment of Classes that are impaired hereunder, and the impairment of Classes that are unimpaired hereunder) may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be altered, amended, or modified, with the consent of the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders (in each case, such consent not to be unreasonably withheld or delayed), at any time after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications.  A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

17.12.  SunGard Settlement Agreement.  If anything in the Plan and Disclosure Statement conflicts with, or is contrary to any term(s) of the SunGard Settlement Agreement, as such term or terms pertain(s) to SunGard Financial Systems LLC's rights, remedies and privileges or with respect to the treatment of the Amended SunGard Claim, the SunGard Settlement Agreement shall control.

17.13.  Confirmation Order.  The Confirmation Order shall, and is hereby deemed to, ratify all transactions effected by the Debtors during the period commencing on the Petition Date and ending on the Confirmation Date except for any acts constituting willful misconduct, gross negligence, recklessness or fraud.

17.14.  Severability.  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

17.15.  Expedited Tax Determination.  Chief Officer or the Liquidation Trustee may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors or PTL for all taxable periods beginning on or before the Effective Date.

17.16.  Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to any contrary result otherwise required under applicable choice or conflict of law rules.

17.17.  Binding Effect.  The Plan shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims and Equity Interests, and their respective successors and assigns, including PTL.

17.18.  Exhibits/Schedules.  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

17.19.  Notices.  All notices, requests, and demands to or upon the Debtors or PTL to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| **Young Conaway Stargatt & Taylor, LLP**<br>Pauline K. Morgan<br>M. Blake Cleary<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 576-3312<br>*Co-Counsel for the Debtors and the Debtors in Possession* | **Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>Andrew N. Rosenberg<br>Oksana Lashko<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 492-0158<br>*Co-Counsel for the Debtors and the Debtors in Possession* |
| **Fried, Frank, Harris, Shriver & Jacobson LLP**<br>Gary Kaplan, Esq.<br>Garrett Ledgerwood, Esq.<br>One New York Plaza<br>New York, New York 10004<br>Telephone: (212) 859-8520<br>Facsimile: (212) 859-4000<br>*Counsel for the Second Lien Noteholders Committee* | **Sidley Austin LLP**<br>Larry J. Nyhan, Esq.<br>Bojan Guzina, Esq.<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone: (312) 853-7323<br>Facsimile: (312) 853-7036<br>*Counsel for the Convertible Noteholders Committee* |
| **Penson Worldwide, Inc., et al.**<br>Attn: Bryce Engel<br>800 Klein Road,<br>Suite 200<br>Plano, Texas 75074 | **Hahn & Hessen LLP**<br>Mark T. Power, Esq.<br>488 Madison Avenue<br>New York, New York 10022<br>Telephone: (212) 478-7200<br>Facsimile: (212) 478-7400<br>*Counsel for the Committee* |

Dated: Wilmington, Delaware
      June 6, 2013

Respectfully submitted,

**Penson Worldwide, Inc., et al.**

By:    */s/ Bryce B. Engel*
        Bryce B. Engel
        Penson Worldwide, Inc., on behalf of itself
        and its affiliated Debtors

## EXHIBIT A

### List of Debtors and Debtors in Possession

(i)     Penson Worldwide, Inc.

(ii)    Penson Financial Services, Inc.

(iii)   SAI Holdings, Inc.

(iv)    Penson Holdings, Inc.

(v)     Nexa Technologies, Inc.

(vi)    Penson Execution Services, Inc.

(vii)   Penson Financial Futures, Inc.

(viii)  GHP1, Inc.

(ix)    GHP2, LLC

(x)     Penson Futures

## EXHIBIT B

### List of Filed Subsidiary Debtors

(i)     Penson Financial Services, Inc.

(ii)    SAI Holdings, Inc.

(iii)   Penson Holdings, Inc.

(iv)    Nexa Technologies, Inc.

(v)     Penson Execution Services, Inc.

(vi)    Penson Financial Futures, Inc.

(vii)   GHP1, Inc.

(viii)  GHP2, LLC

(ix)    Penson Futures

## EXHIBIT C

**Corporate Organization Chart for
Penson Worldwide, Inc. and its Subsidiaries**

