> THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF
> ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES AND
> REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS
> BEEN APPROVED BY THE BANKRUPTCY COURT. THE PROPOSED
> DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS
> NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS
> RESERVE THE RIGHT TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY
> THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE
> STATEMENT HEARING.

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | x |  |
| In re: | : | Chapter 11 |
|  | : |  |
| Penson Worldwide, Inc., et al., | : | Case No. 13-10061 (PJW) |
|  | : |  |
| Debtors.[1] | : | Jointly Administered |
|  | x |  |

## THIRD AMENDED DISCLOSURE STATEMENT WITH RESPECT
## TO THE JOINT LIQUIDATION PLAN OF PENSON WORLDWIDE, INC.,
## AND ITS AFFILIATED DEBTORS

Dated:  June 6, 2013
        Wilmington, Delaware

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Penson Worldwide, Inc. (6356); SAI Holdings, Inc. (3657); Penson Financial Services, Inc. (3990); Penson Financial Futures, Inc. (6207); Penson Holdings, Inc. (4821); Penson Execution Services, Inc. (9338); Nexa Technologies, Inc. (7424); GHP1, Inc. (1377); GHP2, LLC (1374), Penson Futures (6207).

| YOUNG CONAWAY STARGATT & TAYLOR, LLP | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP |
|---|---|
| Pauline K. Morgan | Andrew N. Rosenberg |
| Kenneth J. Enos | Oksana Lashko |
| Rodney Square | 1285 Avenue of the Americas |
| 1000 North King Street | New York, New York 10019 |
| Wilmington, Delaware 19801 | Telephone: (212) 373-3000 |
| Telephone: (302) 571-6600 | |
| | |
| *Co-Counsel for the Debtors and the Debtors in Possession* | *Co-Counsel for the Debtors and the Debtors in Possession* |

---

## VOTING DEADLINE

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING EASTERN TIME) ON JULY 24, 2013 (THE "<u>VOTING DEADLINE</u>"). TO BE COUNTED, THE CLAIMS AND VOTING AGENT MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

**IF YOU RECEIVED A BALLOT FROM A BROKER, NOMINEE OR OTHER AGENT (COLLECTIVELY, AN "<u>INTERMEDIARY</u>"), RETURN THE COMPLETED BALLOT(S) TO SUCH INTERMEDIARY PROMPTLY SO THAT IT CAN BE FORWARDED TO THE DEBTORS' CLAIMS AND VOTING AGENT BEFORE THE VOTING DEADLINE.**

---

## CONFIRMATION HEARING AND
## DEADLINE TO OBJECT TO THE PLAN

**THE HEARING TO CONSIDER CONFIRMATION OF THE PLAN HAS BEEN SCHEDULED FOR JULY 31, 2013 AT 10:00 A.M. (PREVAILING EASTERN TIME). OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED (I) ON OR BEFORE JULY 24, 2013 AT 5:00 P.M. (PREVAILING EASTERN TIME), AND (II) IN THE MANNER SET FORTH IN THE DISCLOSURE STATEMENT ORDER.**

---

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS ATTACHED HERETO) AND THE PLAN IS <u>SPECULATIVE</u>, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (I) THE DEBTORS, OR (II) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

- ii -

<u>RECOMMENDATION</u>

**THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.**

Doc#: US1:8414841v9

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE JOINT LIQUIDATION PLAN OF PENSON WORLDWIDE, INC., AND ITS AFFILIATED DEBTORS TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE", "ESTIMATE", OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS, AND OTHER

ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE CHIEF OFFICER MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS. THE PLAN RESERVES FOR THE CHIEF OFFICER THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS, STATUTORY PROVISIONS, OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' CHIEF OPERATING OFFICER HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE FILING OF THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

THE DEBTORS RECOMMEND AND SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

THE COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF ALL UNSECURED CREDITORS AND HAS RECOMMENDED THAT UNSECURED CREDITORS VOTE IN FAVOR OF THE PLAN.

**TABLE OF CONTENTS**

ARTICLE I. INTRODUCTION ...................................................................................................1

ARTICLE II. BUSINESS DESCRIPTION, PREPETITION INDEBTEDNESS AND
EVENTS LEADING TO CHAPTER 11 ..............................................................6

2.1.    Overview of the Debtors' Businesses/Recent Transactions ....................................6

2.2.    Prepetition Capital Structure and Indebtedness....................................................15

2.3.    The Debtors' Prepetition Financial Position and the Events Leading up to
the Commencement of These Chapter 11 Cases.....................................................17

ARTICLE III. ADMINISTRATION OF THE CHAPTER 11 CASES .........................................22

3.1.    Overview of Chapter 11 .........................................................................................22

3.2.    Commencement of the Debtors' Chapter 11 Cases and First Day Pleadings
and Certain Related Relief......................................................................................22

3.3.    Official Committee of Unsecured Creditors...........................................................23

3.4.    Setting of Bar Dates ...............................................................................................23

ARTICLE IV. SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT
OF CLAIMS AND EQUITY INTERESTS THEREUNDER ..............................24

4.1.    Summary of Plan.....................................................................................................24

4.2.    Identification of Classes Against PWI (Debtor 1) .................................................32

4.3.    Identification of Classes Against PFSI (Debtors 2 .................................................32

4.4.    Identification of Classes Against SAI and PHI (Debtors 3 and 4) ........................33

4.5.    Identification of Classes Against Nexa (Debtor 5) ................................................33

4.6.    Identification of Classes Against Remaining Filed Subsidiary Debtors................34

4.7.    Administrative Expense Claims...............................................................................34

4.8.    Time for Filing Administrative Expense Claims .....................................................35

4.9.    Professional Compensation and Reimbursement Claims .......................................35

- i -

4.10.   Priority Tax Claims.................................................................36

4.11.   Class 1A – Non-Tax Priority Claims......................................36

4.12.   Class 2A – Other Secured Claims..........................................36

4.13.   Class 3A – General Unsecured Claims...................................37

4.14.   Class 4A – Second Lien Note Claims.....................................37

4.15.   Class 5A – Convertible Note Claims.......................................38

4.16.   Class 6A – Intercompany Claims ...........................................38

4.17.   Class 7A – Securities Law Claims..........................................38

4.18.   Class 8A – Equity Interests....................................................39

4.19.   Class 1B – Non-Tax Priority Claims.......................................39

4.20.   Class 2B – Other Secured Claims..........................................39

4.21.   Class 3B – General Unsecured Claims...................................40

4.22.   Class 4B – Subordinated Loan Claims ...................................40

4.23.   Class 5B – Intercompany Claims............................................40

4.24.   Class 6B – Equity Interests ....................................................41

4.25.   Class 1C – Non-Tax Priority Claims .......................................41

4.26.   Class 2C – Other Secured Claims..........................................41

4.27.   Class 3C – General Unsecured Claims ..................................42

4.28.   Class 4C – Second Lien Note Guarantee Claims...................42

4.29.   Class 5C – Intercompany Claims...........................................43

4.30.   Class 6C – Equity Interests ....................................................43

4.31.   Class 1D – Non-Tax Priority Claims.......................................43

4.32.   Class 2D – Other Secured Claims..........................................44

4.33.   Class 3D – General Unsecured Claims..................................44

Doc#: US1:8414841v9

4.34.   Class 4D – Intercompany Claims ....................................................44

4.35.   Class 5D – Equity Interests...........................................................44

4.36.   Class 1E – Non-Tax Priority Claims ...............................................45

4.37.   Class 2E – Other Secured Claims ...................................................45

4.38.   Class 3E – General Unsecured Claims ............................................46

4.39.   Class 4E – Intercompany Claims ....................................................46

4.40.   Class 5E – Equity Interests ...........................................................46

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................47

5.1.   No Substantive Consolidation of the Debtors....................................47

5.2.   Limited Liability Company and Liquidation Trust...............................47

5.3.   Approval of Plan Documents.........................................................52

5.4.   Settlement of Claims and Controversies...........................................52

ARTICLE VI. CORPORATE GOVERNANCE AND ACTIONS ...............................53

6.1.   Post-Effective Date Corporate Existence...........................................53

6.2.   Corporate Action........................................................................53

6.3.   Officers and Boards of Managers ...................................................54

6.4.   Payment of Wind-Down Expenses ..................................................54

6.5.   Cancellation of Existing Securities and Agreements............................54

6.6.   Second Lien Notes ......................................................................55

6.7.   Rights of the Indenture Trustee.......................................................55

ARTICLE VII. PROVISIONS REGARDING VOTING AND DISTRIBUTIONS
            UNDER THE PLAN....................................................................57

7.1.   Nonconsensual Confirmation.........................................................57

7.2.   Elimination of Vacant Classes .......................................................57

7.3.   Voting Classes ...........................................................................57

iii

7.4.   Distributions ................................................................................58

7.5.   Insurance Claims ..........................................................................58

7.6.   Timing of Distributions ................................................................59

7.7.   Holders as of the Distribution Record Date ..................................59

7.8.   Distribution to Address of Record ...............................................59

7.9.   Minimum Distributions .................................................................59

7.10.  Unclaimed Distributions ..............................................................60

7.11.  Setoffs ..........................................................................................60

7.12.  Allocation of Plan Distributions Between Principal and Interest ..........................60

7.13.  Estimation of Claims; Certain Reserves ......................................60

7.14.  Non Recourse ...............................................................................61

7.15.  Satisfaction of Claims and Equity Interests .................................61

7.16.  Withholding and Reporting Requirements ...................................61

ARTICLE VIII. PROCEDURES RELATING TO DISPUTED CLAIMS ....................62

8.1.   Objections to Administrative Expense Claims and Claims ..................................62

8.2.   Amendments to Claims .................................................................62

8.3.   No Distributions Pending Allowance ...........................................62

8.4.   Resolution of Disputed Claims .....................................................62

8.5.   Resolution of Disputed Insurance Claims.....................................62

ARTICLE IX. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............63

9.1.   Rejection or Assumption and Retention or Assignment .........................................63

9.2.   Cure of Defaults ...........................................................................64

9.3.   Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan....................................64

iv

ARTICLE X. EFFECT OF CONFIRMATION AND INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS ................................................... 65

    10.1.   Binding Effect ................................................................................................. 65

    10.2.   Vesting of Assets ............................................................................................ 65

    10.3.   Term of Pre-Confirmation Injunctions or Stays ............................................ 65

    10.4.   Injunction Against Interference with Plan ..................................................... 65

    10.5.   Injunction ....................................................................................................... 65

    10.6.   Releases .......................................................................................................... 66

    10.7.   Exculpation and Limitation of Liability ........................................................ 68

    10.8.   Limitation on Releases and Exculpation ....................................................... 69

    10.9.   Injunction Related to Releases and Exculpation ............................................ 70

    10.10. Releases of Liens and Encumbrances ............................................................ 70

ARTICLE XI. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................. 71

    11.1.   Conditions to Confirmation ........................................................................... 71

    11.2.   Effectiveness .................................................................................................. 71

    11.3.   Waiver of Conditions ..................................................................................... 71

ARTICLE XII. VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN ................................................................................................... 72

    12.1.   Parties in Interest Entitled to Vote ................................................................ 72

    12.2.   Classes Impaired Under the Plan ................................................................... 72

    12.3.   Voting Procedures and Requirements ............................................................ 73

    12.4.   Confirmation Hearing .................................................................................... 75

    12.5.   Confirmation .................................................................................................. 75

    12.6.   Acceptance of Plan ........................................................................................ 76

    12.7.   Confirmation Without Acceptance of All Impaired Classes .......................... 76

12.8.    Best Interests Test ................................................................................77

12.9.    Liquidation Analysis ............................................................................77

12.10.  Feasibility .............................................................................................77

12.11.  Compliance with the Applicable Provisions of the Bankruptcy Code ..................78

ARTICLE XIII. ALTERNATIVE TO CONFIRMATION AND CONSUMMATION OF
              THE PLAN .........................................................................................78

ARTICLE XIV. RISK FACTORS AND CERTAIN FEDERAL INCOME TAX
             CONSEQUENCES OF THE PLAN ........................................................78

14.1.    Allowed Claims May Exceed Estimates .................................................78

14.2.    Plan May Not Be Accepted or Confirmed .............................................78

14.3.    Certain Federal Income Tax Consequences of the Plan .........................79

ARTICLE XV. RETENTION OF JURISDICTION ....................................................79

15.1.    Retention of Jurisdiction. .....................................................................79

ARTICLE XVI. MISCELLANEOUS PROVISIONS ..................................................79

16.1.    Notices .................................................................................................79

ARTICLE XVII. RECOMMENDATION AND CONCLUSION ...............................80

Doc#: US1:8414841v9

# ARTICLE I.

## INTRODUCTION

        Penson Worldwide, Inc. ("PWI"), and the other debtors and debtors in possession, as set forth on Exhibit 1 hereto (collectively, the "Debtors"), hereby submit this third amended disclosure statement (including all exhibits thereto and as may be amended, supplemented or otherwise modified from time to time, the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), to holders of Claims and Interests against the Debtors in connection with (i) the Debtors' solicitation of votes (the "Solicitation") to confirm the *Fourth Amended Joint Liquidation Plan of Penson Worldwide, Inc., and its Affiliated Debtors*, dated as of June 6, 2013 (including all exhibits thereto and as may be amended, supplemented or otherwise modified from time to time, the "Plan") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"). Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan, a copy of which is attached hereto as Exhibit 2.

        The Disclosure Statement, Plan, and related Plan Documents are the result of months of good faith and arm's length negotiations between the Debtors and certain holders of Second Lien Note Claims and Convertible Note Claims that are signatories to the Restructuring Support Agreement, a copy of which is attached hereto as Exhibit 3. The terms of the Plan reflect a negotiated settlement by the Restructuring Support Agreement Parties of, among other things, releases to be granted to the Released Parties under the Plan, the allowed amount of the Subordinated Loans, and the structure and terms of the Debtors' liquidation. Holders of approximately 57% in principal amount of the Second Lien Notes and of approximately 70% in principal amount of the Convertible Notes have signed on to the Restructuring Support Agreement, under which they are, subject to certain terms and conditions, obligated to (i) vote their claims in favor of the Plan and (ii) opt in to the releases granted therein. The Debtors have commenced the Chapter 11 Cases to implement the terms of the Plan, which will result in the liquidation of the Debtors' remaining businesses in a consensual and orderly manner.

        The following documents are annexed hereto as exhibits to this Disclosure Statement:

| EXHIBITS TO DISCLOSURE STATEMENT | |
|---|---|
| Exhibit 1 | List of Debtors |
| Exhibit 2 | Plan |
| Exhibit 3 | Restructuring Support Agreement |
| Exhibit 4 | Prepetition Corporate Organizational Chart |
| Exhibit 5 | Liquidation Analysis |
| Exhibit 6 | Analysis of Certain Federal Income Tax Consequences of the Plan |
| Exhibit 7 | Disclosure Statement Order (without exhibits) |

- 1 -

| Exhibit 8 | Allocation of Assets by Debtor Entity |
|-----------|---------------------------------------|

Contemporaneously with filing this Disclosure Statement, the Debtors filed the Plan which sets forth how Claims against and Equity Interests in the Debtors will be treated. This Disclosure Statement describes certain aspects of the Plan, the Debtors' prior operations, significant events occurring in the Chapter 11 Cases and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

The Plan constitutes a liquidating Chapter 11 plan for the Debtors. The Plan provides for the Debtors' property to be liquidated, and for the proceeds of the liquidation, including any recoveries obtained from litigation against third parties, to be distributed to holders of Allowed Claims and Equity Interests in accordance with the terms of the Plan and the priority of claims provisions of the Bankruptcy Code. The Plan further provides that on or before the Effective Date, Penson Technologies LLC ("PTL") will be formed as a Delaware limited liability company and all assets of the Debtors will be conveyed and transferred to PTL for the liquidation, administration, and distribution of the Debtors' property by PTL. As described more particularly below, notwithstanding the transfer of all assets to a single entity, all assets will be segregated according to the entity that transferred them and all distributions will be made strictly in accordance with the absolute priority rule as if such assets remained in separate entities. Pursuant to the PTL LLC Agreement, PTL will be managed by the Board of Managers and the Chief Officer designated by the Board of Managers. The initial Board of Managers will consist of two members appointed by the Second Lien Noteholders Committee, one member appointed by the Convertible Noteholders Committee and one member appointed by the Committee.

**Although the Plan is presented as a joint plan of liquidation, the Plan does _not_ provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date the Debtors' Estates will _not_ be deemed to be substantively consolidated for any reason. Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate.** In the event proceeds from the liquidation of a particular Debtor's assets are sufficient to pay the Claims against such Debtor in full, excess proceeds from the liquidation of that Debtor's assets will then be used to pay Claims against such Debtor's parent, where applicable (unless the stock of such subsidiary was pledged by its parent, in which case, the proceeds will first be used to satisfy the applicable secured claims prior to payments being made to unsecured creditors). For example, if there are sufficient proceeds from the liquidation of Nexa Technologies, Inc. ("Nexa") to pay the holders of Allowed Claims against Nexa in full, any excess liquidation proceeds will then be used to pay the holders of Allowed Claims against SAI Holdings, Inc., as Nexa's direct parent company. A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate and the secured portion of such claim will be determined based on the value of the assets pledged by that Debtor, for all purposes including, but not limited to, voting and distributions made by PTL; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount (plus post-petition interest due thereon, to the extent legally entitled thereto) of such Claim except upon the Class D Expiration Date if there are sufficient Distributions to provide for such recovery.

2

PTL, through the Chief Officer, in consultation with the Board of Managers, will be responsible for implementing and administering the Plan in accordance with the terms of the Plan, the PTL LLC Agreement, and applicable law. Pursuant to the PTL LLC Agreement, PTL will be managed by the Board of Managers and the Chief Officer designated by the Board of Managers. The initial Board of Managers will consist of two members appointed by the Second Lien Noteholders Committee, one member appointed by the Convertible Noteholders Committee and one member appointed by the Committee. In addition, the Liquidation Trust will be created for the primary purpose of distributing assets to certain general unsecured creditors of entities other than PWI, as described in the Plan.

The Chief Officer, in consultation with the Board of Managers, will initiate and defend Causes of Action on behalf of the Estates after the Plan is confirmed and consummated. Creditors do not have to wait until the final resolution of these Causes of Action before they receive distributions under the Plan. Rather, the Plan provides for distributions of available liquidation proceeds to occur on the Effective Date or as soon thereafter as is practicable (although there can be no assurance that any liquidation proceeds will be available for distribution to creditors on the Effective Date). The Plan also provides for distributions at various intervals after the initial distributions that will enable the distribution of any resulting recoveries from disposition or liquidation of the remaining assets and the PTL Assets, including the Causes of Action, in accordance with the Plan.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement (including the Exhibits hereto), the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in or incorporated by reference into this Disclosure Statement, the Plan, and all exhibits hereto and thereto.

**As more fully described in Article X of the Disclosure Statement, in consideration of the estimated distributions and other benefits provided under the Plan, the Plan provides for releases of all claims and causes of action described below against (a) the Debtors, the Company, and their directors, officers, employees, agents, members, liquidators, monitors, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Persons), each solely in its capacity as such, and only if such Persons occupied such positions at any time on or after the Petition Date; (b) the Second Lien Noteholders Committee, the Second Lien Notes Indenture Trustee and each of their respective advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by the Second Lien Noteholders Committee or the Second Lien Notes Indenture Trustee), each solely in its capacity as such; (c) the Convertible Noteholders Committee, the Convertible Notes Indenture Trustee, and each of their respective advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by**

3

the Convertible Noteholders Committee or the Convertible Notes Indenture Trustee), each solely in its capacity as such; (d) the Plan Support Parties (including, without limitation, each Consenting Second Lien Noteholder and each Consenting Convertible Noteholder) and each of their respective officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by such Persons), each solely in its capacity as such, and (e) the Committee, each of the Committee's members, and each of their directors, officers, employees, agents, members, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by the Committee or the Committee's members), each solely in their capacities as such (collectively, the "Released Parties"), with several exceptions described below.

Pursuant to the Plan, the Debtors, in their individual capacities and as debtors in possession and PTL would release and waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities that arose prior to the Effective Date against the Released Parties in any way relating to the Debtors, PTL, the Canadian Debtor, the Chapter 11 Cases, the Plan or the Disclosure Statement, or the Canadian Proceeding, with the following exceptions:

- There are no releases for any Person's fraud, willful misconduct, or gross negligence.

- The Debtors' or PTL's right or ability to assert or raise certain claims against any Released Party as defense to a claim or suit brought against them or their assets by any Released Party would be preserved.

- With respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates, there are no releases with respect to the Apex Transaction or the Knight Transaction.

- With respect to Knight Execution & Clearing Services LLC and its affiliates, there are no releases with respect to the Knight Transaction.

- With respect to the Debtors themselves and their subsidiaries, there are no releases with respect to the improper disclosure, the failure to disclose, or insufficient disclosures of certain nonaccrual receivables collateralized by certain illiquid assets pledged to PFSI by Call Now, Inc. in relation to Call Now, Inc.'s margin trading account at PFSI, including, among other assets, the so-called Retama Park Development Corporation Bonds.

Pursuant to the Plan, all Holders of Claims that have agreed to do so would release and waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities that arose prior to the Effective Date against the Released Parties in any way relating to the Debtors, PTL, the Canadian Debtor, the Chapter 11 Cases, the Plan or the Disclosure Statement, or the Canadian Proceeding, with the following exceptions:

4

- There are no releases of any person's fraud, willful misconduct, or gross negligence.

- Any Released Party's right or ability to assert or raise claims against any other Released Party as defense to a claim or suit brought against them or their assets by any other Released Party would be preserved.

- With respect to the Debtors themselves and their subsidiaries, there are no releases with respect to the improper disclosure, the failure to disclose, or insufficient disclosures of certain nonaccrual receivables collateralized by certain illiquid assets pledged to PFSI by Call Now, Inc. in relation to Call Now, Inc.'s margin trading account at PFSI, including, among other assets, the so-called Retama Park Development Corporation Bonds.

- With respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates, there are no releases with respect to the Apex Transaction or the Knight Transaction.

- With respect to Knight Execution & Clearing Services LLC and its affiliates, there are no releases with respect to the Knight Transaction.

- There are no releases of any Person who knowingly or willfully failed to disclose, knowingly or willfully improperly disclosed, or intentionally or willfully provided insufficient disclosure of any material fact, including, without limitation, disclosures arising out of or related to any Debtor's nonaccrual receivables or disclosures arising out of or relating to the value of the so-called Retama Park Development Corporation, Cambridge, Dade County, and Will County municipal bonds.

- There are no releases of any claims, causes of action, or culpability of any person arising out of or relating to any Debtor's nonaccrual receivables or disclosures arising out of or related to the so-called Retama Park Development Corporation, Cambridge, Dade County, and Will County municipal bonds to the extent that after January 2, 2013, any Holder of a claim discovers any fact or circumstance not previously known to such Holder that materially affects such claim, cause of action or culpability.

- There are no releases of any claims, causes of action, or culpability of any person arising out of or relating to such person's knowingly or intentionally providing any other false or misleading financial information to the Holder of any claim.

The Debtors believe that releases to be provided under the Plan are reasonable and in the best interests of the Estates.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN. THIS

5

DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

Additional copies of this Disclosure Statement can be accessed free of charge at http://www.kccllc.net/penson. Additional copies of this Disclosure Statement are also available upon request made to the office of the Debtors' co-counsel, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attention: Pauline K. Morgan and Kenneth J. Enos (302) 571-6600 (phone) or (302) 576-3312 (facsimile) or Paul, Weiss, Rifkind, Wharton & Garrison LLP, Attention: Andrew N. Rosenberg and Oksana Lashko, 1285 Avenue of the Americas, New York, New York 10019, (212) 373-3000 (phone) or (212) 492-0158 (facsimile).

## ARTICLE II.

## BUSINESS DESCRIPTION, PREPETITION
## INDEBTEDNESS AND EVENTS LEADING TO CHAPTER 11

2.1.    Overview of the Debtors' Businesses/Recent Transactions.

Penson Worldwide, Inc. and its direct and indirect wholly-owned subsidiaries: SAI Holdings, Inc. ("SAI"), Penson Financial Services, Inc. ("PFSI"), Penson Financial Futures, Inc., Penson Holdings, Inc. ("PHI"), Penson Execution Services, Inc., GHP1, Inc., GHP2, LLC, Nexa, and Penson Financial Services Canada, Inc. ("PFSC"), a non-Debtor entity (collectively, with PWI, the "Company"), through the Company's broker-dealer subsidiary PFSI and certain third party contractual relationships, historically provided a broad range of critical securities and futures processing infrastructure products and services to the global financial services industry. The Company's products and services included securities and futures clearing and execution, financing and cash management technology and other related offerings. The Company also provided tools and services to support trading in multiple markets, asset classes and currencies.

The Company's only remaining operating business in the United States is its technology and data product offerings, which are principally developed and marketed through Nexa. Nexa's business includes the development and marketing of customizable front-end trading platforms, a comprehensive database of real-time and historical United States and international equities, options, and futures trade data, and order-management services. This technology embedded in Nexa's securities and futures processing infrastructure has enhanced the Company's capacity to handle an increasing volume of transactions without a corresponding

increase in personnel. Nexa uses proprietary technology and technology licensed from third parties to provide customized, detailed account information to its clients.

The Debtors conducted a process of marketing Nexa as a going-concern sale. On March 26, 2013, the Court entered its *Order Approving and Authorizing (A) the Sale of Substantially All of the Assets Related to the Direct Access Trading Technology and Online Brokerage Solutions of Penson Worldwide, Inc. and Nexa Technologies, Inc. Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Asset Purchase Agreement, (C) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases as Part of the Sale, and (D) Granting Related Relief* [Docket 364] (the "Nexa Sale Order"). Pursuant to the Nexa Sale Order, the Debtors were authorized to sell substantially all of the assets of Nexa Technologies, Inc. to Fédération des Caisses Desjardins du Québec. The Nexa sale closed on April 1, 2013.

In the second quarter of 2012, the Company consummated several transactions described below that resulted in the Company's exit from the securities and futures clearing businesses in the United States, as follows:

(a) In May of 2012, PFSI sold certain of the assets of the Company's futures clearing business, including customer contracts, segregated customer account assets, assets relating to foreign currency exchange business, certain membership seats and licenses for clearing exchanges, and other related assets to Knight Execution & Clearing Services LLC (together with its affiliates, "Knight").

(b) In May and June of 2012, PFSI entered into a number of agreements with Apex Clearing Holdings LLC ("Apex Holdings"), the parent company of Apex Clearing Corporation ("Apex Clearing" and together with Apex Holdings, "Apex"). In connection with these agreements, PFSI (i) sold and transferred to Apex Clearing its customer and correspondent accounts and related contractual rights under its securities clearing contracts and other related assets, (ii) transferred certain limited liabilities to Apex Clearing, and (iii) contributed net assets valued under the purchase agreement at approximately $103 million that were counted as a total of $90 million towards the regulatory capital of Apex Clearing for the issuance of membership interests representing 93.75% of the equity interests in Apex Holdings.

(c) PFSI and Nexa entered into transition services agreements with both Knight and Apex Holdings, pursuant to which, PFSI and Nexa agreed to provide personnel and infrastructure support to the operations of Knight and Apex Clearing.

As a result of the Apex Transaction and the Knight Transaction (each as defined below), PFSI is no longer a registered broker-dealer and the Debtors no longer have any United States-based broker-dealer operations. However, as discussed in greater detail below, PFSI continues to own a 93.75% membership non-voting interest in Apex Holdings.

PFSC continued to provide securities clearing services including margin lending and securities lending and borrowing transactions, primarily to facilities clearing and financing

7

activities. However, the Company has since substantially exited the securities and futures clearing businesses in Canada. During 2011, the Company explored strategic alternatives to realize value from PFSC's broker-dealer operations, and, in 2012, engaged investment bankers to explore all strategic options for PFSC. Unfortunately, the Company was unable to find a going-concern buyer to acquire PFSC. Given the requirements of its SRO (the Investment Industry Regulatory Organization of Canada ("IIROC")) governing the maintenance of risk adjusted capital, liquidity and ongoing recent operating losses, the continued viability of PFSC as an ongoing standalone business did not appear to be sustainable. In September 2012, PFSC commenced the orderly wind-down of its business and affairs in ongoing consultation with its principal regulators (including IIROC and provincial securities regulators) and stakeholders, and on February 1, 2013, commenced a liquidation proceeding under Canadian law (the "Canadian Proceeding"). At the conclusion of the Canadian Proceeding, PFSC expects to distribute to PHI, its sole shareholder, and the holders of Allowed Second Lien Notes Claims, which hold a pledge of 65% of PHI's equity in PFSC, any residual proceeds that remain after the general unsecured creditors of PFSC have been paid in full. The ultimate amount and timing of distributions of the residual proceeds is dependent on resolution of various claims filed against PFSC, including a claim in connection with the Mount Real Corporation class action lawsuit (the "MR Class Action") filed in Quebec Superior Court that seeks compensation for alleged investor losses in the amount of $130 million. PFSC is one of the named defendants in the MR Class Action, along with accounting firms BDO Dunwoody, Samson Belair/Deloitte & Touche, Schwartz Levitsky Feldman and custodian B2B Trust.

*Knight Transaction*. On May 28, 2012, the Company entered into an Asset Purchase Agreement (the "Knight APA") with Knight, pursuant to which (i) the Company sold certain assets of PFSI's futures clearing business (the "FCM Business"), including but not limited to, customer contracts, segregated customer account assets, assets relating to the foreign currency exchange business, certain membership seats and licenses for clearing exchanges, and other related assets to Knight; and (ii) Knight assumed, subject to specified exceptions, certain liabilities and obligations under customer contracts in the FCM Business (the "Knight Transaction"). On May 31, 2012, the Company and Knight closed the sale.

In consideration for the sale, Knight agreed to make an initial payment of $5 million in cash to PFSI. This payment was fully paid by June 7, 2012. Knight also agreed to pay an earnout amount ("Earnout Amount") within 45 days of the first, second and third anniversary of the closing of the sale. The Earnout Amount is to be calculated as 1.25% of the total revenue for every $1 million of revenue that is in excess of $20 million in each trailing twelve month period.

In connection with the sale, the Company also entered into a Transition Services Agreement with Knight (the "Knight Transition Agreement"), pursuant to which the Company agreed to provide Knight with all services, functions, products, software and intellectual property primarily used to support the FCM Business following the sale, including services relating to regulatory compliance and reporting requirements. Knight agreed to pay certain fees to PFSI for the transition services, which continued for a period of 6 months after the closing. The Debtors reserve their rights with respect to any claims, rights or causes of action that they may have in

8

connection with the Knight Transaction, including, without limitation, against Knight and any other affiliated parties.

*The Apex Transactions*.  In May and June 2012, PFSI and certain other parties entered into a number of agreements (such transaction, the "Apex Transaction") that resulted in the formation of Apex Holdings, a limited liability company created to own Apex Clearing (f/k/a Ridge Clearing & Outsourcing Solutions, Inc.).  Apex Holdings is managed by Apex Clearing Solutions LLC ("Apex Solutions"), a subsidiary of Peak6 Investments, L.P. ("Peak6").

In connection with the Apex Transaction, PFSI (i) sold and transferred to Apex Clearing the customer and correspondent accounts and related contractual rights of PFSI under its securities clearing contracts and other related assets, (ii) transferred certain limited liabilities to Apex Clearing, and (iii) contributed net tangible assets valued under the purchase agreement at approximately $103 million that were counted as a total of $90 million towards the regulatory capital of Apex Clearing in consideration for the issuance of a non-voting membership interests representing 93.75% of the equity interests in Apex Holdings (the "Apex JV Interest").

In addition, PFSI agreed to certain indemnification obligations related to the Apex Transaction and contributed $2 million into an escrow account to be held for a period of five years from the closing date to satisfy such indemnity obligations, all pursuant to that certain Assignment and Assumption Agreement dated as of May 31, 2012 (the "Apex AAA").

The Apex AAA contains a provision providing for either the payment of additional consideration from PFSI or the refund of consideration from Apex Clearing based on the actual value of assets transferred under the agreement (the "NAV True-Up").  The first NAV True-Up payment was due three days after the closing of the Apex AAA.  PFSI has been in ongoing discussions with Apex Clearing regarding amounts it contends it is owed under the NAV True-Up provision of the Apex AAA.  As of the Petition Date, PFSI believes it is owed not less than an additional $7.0 million under the Apex AAA.  This calculation is disputed by Apex. Apex Clearing has alleged that no NAV True-Up payments are due to PFSI under the Apex AAA and that Apex Clearing may be owed additional consideration from PFSI based on the actual value of the assets transferred.

The LLC Agreement for Apex Holdings also contains an acknowledgement in Section 3.03 thereof by PFSI that Peak6 intends to offer the Second Lien Noteholders and the Convertible Noteholders an opportunity to invest in Apex Solutions or acquire an equity interest in Apex Solutions from Peak6.  As of the date hereof, to the best of the Debtors' knowledge, no such offer has been made to the Second Lien Noteholders or the Convertible Noteholders and no members of the Second Lien Noteholders Committee or the Convertible Noteholders Committee have an investment in or own any equity interest in Apex Solutions.  Peak6 Cayman Management Ltd. is a Convertible Noteholder and a signatory to the January RSA (as defined below).

PFSI and certain other Debtors entered into a number of other agreements in connection with the Apex Transaction, as follows:

9

a.  *The Apex Transition Agreement*:  PFSI and Nexa entered into a Transition Services Agreement with Apex Holdings and Apex Clearing to provide transition services for an initial period of 12 months, which may be extended by Apex Holdings for an additional 6 months, including the continued servicing of various customer contracts that PFSI transferred to Apex Clearing (the "<u>Apex Transition Agreement</u>").  The amounts payable under the Apex Transition Agreement to PFSI roughly approximate the costs of providing the transition services thereunder.  Additionally, PWI, PFSI and Nexa agreed to license certain intellectual property to Apex Clearing and Apex Holdings related to the transition services under the Apex Transition Agreement.  PFSI and Nexa entered into a new services agreement with Apex Clearing on January 11, 2013, which was intended to replace the Apex Transition Agreement.  The Apex Transition Agreement was terminated by Apex Clearing effective January 19, 2013.  The Debtors are seeking authorization from the Court to assume the January 11, 2013 contract.

b.  *The Penson-Apex Credit Facility*:  PFSI entered into an unsecured $12 million credit facility with Apex Clearing to provide a line of credit to Apex Clearing in the post-closing period (the "<u>Penson-Apex Credit Facility</u>").  The line of credit under the Penson-Apex Facility is fully drawn, and matured in full on December 5, 2012.  As of the Petition Date, Apex Clearing has not repaid the amounts borrowed under the Penson Apex Credit Facility and has asserted full rights of setoff under the Penson-Apex Credit Facility.  The Debtors have disputed Apex Clearing's rights of setoff.

c.  *Indemnity and Support Agreement*:  PWI and Nexa entered into an indemnity and support agreement, pursuant to which they have agreed to indemnify Apex Holdings, Apex Solutions and certain of their affiliates for certain losses related to the Apex Transaction.

In connection with the Apex Transaction, Apex Solutions contributed $5 million in cash to Apex Holdings in exchange for 5.21% of the membership interests in Apex Holdings, and certain other investors agreed to contribute a total of $1.0 million of cash to Apex Holdings in exchange for approximately 1.04% of the membership interests in Apex Holdings. Apex Solutions also provided $35 million in subordinated loans to Apex Clearing, which qualified as regulatory capital for Apex Clearing, and provided Apex Clearing with a $10 million line of credit for post-closing financing. As a result, Apex Clearing had regulatory capital valued at approximately $130 million at the closing of the Apex Transaction. Apex Solutions has the option, from time to time, to purchase all or a portion of PFSI's membership interest in Apex Holdings for consideration equal to 120% of the then current value of PFSI's capital account. Further, Apex Solutions is the managing member of Apex Holdings pursuant to the terms of Apex Holding's limited liability company agreement, and Apex Solutions is entitled to an annual management fee equal to (i) 20% of the first $10 million of the consolidated net profits of Apex Holdings and (ii) 30% of the consolidated net profits in excess of such amounts. None of the other members of Apex Holdings, including PFSI, have any voting, consent, or approval rights,

10

including the right to demand distributions from Apex Holdings, to replace Apex Solutions as the managing member of Apex Holdings, or to appoint a successor managing member of Apex Holdings.

Also, in connection with the Apex Transaction, the Company entered into a Termination and Mutual Release Agreement (the "Broadridge Release") with Broadridge Financial Solutions, Inc. ("Broadridge Financial"), Ridge Clearing & Outsourcing Solutions, Inc. ("Ridge") and Broadridge Financial Solutions (Canada), Inc. ("Broadridge Canada," and together with Broadridge Financial and Ridge, collectively, "Broadridge"), pursuant to which the Company and Broadridge agreed to (i) terminate the Schedules under the master services agreement by and between the Company and Broadridge, dated November 2, 2009 (collectively the "Master Services Agreement") applicable to the Company's United States and United Kingdom subsidiaries, other than to the extent necessary to provide the transition services under the Services Agreement and to continue to service the Company's Canadian subsidiary, PFSC; and (ii) terminate, discharge and release in full the Company's obligations under the Master Services Agreement, Schedules and related documents (other than the Master Services Agreement, Schedules and related documents with respect to PFSC), including all obligations to make principal and interest payments, under the Ridge Seller Note (as defined below) issued to Broadridge that was due June 25, 2015 and had an outstanding principal amount of approximately $20,578,000. The Company and Broadridge also agreed to release all claims equal to an amount not less than $87,000,000 arising under the Master Services Agreement, provided that Broadridge will retain claims, if any, against PFSC of up to $20,000,000 related to termination of the Master Services Agreement, Schedules and related documents with respect to PFSC, while the Company will retain all of its rights under the Master Services Agreement to defend any such claims against PFSC.

Certain of the Company's creditors contend that the Company did not receive reasonably equivalent value in exchange for the transfer of its customer accounts and regulatory capital in the Apex Transaction and, as a result, the Apex Transaction may be avoidable as a fraudulent transfer or conveyance under the Bankruptcy Code and state law. Any fraudulent transfer or conveyance actions would likely be pursued by PTL. As detailed more fully in Article IV of this Disclosure Statement, any proceeds from such actions would be proceeds of the PFSI estate, distributable in accordance with Article V of the Plan. The Debtors reserve their rights with respect to any claims, rights or causes of action that they may have in connection with the Apex Transaction, including, without limitation, against Apex and any other affiliated parties and Peak6 and any other affiliated parties.

***SAMCO Transaction***. On April 25, 2012, SAI entered into an Asset Purchase Agreement (the "SAMCO APA") with PNK (SA), LLC and SAMCO Capital Markets, Inc. (together "SAMCO") to sell certain assets held by the Company related to Retama Development Corporation ("RDC") consisting of (a) certain promissory notes issued by RDC in the aggregate original principal amount of $800,000 secured by a Deed of Trust, Security Agreement and Fixture Filing executed by RDC; and (b) certain assets acquired pursuant to the public foreclosure auctions of collateral securing certain RDC-related assets, including (i) SAI's holdings of RDC revenue bonds, (ii) a certain funding agreement between the RDC and Call

11

Now, Inc., a company affiliated with a former insider of PWI, and (iii) certain assets and interests related to the RDC (collectively, the "RDC Assets"). The RDC Assets were pledged to the Debtors by Call Now, Inc. as collateral for Call Now, Inc.'s margin loans. Subsequently, the Company foreclosed on the RDC Assets. The total purchase price under the SAMCO APA was approximately $6.95 million cash, and the Company recorded a significant write down of approximately $15.6 million in the value of the RDC Assets as well as bad debt expenses related to its disposition of the RDC Assets. Roger J. Engemoen, the former Chairman of the PWI Board of Directors, is the Chairman and a controlling shareholder of SAMCO.

***SAMCO Arbitration.*** In July 2012, PFSI brought an arbitration proceeding before FINRA against SAMCO and Roger J. Engemoen, the Chairman and a controlling shareholder of SAMCO, the former Chairman of the Board of Directors of PWI and certain of its subsidiaries, and a director of certain of PWI's other subsidiaries (the "SAMCO Claims") PFSI initiated this FINRA arbitration proceeding seeking to recover approximately $3 million in interest payments erroneously advanced to SAMCO Capital Markets, Inc., a PFSI correspondent owned by Roger J. Engemoen, Jr., over a period of years during which Mr. Engemoen was Chairman of the Board of Directors of PFSI's parent company Penson Worldwide, Inc. Upon being informed that PFSI intended to bring the SAMCO Claims, on July 16, 2012, Mr. Engemoen resigned from his positions as Chairman of the Board of Directors of PWI and certain of its subsidiaries and as a director of certain of PWI's other subsidiaries, in light of the potential conflicts of interest created by the SAMCO Claims. Discovery has begun and PFSI is currently gathering documentation to support its claim. The arbitration hearing is set for September 24-27, 2013, and PFSI expects a decision from the arbitration panel by the end of 2013.

***Acquisition of the clearing business of Schonfeld Securities, LLC.*** In November 2006, the Debtors acquired the clearing business of Schonfeld Securities LLC ("Schonfeld"), a New York-based securities firm. The Debtors closed the transaction in November 2006 and in January 2007, issued approximately 1,100,000 shares of common stock valued at approximately $28,300,000 to the previous owners of Schonfeld as partial consideration for the assets acquired. In addition, the Debtors agreed to pay an annual earnout of stock and cash over a four-year period that commenced on June 1, 2007, based on net income, as defined in the asset purchase agreement ("Schonfeld Asset Purchase Agreement"), for the acquired business. On April 22, 2010, SAI and PFSI entered into a letter agreement (the "Letter Agreement") with Schonfeld Group Holdings LLC ("Schonfeld Holdings"), Schonfeld, and Opus Trading Fund LLC ("Opus") that amended and clarified certain terms of the Schonfeld Asset Purchase Agreement. The Letter Agreement, among other things, for purpose of determining the total payment due to Schonfeld under the earnout provision of the Schonfeld Asset Purchase Agreement, removed the payment cap and reduced the SunGard synergy credit from $2,900,000 to $1,450,000 in 2010 and $1,000,000 in 2011. The Letter Agreement also assigned all of Schonfeld's responsibilities under the Schonfeld Asset Purchase Agreement to its parent company, Schonfeld Holdings, and extended the initial term of Opus's portfolio margining agreement with PFSI from April 30, 2017 to April 30, 2019.

In January 2011, the Company and Schonfeld Holdings entered into a letter agreement setting the amount due for the third year earnout at $6,000,000 due to the provisions

12

in various agreements related to the Schonfeld transaction, including the termination/compensation agreement, which reduced the amount that the Company was required to pay under the Schonfeld Asset Purchase Agreement. A payment of approximately $26,600,000 was paid in connection with the first year earnout that ended May 31, 2008; approximately $25,500,000 was paid in connection with the second year of the earnout that ended May 31, 2009 and approximately $9,269,000 was paid in connection with the fourth year of the earnout that ended on May 31, 2011. Pursuant to the terms of a letter agreement with Schonfeld, as of June 30, 2012, the Company had paid $2,500,000 as result of the third year of the earnout ended May 31, 2010. The remaining $3,500,000 was to be paid evenly over the seven month period commencing on February 1, 2012. The Company has not made any payments subsequent to the payment due January 1, 2012, due to a contractual dispute with one of the Schonfeld correspondents. The Debtors believe that they are owed certain amounts in connection with the Schonfeld transaction and continue to seek to negotiate a resolution to this dispute. The Debtors reserve their rights with respect to any claims, rights or causes of action that they may have in connection with the Schonfeld transaction, including, without limitation, against Schonfeld and any other affiliated parties and Opus and any other affiliated parties.

*Illiquid Instruments.* SAI holds certain illiquid financial instruments (the "Illiquid Instruments") that may generate value during the pendency of these Chapter 11 Cases. The Illiquid Instruments primarily consist of certain municipal bonds, including promissory notes issued by RDC, Cambridge, Dade County, Leon County and Will County municipal bonds, certain partnership interests, secured debts and other collateral.

RDC Revenue Bonds. These tax-exempt bonds were issued in 1997 by RDC, a local government corporation organized by and acting on behalf of the City of Selma, Texas, to refinance the construction loan for horse racing track located in the City of Selma, Texas. The Series A bonds in the outstanding principal amount of $133,000 bear interest at 7.00% per annum and mature on September 1, 2033. The Series B bonds in the outstanding principal amount of $84,725,000 bear interest at 8.00% per annum and mature on September 1, 2033. The Company sold its RDC bonds to SAMCO in connection with the SAMCO transaction, as described above.

Cambridge Student Housing Finance Bonds. These tax-exempt bonds were issued in 2004 to refinance the construction loan for a 540-bed Class A full service dormitory on 7.8383 acres located in College Station, Texas. The project is owned by the Texas Student Housing Authority ("TSHA"), a quasi-political subdivision of the city of Westlake, Texas. The project primarily serves undergraduate students from Texas A&M University with some additional students from Blinn College. The Series A bonds in the outstanding principal amount of $16,530,000 bear interest at 7.00% per annum and mature on November 1, 2039. The Series A bonds are secured by a first lien on the land, improvements and fixtures. The Series B bonds in the outstanding principal amount of $4,025,000 are subordinate to the Series A bonds, bear interest at 8.00% per annum and mature on November 1, 2024. The Series C bonds in the outstanding principal amount of $4,820,000 are subordinate to the Series A and B bonds, bear interest at 9.70% per annum and mature on November 1, 2039. The Series D bonds in the outstanding principal amount of $5,380,000 are subordinate to the Series A, B, and C bonds, bear

13

interest at 9.70% per annum and mature on November 1, 2039. As of the Petition Date, the Company held $3,081,820 of Series C bonds and $3,678,832 of Series D bonds. In 2006, the Brazos County Appraisal District notified TSHA that its exemption from property taxes has been revoked. TSHA appealed the revocation to the Brazos County District Court. On May 26, 2011, the District Court confirmed Brazos County revocation of the tax-exempt status of the property. This decision is now being appealed by TSHA to the Texas State Court of Appeals in Waco, Texas. The estimated tax liability is in excess of $4,000,000.

Dade County Housing Finance Bonds. These tax-exempt bonds were issued in 1989 for the acquisition and rehabilitation of approximately 377 low-income housing units in 7 separate buildings located in the northern section of the City of Miami. The project is owned and managed by New Arena Square North & South, Ltd. There is a $750,000 loan from the City of Miami secured by a first lien on the real estate and improvements. The senior bonds in the outstanding principal amount of $2,000,000 bear interest at 10.25% per annum, mature on May 1, 2019 and are secured by a priority lien on the land, improvements and fixtures. The junior bonds in the outstanding principal amount of $10,500,000 bear interest at 10.25% per annum and mature on May 1, 2019. As of the Petition Date, the Company held $9,750,000 of the junior bonds.

Leon County Educational Facilities Bonds. These tax-exempt bonds were issued in 1998 to refinance the defaulted original bonds issued for the acquisition of a 541-bed full service dormitory and a 300-space parking garage located in Tallahassee, Florida. The project is owned by the Leon County Educational Facilities Authority ("LCEFA"), a quasi –political subdivision of Leon County, Florida. The project primarily serves undergraduate students from Florida State University. The Series A bonds in the outstanding principal amount of $9,470,000 bear interest at 6.75% per annum, mature on September 1, 2028 and are secured by a first lien on the land, improvements and fixtures. The Series B bonds in the outstanding principal amount of $20,500,000 bear interest at 7.625% per annum and mature on September 1, 2028. As of the Petition Date, the Company held $15,900,000 of Series B bonds.

Will County Student Housing Revenue Bonds. This combination of tax-exempt and taxable bonds were issued in 2002 to provide permanent financing for an on-campus student housing project consisting of 284 beds situated on approximately 7 acres that is located on the campus of Joliet Junior College ("JJC"). This land was acquired from JJC through the execution of a subordinated promissory note in the amount of $1,075,932 that is payable to JJC from excess cash flow of the project. The project is owned by the Foundation Housing, LLC, whose sole member is the Joliet Junior College Foundation, a non-profit organization founded in 1973 to support the educational purposes of the JJC. The Series A 6.375% tax-exempt bonds in the outstanding principal amount of $1,170,000 mature on September 1, 2013. The Series A 6.625% tax-exempt bonds in the outstanding principal amount of $3,980,000 mature on September 1, 2023 and the Series A 6.750% tax-exempt bonds in the outstanding principal amount of $8,835,000 mature on September 1, 2033. The Series B taxable bonds in the outstanding principal amount of $450,000 bear interest at 7.75% per annum and matured in 2009. All of these municipal bonds are secured by liens on the land, improvements and fixtures and are senior in payment priority to the subordinated promissory note. As of the Petition Date, the Company

14

held $1,100,000 of Series A 6.625% tax-exempt bonds due 2023, $4,120,000 of Series A 6.750% tax-exempt bonds due 2033, and $225,000 of Series B 7.75% taxable bonds.

The value of these Illiquid Instruments is speculative but the Debtors estimate it to be in the range of approximately $5-$10 million. It is contemplated that KPMG will assist the Debtors in their marketing efforts to sell the Illiquid Instruments. It may take significant time and investment of resources to liquidate these various Illiquid Instruments.

*Intellectual Property*. PWI holds a number of patents associated with the automated purchase and sale of financial instruments. The Company is in the process of performing due diligence on its patent portfolio, and is hopeful that these patents will generate future revenue through, among other things, the prosecution of patent infringement claims (the "Patent Claims"). The value of the patents are unknown at this time. To assist with these efforts, the Company anticipates retaining a patent litigation firm.

*For additional information regarding the Debtors' business operations, refer to the Declaration of Bryce B. Engel in Support of Chapter 11 Petitions and Requests for First Day Relief, dated January 11, 2013 [Docket No. 2] (the "First Day Declaration"), which is incorporated herein by reference.*

2.2.    Prepetition Capital Structure and Indebtedness.

PWI is a holding company incorporated in Delaware, and PWI owns 100% of the equity of SAI, another holding company. PWI and SAI have historically conducted business through their direct and indirect subsidiaries. SAI directly owns the following entities, each of which is a Debtor in these Chapter 11 Cases: GHP1, Inc. and GHP2, LLC, Penson Execution Services, Inc., Penson Financial Futures, Inc., PFSI, PHI and Nexa. Nexa is the only Debtor with on-going business operations. PHI directly owns a number of non-Debtor entities, including Penson Asia Limited ("Penson Asia"), PFSC, Penson Financial Services Ltd. ("Penson UK"), and Penson Financial Services Venture, Inc.

*Senior Facility*. On May 6, 2010, PWI and certain guarantors thereto entered into a $50 million senior secured revolving facility with Regions Bank, as administrative agent, swing line lender and letter of credit issuer, and the lenders party thereto (together with all exhibits and schedules thereto, as amended, supplemented or otherwise modified from time to time, the "Senior Facility"). As of March 31, 2012, the Company had completely paid down its obligations under the Senior Facility.

*Second Lien Notes*. On May 6, 2010, PWI issued Second Lien Notes in the aggregate principal amount of $200.0 million. The Second Lien Notes bear interest at a rate of 12.50% per year and mature on May 15, 2017. The Second Lien Notes are guaranteed by SAI and PHI. The Second Lien Notes are secured by a second priority lien (junior only to the liens securing the Senior Facility, which has been repaid in full), on the equity interests in SAI, PHI, PFSI and GHP1 and sixty-five percent (65%) of the equity interests in PFSC. The Second Lien Notes were issued pursuant to the Second Lien Notes Indenture dated as of May 6, 2010 with U.S. Bank National Association, as the Second Lien Notes Indenture Trustee, and secured by a Second Lien Pledge Agreement dated as of May 6, 2010 with the Second Lien Notes Indenture

15

Trustee. The rights of the Second Lien Notes Indenture Trustee pursuant to the Second Lien Pledge Agreement are subject to an Intercreditor Agreement entered among the Company, the Second Lien Notes Trustee and the administrative agent for the Company's Senior Facility, which has been repaid in full. As of the Petition Date, there was approximately $216,940,625.00 in principal and interest outstanding under the Second Lien Notes Indenture.

*Convertible Notes.* On June 3, 2009, PWI issued Convertible Notes in the aggregate principal amount of $60.0 million. The Convertible Notes bear interest at a rate of 8.0% per year and mature on June 1, 2014. The Convertible Notes were issued pursuant to the Convertible Notes Indenture dated as of June 3, 2009 with U.S. Bank National Association, as the Convertible Notes Trustee. Since the Petition Date, Wells Fargo Bank, N.A. has replaced U.S. Bank National Association as the Convertible Notes Trustee. The Convertible Notes are unsecured obligations of PWI. As of the Petition Date, there was approximately $63,017,400.00 million in principal and interest outstanding under the Convertible Notes Indenture.

*Intercompany Loans.* There is an intercompany loan agreement dated as of May 6, 2010 between PWI, as lender, and PFSI as Broker/Dealer (the "PWI Subordinated Loan"), in the principal amount of $70 million. The $70 million loaned under the PWI Subordinated Loan was from proceeds of the Second Lien Notes, bears interest at 12.5% per annum, and matures on May 6, 2015. The PWI Subordinated Loan is subordinated in payment to all claims of all other present and future creditors of PFSI. As of the Petition Date, the principal amount outstanding under the PWI Subordinated Loan is $70 million plus accrued interest.

There are also intercompany loan agreements dated as of June 29, 2011, in the principal amount of $5 million, and dated as of June 30, 2011, in the principal amount of $10 million between SAI Holdings, as an assignee through certain assignment agreements, and PFSI (collectively, the "SAI Subordinated Loan" and together with the PWI Subordinated Loan, the "Subordinated Loans"), which matured on June 29 and June 30, 2012, respectively, and are now payable. The SAI Subordinated Loan bears interest at 12% per annum and is subordinated in payment to all claims of all other present and future creditors of PFSI. As of the Petition Date, the principal amount outstanding under the SAI Subordinated Loan is $13.5 million plus accrued interest.

In connection with the negotiations leading to the formulation of the Plan, certain creditors disputed the validity of the Subordinated Loans and argued that they should be characterized as an equity contribution rather than debt. Because interest payments were made on these Subordinated Loans and the Subordinated Loans were both formally documented and publicly disclosed, after a series of negotiations, certain holders of the Second Lien Notes, the Convertible Notes and the Debtors have agreed to treat a portion of the Subordinated Loans as allowed. Specifically, under the terms of the Plan, (i) PWI will be deemed to hold an Allowed Claim against PFSI in the amount of $45 million on account of the PWI Subordinated Loan and (ii) SAI will be deemed to hold an Allowed Claim against PFSI in the amount of $12 million on account of the SAI Subordinated Loan. The settlement and the reduction of the amounts of these Subordinated Loans do not affect distributions to the subsidiary unsecured creditors because the applicable unsecured creditors would get paid in full before any amounts would be paid on account of the Subordinated Loan Claims.

16

Separately, there is also a secured promissory note (the "Promissory Note"), dated as of May 15, 2012, between SAI, as the borrower, and PFSI, as the lender thereunder, in the principal amount of $5,500,000. It is secured by the Illiquid Instruments. No UCC statements were ever filed with respect to the Promissory Note.

The Promissory Note was put in place in order to assist the Debtors in making the $12.5 million semiannual interest payment on the Second Lien Notes. The proceeds of the Promissory Note were used to pay interest on the outstanding Second Lien Notes. The Debtors had to request permission from FINRA to allow SAI to withdraw regulatory capital and to borrow $5.5 million from PFSI via the Promissory Note. FINRA granted permission to PFSI to make the loan represented by the Promissory Note to SAI on the condition that the municipal bonds owned by SAI would be used as collateral to secure the Promissory Note. The bonds were pledged in connection with the margin trading accounts of Call Now, Inc., a company affiliated with a former insider of PWI, at PFSI. Because the collateral went down in value, FINRA requested that PFSI move the margin loans extended to Call Now, Inc. to SAI and move the bonds from PFSI to SAI. Subsequently, the Company foreclosed on those bonds. As of the Petition Date, the Company's books and records show that the bonds are held by SAI Estate. Under the terms of the Plan, any proceeds realized on the Illiquid Instruments are being allocated as set forth on Exhibit 8 attached hereto.

Holders of the Promissory Note Claim will be entitled to receive 40% of the proceeds of the Illiquid Instruments up to a maximum of $3.5 million. The Promissory Note Claim will be placed in Class 2C against the SAI and PHI Estates.

***Broadridge.*** On November 2, 2009, PWI, together with PFSI, entered into an asset purchase agreement with Broadridge and its wholly owned subsidiary Ridge to acquire substantially all of Ridge's contracts with its securities clearing clients. As part of this transaction, the parties entered into a Master Services Agreement and on June 25, 2010, the Company issued a $20,578,000 five-year subordinated note due June 25, 2015 (the "Ridge Seller Note"). The Ridge Seller Note is payable by PWI and bears interest at an annual rate equal to 90-day LIBOR plus 5.5%. As discussed above, on June 5, 2012, in connection with the Knight Transaction and the Apex Transaction, the Company entered into the Broadridge Release pursuant to which, among other things, Broadridge released the Company from all claims under the Master Services Agreement with Broadridge (other than those relating to PFSC) equal to an amount not less than $87,000,000. In addition, the Ridge Seller Note was terminated and discharged without payment.

2.3.   The Debtors' Prepetition Financial Position and the Events Leading up to the Commencement of These Chapter 11 Cases.

***Declines in Financial Performance of Broker-Dealer Business.*** In the past, the Company's revenue and profitability was tied to the strength of the global economy and the functioning of global markets. The past several financial quarters have seen a weakened global economy, including substantial economic uncertainty and prolonged volatility in the world's financial markets. These factors led to investor-flight from the public markets, which was compounded by other anomalous events, such as the May 2010 "Flash Crash" that saw the Dow Jones Industrial Average lose approximately 9% of its value and then recover that loss within a

17

matter of minutes. Average daily trading volume in equities fell by 5% in 2010 and 8% in 2011, and short selling continued to fall in each of the years from 2009 through 2011. This decrease in market participation and activity had a direct, negative impact on the Company's commission and interest revenues which were closely correlated to activity in the financial markets. Events increasing market volatility also negatively impacted the Company because its broker-dealer subsidiaries were often subjected to increased regulatory capital requirements that created liquidity issues and inhibited the Company from closing and settling transactions.

The Company has also faced increased competition in the clearing industry which led to downward pressure on the per transaction revenue that it could realize. Further, the continued period of low short-term interest rates had a negative impact on the spread, and corresponding revenue, that the Company could earn in its margin lending business. Moreover, in August 2011, TD Ameritrade, Inc., one of PFSI's largest clients, deconverted accounts with PFSI to TD Ameritrade's own systems. While this resulted in an improvement to the excess regulatory capital position of PFSI, it also eliminated a significant source of clearing transactions revenue and daily interest earning assets available for lending.

*Cost-Savings Initiatives*. Prior to the sale and transfer of most of the assets of its United States-based broker-dealer business, the Company engaged in a number of initiatives to streamline its business operations, improve its liquidity position and increase financial and operating results. These initiatives included combining the securities and futures divisions into one entity, which led to an enhancement of the combined entities' regulatory capital position by $25.1 million, amending the Broadridge Master Services Agreement to outsource an additional $8 million worth of services by July 2013, the internal streamlining of operations which were anticipated to provide up to $6 million in annual cost reductions, and the pay down of the Senior Facility, which eliminated approximately $2 million in interest expenses. These efforts, however, were not enough to stem losses in the fourth quarter of 2011 and the first three quarters of 2012.

*Spring 2012 Out-of-Court Restructuring Efforts*. A confluence of factors including a weakened global economy, prolonged market volatility, lower trading volumes and continued low short-term interest rates have had a significant and negative effect on the business and results of operations of the Company. Because of liquidity difficulties, the Company determined that it would be unable to make the interest payments required to be made under the Second Lien Notes and the Convertible Notes. To alleviate these liquidity issues, in the second half of 2012, the Company began negotiations with the holders of a majority of the Second Lien Notes, the holders of over 70% of the Convertible Notes and Broadridge. On March 13, 2012, the Company entered into a Restructuring Support Agreement (the "March RSA") with (i) holders of more than 50% of the Second Lien Notes, (ii) holders of more than 70% of the Convertible Notes, and (iii) Broadridge, to restructure the Company's existing long-term debt obligations. The March RSA proposed an exchange offer (the "Exchange Offer") that would exchange PWI's existing long-term indebtedness for $105 million of new 12.5% senior secured notes, $120 million of new Series A preferred stock in PWI, $35 million of new Series B preferred stock in PWI, and 61.5% of the common stock in post-restructuring PWI. The Exchange Offer was subject to acceptance by 95% of the holders of both the Second Lien Notes and Convertible Notes. In connection with the March RSA, Broadridge also agreed to restructure certain terms of the Broadridge Master Services Agreement.

18

The March RSA provided that it would automatically terminate if the Exchange Offer was not launched by May 14, 2012. After entry into the March RSA, the Company discussed the terms of the Exchange Offer with holders of a substantial amount of the Company's debt, but the Company and these holders were unable to reach a satisfactory agreement on the terms of a potential restructuring. As a result, without sufficient support from its debt-holders, the Company did not launch the Exchange Offer by May 14, 2012, and the March RSA automatically terminated by its own terms. Nonetheless, as discussed below, the Company has continued to negotiate with significant holders of its debt regarding the wind-down of the Company's business.

*Regulatory Pressure to Dispose of United States Broker-Dealer Business*. As a result of concerns about continuing operating losses, the lack of progress in restructuring the Company's long-term debt obligations, and regulatory and correspondents concerns, PFSI began to explore strategic alternatives for its broker-dealer business. This included engaging in discussions with Knight regarding a transaction related to the futures division of the United States broker-dealer business. These actions were hastened by actions taken by the Chicago Mercantile Exchange ("CME"), the primary futures regulator, and FINRA, which threatened taking regulatory action against PFSI, including forcing PFSI into a SIPC liquidation, if it did not dispose of its broker-dealer operations promptly.

Shortly after receiving notice from CME, PFSI entered into a letter of intent with Knight on May 21, 2012, which culminated in the Knight Transaction. Additionally, after a series of correspondence with FINRA that raised regulatory concerns regarding its securities division, PFSI entered into an agreement with FINRA to enter into a strategic transaction or face SIPC liquidation. PFSI then entered into the Apex Transaction.

*NASDAQ Delisting*. On May 1, 2012, PWI received notice from the NASDAQ Stock Market ("NASDAQ") that its share price had failed to obtain a bid price for its stock above $1.00 for the prior 30 consecutive days as required for listing on the NASDAQ Global Select Market. PWI was provided a 180-day grace period (or until October 29, 2012) to regain compliance with the minimum bid requirement for a minimum of ten consecutive business days. On July 27, 2012, PWI received a separate notice from NASDAQ that it was not in compliance with the $5 million minimum market value of publicly held shares ("MMVPHS") requirement. PWI was again provided a 180-day grace period (or until January 22, 2013) to regain compliance with the MMVPHS requirement for a minimum of ten consecutive business days. Finally, on August 20, 2012, PWI received a letter from NASDAQ indicating that (i) PWI had not maintained a minimum of $10 million in stockholders' equity for continuing listing on the NASDAQ Global Select Market and (ii) PWI had 45 calendar days to submit a plan to regain compliance.

On September 26, 2012, PWI issued a press release stating that it would voluntarily terminate its listing on the NASDAQ Global Select Market on or about October 8, 2012, and on October 18, 2012, PWI was delisted from NASDAQ.

*Significant Prepetition Regulatory Actions*. The staff of the Division of Corporate Finance of the United States Securities and Exchange Commission (the "SEC") has issued letters to PWI setting forth comments and questions with respect to the Company's Annual Report on Form 10-K for the year ended December 31, 2010 and Quarterly Reports on

19

Form 10-Q for the quarterly periods ended March 31, 2011 and September 30, 2011, as well as comments to the Company's Annual Report on Form 10-K for the year ended December 31, 2011 (collectively, the "SEC Comment Letters"). Among other things, the SEC Comment Letters question the timing of an impairment charge taken by PWI with respect to certain of its non-accrual receivables, related to the RDC Assets, for which the Company reported a $43 million bad debt charge in the second quarter of fiscal year 2011. PWI had been in discussions with the SEC's staff regarding the accounting treatment for this impairment charge and SEC staff indicated that those discussions could, among other things, result in a restatement of the Company's financial statements by accelerating the impairment charge into prior periods.

**_Purported Class Action and Derivative Actions brought by PWI's Shareholders_**. PWI, certain of its officers and directors and certain of its advisors have been named as defendants in a putative class action (the "Putative Class Action") commenced in the United States District Court for the Northern District of Texas (the "Northern Texas District Court"), and three shareholder derivative actions, two of which are pending in Texas state court and the other of which is pending in the Northern Texas District Court (collectively, the "Shareholder Actions"). The Putative Class Action alleges that PWI overstated its assets, income and EBITDA, that its financial statements were not prepared in accordance with GAAP, and alleges a class period of March 30, 2007 through August 4, 2011. The Shareholder Actions allege causes of action for, among other things, breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

Following a mediation related to the Putative Class Action, the parties to the Putative Class Action entered into a Stipulation of Settlement dated as of December 28, 2012, to resolve the Putative Class Action (the "Class Action Stipulation"). The Class Action Stipulation provides, among other things, that a payment of $6 million will be made on behalf of the Debtors and the individual defendants into a settlement fund administered pursuant to the terms of the Class Action Stipulation. This payment will be made from the proceeds of the Debtors' directors and officers insurance program, under which the Debtors and their officers and directors are beneficiaries under certain insurance policies. As more fully described in the _Debtors' Motion for an Order Permitting Their Current and Former Directors, Officers, and Employees to Seek Reimbursement and Advancement of Defense Costs From the Debtors' Insurance Providers_ [Docket No. 209], the Debtors maintain a Management Liability and Company Reimbursement Insurance Policy (the "Primary Policy") issued by XL Specialty Insurance Company ("XL") with an aggregate limit of liability of $15 million. In addition to the Primary Policy, the Debtors have excess layers of directors and officers insurance that has an aggregate insured amount of $50 million for the current policy period.

The Class Action Stipulation is subject to approval by the Northern Texas District Court and the Bankruptcy Court. On December 28, 2012, a motion was filed and is currently pending in the Northern Texas District Court to approve the Class Action Stipulation. The Debtors have filed a motion in the Bankruptcy Court seeking approval of the Class Action Stipulation, including the use of insurance proceeds to fund the Class Action Stipulation on behalf of the Debtors and the individual defendants, as required by the Class Action Stipulation. On February 20, 2013, the Committee filed a limited objection [Docket No. 195] to the motion to approve the Class Action Stipulation. In its limited objection, the Committee stated that while it is "not opposed _per se_ to a settlement of the shareholder class action litigation by the Debtors'

20

insurance carriers", it needs time to analyze the Class Action Stipulation and certain underlying facts. The Debtors have resolved the Committee's limited objection by including certain clarifying language in the order approving the motion. The Debtors believe that approval of the Class Action Stipulation is in the best interest of the Debtors' estates. The hearing to approve the Class Action Stipulation was held on March 26, 2013 and the Class Action Stipulation was approved by the Bankruptcy Court.

***Settlement of SunGard Claim.*** On March 6, 2013, SunGard Financial Systems LLC (together with its subsidiaries and affiliates, "SunGard") filed a proof of claim against PFSI, asserting that SunGard was owed at least $17,593,407.00 (Claim No. 69) as of the Petition Date (the "SunGard Claim"). The Debtors and their professionals have analyzed the SunGard Claim and after months of good faith and arm's length negotiations, the parties have agreed to settle the SunGard Claim on the terms set forth in that certain settlement agreement (the "SunGard Settlement Agreement"), which will be subject to Bankruptcy Court approval. Pursuant to the SunGard Settlement Agreement, the SunGard Claim will be allowed as a general unsecured claim against PFSI in the aggregate amount of $16.0 million (the "Amended SunGard Claim"), and will be classified and treated with other General Unsecured Claims against PFSI. The SunGard Settlement Agreement also provides for, among other things, mutual releases by the parties as set forth therein. Pursuant to Section 17.12 of the Plan, if anything in the Plan and Disclosure Statement conflicts with, or is contrary to any term(s) of the SunGard Settlement Agreement, as such term or terms pertain(s) to SunGard's rights, remedies and privileges or with respect to the treatment of the Amended SunGard Claim, the SunGard Settlement Agreement shall control.

***Renewed Discussion with Noteholders and New Restructuring Support Agreement.*** Following termination of the March RSA and the completion of the Knight Transaction and the Apex Transaction, the Company re-engaged in negotiations with significant holders of its Second Lien Notes (the "Second Lien Noteholders Committee") and Convertible Notes (the "Convertible Noteholders Committee") regarding a potential consensual wind-down of its business. After months of good faith and arm's length negotiations, on January 10, 2013, the Debtors entered into a restructuring support agreement (the "January RSA") with certain members of the Second Lien Noteholders Committee and each member of the Convertible Noteholders Committee (collectively, the "Consenting Noteholders"), pursuant to which the Consenting Noteholders have agreed, subject to certain terms and conditions, including approval of this Disclosure Statement, to support a consensual orderly liquidation of the Company's business, and to vote in favor of the Plan when solicited to do so. The Debtors have commenced these cases to implement the terms of the Plan, which will result in the liquidation of the Debtors' remaining businesses in a consensual and orderly manner.

*For a more detailed description of the Debtors' prepetition financial position and the events leading up to the commencement of these Chapter 11 Cases, refer to the First Day Declaration, which is incorporated herein by reference.*

21

## ARTICLE III.

## ADMINISTRATION OF THE CHAPTER 11 CASES

3.1.    Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of a chapter 11 petition. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor, to the fullest extent permitted by applicable law, from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of a chapter 11 case until such time as a bankruptcy court has approved a disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement in satisfaction of the applicable disclosure requirements under section 1125 of the Bankruptcy Code.

3.2.    Commencement of the Debtors' Chapter 11 Cases and First Day Pleadings and Certain Related Relief.

On the Petition Date, the Debtors filed motions seeking the Court's approval of several orders authorizing the Debtors to pay various prepetition claims, which are designed to ease the strain on the Debtors' relationship with their employees created by the filing of these bankruptcy cases, and ensure a smooth transition into chapter 11. The motions sought authority for the Debtors, among other things, to (i) pay prepetition compensation, benefits and employee expense reimbursements to employees, as well as continue their severance plan and to make payments thereunder to all non-insider employees; and (ii) establish procedures to resolve adequate assurance requests for their utility accounts. The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

22

*For additional information with respect to the first day pleadings and related relief sought by the Debtors at the beginning of these Chapter 11 Cases, refer to the First Day Declaration, which is incorporated herein by reference.*

3.3.    Official Committee of Unsecured Creditors.

On January 24, 2013, the U.S. Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee is currently comprised of the following parties: (i) Schonfeld Holdings, (ii) SunGard and (iii) Wells Fargo Bank, N.A., a successor to the Convertible Notes Trustee.

3.4.    Setting of Bar Dates.

On February 7, 2013, the Bankruptcy Court entered an order [Docket No. 144] (the "Bar Date Order") establishing, among other deadlines, March 11, 2013 at 5:00 p.m. (prevailing Pacific Time) as the general Bar Date for filing proofs of claim in the Chapter 11 Cases for all persons and entities other than governmental units and July 10, 2013, at 5:00 p.m. (prevailing Pacific Time) as the bar date for governmental units to file proofs of claim in the Chapter 11 Cases. Except as expressly set forth in the Bar Date Order, Holders of Claims shall submit requests for payment on or before the applicable bar date or forever be barred from doing so. The notice of the Bar Date Order delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) set forth the bar dates and constituted good and sufficient notice of bar dates. The Debtors shall have 120 days (or such longer period as may be allowed by order of the Court, which may be entered without notice or a hearing) following the applicable bar date to review and object to all Claims.

23

## ARTICLE IV.

## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND EQUITY INTERESTS THEREUNDER

4.1.   Summary of Plan.

The Plan is a plan of liquidation, pursuant to which the net proceeds from the disposition of any remaining assets, and/or any recoveries in connection with Avoidance Actions or other litigation against third parties will be distributed to persons or entities holding Allowed Claims and Equity Interests in accordance with the priorities of the Bankruptcy Code and the summary of treatment of Claims and Equity Interests set forth below.  The Debtors do not have the resources to undertake a comprehensive analysis and pursuit of various causes of action against third parties.  Instead, the Debtors' major stakeholders, through PTL and the Liquidation Trust, will decide which causes of action are worth pursuing.

The number and amount of Allowed Claims will not affect distributions for holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, or Allowed Other Secured Claims.  The Debtors estimate the Administrative Expense Claims to be in the range of $3.5-$4.0 million.  Of this amount, approximately $650,000 is estimated to be for the aggregate fees and expenses of counsel to the Second Lien Noteholders Committee and counsel to the Convertible Noteholders Committee, in accordance with the terms of the January RSA.  This amount has not been confirmed.  Actual distributions may differ depending on, among other things, the amount of the recoveries on account of Avoidance Actions or other litigation against third parties, the proceeds from the disposition of any remaining assets, and the Wind-Down Expenses.

The Debtors' assets will be allocated to a specific Debtor Estate as set forth on Exhibit 8 attached hereto.  As will be further described in the PTL LLC Agreement, to the extent any member of the Board of Managers does not agree on allocation to a specific Debtor Estate of any proceeds of any claims or causes of action or any assets that are not reflected as belonging to a specific Debtor Estate on Exhibit 8, such member may file a motion with the Bankruptcy Court seeking to resolve the allocation of such claims, causes of action or assets.

24

*Distributions and Estimated Recoveries under the Plan.* The Debtors' assets are primarily comprised of the Apex JV Interest, the NAV True-Up, the amounts owed to PFSI under the Penson-Apex Credit Facility, the Illiquid Instruments, the net proceeds from the sale of Nexa, any residual proceeds from the wind-down of PFSC remaining after distributions to PFSC's general unsecured creditors under the Canadian Proceeding, and the patents and Patent Claims. These assets may not be reduced to cash during the Chapter 11 Cases in which case they will be transferred to PTL and creditors will receive cash from the liquidation or prosecution, as applicable, of the PTL Assets at some point in the future. Proceeds from recovery on account of these assets will be distributable to holders of claims in accordance with the absolute priority rule, and as such, not all of these assets will be available to satisfy claims against all of the Debtors. As more fully described below, it is anticipated that any recoveries from these assets will be primarily distributed to holders of Second Lien Note Claims, Convertible Note Claims and General Unsecured Claims at various Debtor entities, in accordance with treatment of such Claims set forth in the Plan. The Plan also contemplates that to the extent that asset recoveries exceed expectations, after payment in full of all Allowed Claims of Second Lien Noteholders, Convertible Noteholders and General Unsecured Claims, any remaining recoveries would be distributed to the holders of Securities Law Claims against the PWI Estate, if any, and Equity Interests in PWI.

Distributions at PWI. PWI's unencumbered assets include the patents, the Patent Claims and other Estate causes of action. The value of such assets is unknown at this time. PWI's unencumbered assets also consist of any proceeds that PWI recovers from PFSI on the PWI Subordinated Loan. Any value remaining at PFSI after payment of PFSI's general unsecured creditors will be distributed Pro Rata to PWI on the PWI Subordinated Loan and SAI on the SAI Subordinated Loan. PFSI's primary assets are the Apex JV Interest, the NAV True-Up, the amounts owed to PFSI under the Penson-Apex Credit Facility, and any recoveries obtained from the SAMCO Arbitration and any causes of action. As described more fully below, the value of these assets, excluding the equity interest and any recovery on causes of action, is unclear and subject to resolution of disputes with Apex but the Debtors estimate that they should receive approximately $20 million from the liquidation of these assets. The value of equity interest is unknown but consists primarily of $90 million of regulatory capital. PFSI's General Unsecured Claims are estimated to be in the range of $20-$25 million. Since there are no security interests granted to creditors in PWI's assets other than equity pledges granted to Second Lien Noteholders, any proceeds from PWI assets (including patents), other than PWI's pledge of equity in SAI, would be distributed *pari passu* among the Second Lien Noteholders, the Convertible Noteholders and holders of PWI's General Unsecured Claims. If any value remains after these claims are satisfied prior to the Class D Expiration Date, such value would be distributed to holders of Securities Law Claims against the PWI Estate, if any, and holders of Equity Interests in PWI. The Debtors estimate the General Unsecured Claims at PWI to be in the range of $282-$284 million.

25

Distributions at SAI and PHI. SAI's assets primarily consist of Illiquid Instruments (subject to the 40% sharing arrangement with the PFSI Estate), equity interests in Nexa and PFSI, and any proceeds SAI recovers from PFSI on the SAI Subordinated Loan. The value of Illiquid Instruments is speculative but the Debtors estimate it to be in the range of approximately $5- $10 million. The Debtors do not believe that there are any other Claims against either SAI or PHI other than with respect to the Second Lien Noteholders, Schonfeld Holdings and the Promissory Note. Accordingly, distributions from the liquidation of SAI's assets are contemplated to be made to (i) the Second Lien Noteholders through SAI's guarantee of PWI's obligations under the Second Lien Notes Indenture, in respect of their Allowed Second Lien Note Guarantee Secured Claim against SAI and (ii) other holders of Allowed Claims against SAI. Distributions from the liquidation of PHI's assets are contemplated to be made to the Second Lien Noteholders through PHI's guarantee of PWI's obligations under the Second Lien Notes Indenture, in respect of their Allowed Second Lien Note Guarantee Secured Claim against PHI.

Distributions at PFSI. PFSI's assets primarily consist of *de minimis* deposits, escrows, the NAV True-Up, the Penson-Apex Credit Facility, the Apex JV Interest, and any award resulting from the SAMCO Arbitration or any avoidance actions related to the Apex Transaction and the Knight Transaction. The value of these assets, excluding the Apex JV Interest, is unclear and subject to resolution of disputes with Apex but the Debtors estimate that they should receive approximately $20 million from the liquidation of these assets. The value of the Apex JV Interest is unknown but consists primarily of the value of PFSI's capital account at Apex Holdings. Apex has alleged that no NAV True-Up payments are due to the Company and that Apex may be owed additional consideration from PFSI under the Apex AAA and that Apex Clearing may be owed additional consideration from PFSI based on the actual value of the assets transferred. The Debtors believe that they are owed not less than an additional $7.0 million for the NAV True-Up. The Debtors and Apex Clearing have engaged in negotiations in an effort to resolve their disputes over the NAV True-Up and expect to continue such negotiations. Apex also claims that it has various claims against the Debtors which it can use to offset its obligations under the Penson-Apex Credit Facility, which matured in December 2012. Apex has consequently taken the position that no amounts will be paid on the Penson-Apex Credit Facility. The Debtors dispute Apex's claims and believe that all amounts are due and payable under the Penson-Apex Credit Facility. The Debtors intend to vigorously pursue their rights with respect to the NAV True-Up and Penson-Apex Credit Facility; however, resolution of these matters may take time and the outcome is uncertain.

All value of PFSI would first be distributed to holders of General Unsecured Claims against the PFSI Estate and then would be distributed to PWI via the PWI Subordinated Loan and to SAI via the SAI Subordinated Loan. As described above, any proceeds of the SAI Subordinated Loan would be distributed to the Second Lien Noteholders. The excess above the subordinated loan amounts would go to the Second Lien Noteholders through the pledge by SAI of PFSI stock to the Second Lien Noteholders. In addition, pursuant to the Intercompany Claims Settlement, in full satisfaction of the Promissory Note Claim, 40% of all proceeds from the Illiquid Instruments, up to $3,500,000, shall be distributed to the PFSI Estate. No further distributions on account of the Promissory Note Claim will be made. The Debtors estimate that PFSI's General Unsecured Claims against PFSI range from $20-$25 million.

26

Distributions at Nexa. It is expected that Nexa's assets will be sold during the Chapter 11 Cases and the net proceeds of the sale would be distributed to creditors. On March 26, 2013, the Bankruptcy Court entered an order approving the sale of Nexa's assets for $10.5 million. After payment of Nexa's general unsecured creditors, the remaining proceeds of the sale will be distributed to Nexa's direct parent, SAI. Distributions from SAI are contemplated to be made to (i) the Second Lien Noteholders through SAI's guarantee of PWI's obligations under the Second Lien Indenture, in respect of their Allowed Second Lien Note Guarantee Secured Claims against SAI and (ii) other holders of Allowed Claims against SAI. Because SAI has guaranteed PWI's obligations under the Second Lien Notes, these proceeds would then be distributed to holders of Second Lien Note Guarantee Claims. The Debtors estimate that Nexa's General Unsecured Claims range from $400,000-$900,000.

Distributions at PFSC. All value of PFSC from its wind-down and liquidation in Canada would be distributed to PFSC's general unsecured creditors and used for payment of any accrued or upcoming fees and expenses relating to the business and affairs thereof and its wind-down, liquidation and dissolution. At the conclusion of the Canadian Proceeding, any residual proceeds from the wind-down of PFSC remaining after such distributions to its general unsecured creditors and other payments are contemplated to be made to the Second Lien Noteholders through a pledge of 65% of PFSC's stock and through PHI's guarantee of PWI's obligations under the Second Lien Notes Indenture (since PHI is a direct parent of PFSC). It is uncertain what proceeds, if any, will be available to distribute to non-PFSC creditors at the conclusion of the Canadian proceeding or when any such distributions would be made.

THE DISTRIBUTION ANALYSIS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

*Plan Structure.* On the Effective Date of the Plan, all of the Debtors' assets will be transferred to PTL, a newly formed Delaware limited liability company, for the liquidation, administration, and distribution of the Debtors' assets to creditors in accordance with the terms of the Plan and the PTL LLC Agreement. Notwithstanding the transfer of all assets to a single entity, all assets will be segregated according to the entity that transferred them and all distributions will be made strictly in accordance with the absolute priority rule as if such assets remained in separate entities. PTL will be managed by a Board of Managers and the Chief Officer designated by the Board of Managers. The initial Board of Managers will consist of four members, two of whom will be appointed by the Second Lien Noteholders Committee, one of whom will be appointed by the Convertible Noteholders Committee and one of whom will be appointed by the Committee.

27

PTL, through the Chief Officer, in consultation with the Board of Managers, will be responsible for implementing and administering the Plan, including distributing assets to the Second Lien Noteholders, the Convertible Noteholders and Holders of General Unsecured Claims against PWI. In addition, a Liquidation Trust will be created for the primary purpose of distributing assets to all other creditors, including Holders of General Unsecured Claims against PWI's domestic subsidiaries, and Equity Interests in PWI.

The Chief Officer, in consultation with the Board of Managers, will also initiate and defend any causes of action on behalf of the Company after the Plan is confirmed and consummated. The Plan provides that Holders of Claims may assign and transfer to PTL certain causes of actions and liabilities such Holders have against certain third parties (a) for damages arising from the purchase or sale of any security of the Debtor or the Debtor's affiliates or (b) for violations of the securities laws, misrepresentations, or any similar actions or liabilities arising from the purchase or sale of any such security. PTL shall not be obligated to pursue any transferred Third-Party Cause of Action and, as assignee of such Transferred Third-Party Causes of Action, all decisions with respect to such Transferred Third-Party Causes of Action, including decisions with respect to the prosecution and settlement of such Transferred Third Party Causes of Action, will belong solely to PTL. For purposes of distributions, the proceeds of any transferred Third-Party Causes of Action will be general property of PWI's estate and any proceeds thereof shall be distributed in accordance with Article IV of the Plan without regard to the identity or status of the Third-Party Cause of Action Transferor.

Creditors will not have to wait until the final resolution of these causes of action before they receive distributions under the Plan. Rather, the Plan provides for distributions to occur on the Effective Date or as soon thereafter as is practicable, to the extent any assets are available for distribution to creditors as of the Effective Date. The Plan also provides for distributions at various intervals after the initial distributions, which will enable the distribution of any resulting recoveries from disposition or liquidation of the assets or pursuit of causes of action, in accordance with the Plan.

The Plan breaks down Claims and Equity Interests against each Debtor into various classes, as set forth in the charts below. To effectuate distributions under the Plan to these creditors, the Plan contemplates four classes of membership interests in PTL (Class A Units, Class B Units, Class C Units, and Class D Units), which will be distributed, in exchange for full and final satisfaction, settlement, release and compromise of such Claims and Equity Interests, as follows:

- Class A Units shall be distributed to the holders of Second Lien Notes in exchange for release and discharge of their Second Lien Note Claims. These include the Second Lien Note Claims against PWI as issuer of the Second Lien Notes, and SAI and PHI, as guarantors thereunder and also covers their security interests in various assets of PWI, SAI and PHI.

Doc#: US1:8414841v9

- Class B Units shall be distributed to (A) the holders of Convertible Notes in exchange for release and discharge of Convertible Note Claims; and (B) the Holders of General Unsecured Claims against PWI in exchange for release and discharge of such General Unsecured Claims. Each of these groups only holds unsecured claims against PWI. The distributions of assets of PWI (other than those pledged to secure the Second Lien Notes) will be made Pro Rata to the holders of Second Lien Note Claims, Convertible Note Claims, and General Unsecured Claims against PWI.

- Class C Units shall be distributed to the Liquidation Trust for the benefit of holders of General Unsecured Claims against each of PWI's domestic subsidiaries in exchange for release and discharge of such General Unsecured Claims. These claims will be paid from the assets of the respective subsidiary against which the claim is held (e.g., claims against PFSI would be paid solely from PFSI's assets).

- Class D Units shall be distributed to the Liquidation Trust for the benefit of (i) the holders of Equity Interests in PWI, and (ii) the holders of Securities Law Claims against the PWI Estate, if any, in exchange for release and discharge of such Claims and Equity Interests. Unless all amounts payable to the holders of Class A Units, Class B Units, and Class C Units are paid prior to the fifth anniversary of the Effective Date, all rights of the holders of Class D Units and the Class D Units themselves would expire on the fifth anniversary of the Effective Date and no distributions would be made by PTL on account of such Units after that date. Any amounts received by PTL from the liquidation of the Debtors' assets after this expiration date would be distributed to the holders of Class A Units and Class B Units in proportion to their respective claims, except proceeds of assets pledged to secure the Second Lien Notes which will be distributed to holders of Second Lien Note Secured Claims. The holders of Class D Units would only receive a distribution after all other creditor claims have been fully satisfied.

     *Settlement of Intercompany Claims under the Plan.* The Plan provides for settlement of the PWI Subordinated Loan and the SAI Subordinated Loan among the Second Lien Noteholders and the Convertible Noteholders. Under the terms of the Intercompany Claims Settlement, in recognition of the arguments that the Second Lien Noteholders and the Convertible Noteholders have made with respect to the PWI Subordinated Loan and the SAI Subordinated Loan, the Claims on account of the PWI Subordinated Loan Note shall be Allowed in the amount of $45 million and the Claims on account of the SAI Subordinated Loan shall be Allowed in the amount of $12 million. The Debtors believe that the Intercompany Claims Settlement is fair, reasonable, and in the best interests of the Debtors and their creditors.

     Although the Plan is presented as a joint plan of liquidation, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates will not be deemed to be substantively consolidated for any reason. Notwithstanding anything in the Plan or Disclosure Statement to the contrary, Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, even after such Debtor's assets are transferred to PTL.

29

*Preservation of Estate Causes of Action*.  Except with respect to those specific identified Estate Causes of Action being released under the terms of the Plan, any and all of the Causes of Action, whether direct, indirect or derivative in nature, held or owned by any of the Debtors or the Debtors' Estates are being preserved under the Plan and transferred and assigned to PTL.  By way of a general description, such Causes of Action include, without limitation, the following:

(i)  Any Causes of Action asserted by one or more Debtors, as plaintiff(s), prior to the Petition Date against various defendants in a variety of state and federal jurisdictions within the United States, which Causes of Action include, without limitation, actions (i) for breach of contract, (ii) for breach of a non-compete agreement with any Debtor, (iii) against former employee to recover bonuses; and (iv) to recover early payoffs.  The Debtors anticipate further investigation may reveal other Causes of Action on similar grounds, which Causes of Action (along with the Causes of Action pending as of the Petition Date) may be asserted from and after the date hereof;

(ii)  Potential Causes of Action against those certain former officers and directors of the Debtors, for alleged breaches of their fiduciary duties and other obligations to the Debtors, as well as alleged waste of corporate assets of the Debtors.  Such alleged breaches and waste of corporate assets, if found to be true, may have caused the Debtors to suffer substantial losses and damages.  Such alleged breaches of duties and obligations by such officers and directors, include, without limitation:

    a)     failing to implement, execute and oversee effective controls and procedures to manage, address and minimize known risks in the margin lending by the Debtors;

    b)     failing to implement, execute and oversee effective controls and procedures to insure that margin loans made by the Debtors were in accordance with requirements and limits mandated by regulatory authorities and thereafter maintained within those requirements and limits;

    c)     failing to implement, execute and oversee effective controls and procedures to prevent in the first instance or thereafter detect and remedy those margin loans that were made by the Debtors and secured by non-marginable assets;

    d)     failing to remedy or otherwise address known deficiencies in margin lending by the Debtors;

    e)     failing to implement, execute and oversee effective controls over financial reporting by the Debtors;

    f)     failing to implement, execute and oversee effective controls and procedures in the public disclosures by the Debtors; and

    g)     failing to safeguard and protect the assets of the Debtors.

(iii)  The Debtors anticipate there may be viable Causes of Action against the following parties, among others:

30

a)    any party that received an avoidable transfer under Chapter 5 of the Bankruptcy Code, including those identified in the Debtors' Statements of Financial Affairs, of an interest in property of any Debtor, or in favor of whom any Debtor incurred an obligation, prior to the Petition Date, or any mediate or immediate transferee of any such party;

b)    any party that received an unauthorized transfer of an interest in property of any Debtor post-petition, or any mediate or immediate transferee of any such party; and

c)    any Causes of Action as described elsewhere in the Disclosure Statement, including, without limitation, arising out of the Apex Transaction, Knight Transaction, and Schonfeld transaction and any potential claims against auditors.

The enumeration of Causes of Action in the foregoing shall be without prejudice to the retention of jurisdiction over any Cause of Action discovered by the Debtors or PTL after the date of this Disclosure Statement.

THE FOLLOWING CHARTS SUMMARIZE THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS AND THE POTENTIAL DISTRIBUTIONS UNDER THE PLAN. THE AMOUNTS SET FORTH BELOW ARE ESTIMATES ONLY. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS. THE RECOVERIES SET FORTH BELOW ARE PROJECTED RECOVERIES AND ARE THEREFORE SUBJECT TO CHANGE. THE ALLOWANCE OF CLAIMS AND INTERESTS MAY BE SUBJECT TO LITIGATION OR OTHER ADJUSTMENTS, AND ACTUAL ALLOWED CLAIM OR INTEREST AMOUNTS MAY DIFFER MATERIALLY FROM THESE ESTIMATED AMOUNTS. IMMEDIATELY FOLLOWING THE CHARTS IS THE DESCRIPTION OF THE TREATMENT OF THE CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.

4.2.    Identification of Classes Against PWI (Debtor 1).

The following chart assigns letter "A" to each Class of Claims and Interests against PWI for purposes of identifying each separate Class of Claims and Interests against PWI.

| Class | Description | Treatment | Entitled to Vote | Estimated Recoveries |
|-------|-------------|-----------|------------------|----------------------|
| Class 1A | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 2A | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 3A | General Unsecured Claims | Impaired | Yes | 0-15%[2] |
| Class 4A | Second Lien Note Claims | Impaired | Yes | 0-15% |
| Class 5A | Convertible Note Claims | Impaired | Yes | 0-15% |
| Class 6A | Intercompany Claims | Impaired | No (deemed to reject) | 0% |
| Class 7A | Securities Law Claims | Impaired | No (deemed to reject) | 0% |
| Class 8A | Equity Interests | Impaired | No (deemed to reject) | 0% |

4.3.    Identification of Classes Against PFSI (Debtors 2).

The following chart assigns letter "B" to each Class of Claims and Interests against PFSI for purposes of identifying each separate Class of Claims and Interests against PFSI.

| Class | Description | Treatment | Entitled to Vote | Estimate Recoveries |
|-------|-------------|-----------|------------------|---------------------|
| Class 1B | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) | 100% |

---

[2]    The approximate recovery percentage identified for General Unsecured Claims is based on the Debtors' best estimate of the aggregate amount of the General Unsecured Claims ultimately Allowed upon conclusion of the Claims reconciliation and objection process. Accordingly, actual recoveries may be less as they are subject to a number of factors, including, but not limited to, the successful prosecution of certain objections to Claims.

32

| Class | Description | Treatment | Entitled to Vote | Estimate Recoveries |
|-------|-------------|-----------|------------------|---------------------|
| Class 2B | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 3B | General Unsecured Claims | Impaired | Yes | 50-100%[2] |
| Class 4B | Subordinated Loan Claims | Impaired | Yes | 0-100% |
| Class 5B | Intercompany Claims | Impaired | No (deemed to reject) | 0% |
| Class 6B | Equity Interests | Impaired | No (deemed to reject) | $0-$35.7 million[3] |

4.4.    Identification of Classes Against SAI and PHI (Debtors 3 and 4).

The following chart assigns letter "C" to each Class of Claims and Interests against Guarantor Debtors SAI and PHI for purposes of identifying each separate Class of Claims and Interests against SAI and PHI.

| Class | Description | Treatment | Entitled to Vote | Estimated Recoveries |
|-------|-------------|-----------|------------------|----------------------|
| Class 1C | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 2C | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 3C | General Unsecured Claims | Impaired | Yes | 0-12%[2] |
| Class 4C | Second Lien Note Guarantee Claims | Impaired | Yes | 0-29% |
| Class 5C | Intercompany Claims | Impaired | No (deemed to reject) | 0% |
| Class 6C | Equity Interests | Impaired | No (deemed to reject) | 0% |

4.5.    Identification of Classes Against Nexa (Debtor 5).

The following chart assigns letter "D" to each Class of Claims and Interests against Nexa for purposes of identifying each separate Class of Claims and Interests against Nexa.

---

[3]    This estimate is for illustrative purposes only and assumes full recovery on the NAV True-Up and the amounts owed under the Penson-Apex Credit Facility and a range of recovery from $0-$90 million with respect to the Apex JV Interest.

33

| Class | Description | Treatment | Entitled to Vote | Estimated Recoveries |
|---|---|---|---|---|
| Class 1D | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 2D | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 3D | General Unsecured Claims | Impaired | Yes | 100%[2] |
| Class 4D | Intercompany Claims | Impaired | No (deemed to reject) | 0% |
| Class 5D | Equity Interests | Impaired | No (deemed to reject) | $7.9-$8.5 million |

4.6.    Identification of Classes Against Remaining Filed Subsidiary Debtors.[4]

The following chart assigns letter "E" to each Class of Claims and Interests against the remaining Filed Subsidiary Debtors for purposes of identifying each separate Class of Claims and Interests against the remaining Filed Subsidiary Debtors.

| Class | Description | Treatment | Entitled to Vote | Estimated Recoveries |
|---|---|---|---|---|
| Class 1E | Non-Tax Priority Claims | Unimpaired | No (conclusively presumed to accept) | 100% |
| Class 2E | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) | 0% |
| Class 3E | General Unsecured Claims | Impaired | Yes | $0-$1,000[2] |
| Class 4E | Intercompany Claims | Impaired | No (conclusively presumed to accept) | 0% |
| Class 5E | Equity Interests | Impaired | No (deemed to reject) | $0-$1,000 |

**Treatment of Administrative Expense Claims and Priority Tax Claims**

4.7.    Administrative Expense Claims.

---

[4]    Remaining Filed Subsidiary Debtors are Penson Execution Services, Inc., Penson Financial Futures, Inc., GHP1, Inc., GHP2, LLC, and Penson Futures.

34

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

Under the terms of the January RSA, the Debtors have agreed to pay the reasonable and documented fees and expenses due and owing to (i) Fried, Frank, Harris, Shriver & Jacobson LLP, counsel to the Second Lien Noteholders Committee and one (1) local counsel for the Second Lien Noteholders Committee, and (ii) Sidley Austin LLP, counsel to the Convertible Noteholders Committee and one (1) local counsel for the Convertible Noteholders Committee, in each case, in accordance with their existing engagement or fee letters. Under the Plan, the fees payable under the January RSA are to be paid by the Debtors prior to or on the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

4.8.    Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim accruing on or after January 11, 2013, other than: (a) a Fee Claim; (b) an Administrative Expense Claim that has been Allowed on or before the Effective Date; and (c) a claim for U.S. Trustee Fees, must submit to the Claims and Voting Agent and serve on PTL and its counsel and the Liquidation Trustee and counsel to the Liquidation Trust, a request for such Administrative Expense Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the date that is forty (40) days after service of notice of occurrence of the Effective Date. Such request must include at a minimum: (i) the name of the Debtor(s) that are purported to be liable for the Administrative Expense Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. For the avoidance of doubt, Section 2.02 of the Plan shall not be applicable to any claims arising under section 503(b)(9) of the Bankruptcy Code, or Indenture Trustee Fee Claims or any Restructuring Support Agreement Professional Fees, which Fee Claims shall be paid pursuant to Sections 10.07 and 17.02 of the Plan, respectively. **FAILURE TO FILE AND SERVE SUCH NOTICE OR REQUEST TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND EXTINGUISHED.**

4.9.    Professional Compensation and Reimbursement Claims.

All requests for allowance of Fee Claims on a final basis must be filed with the Bankruptcy Court and served on PTL and its counsel, and the U.S. Trustee, no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court. For the avoidance of doubt, Section 2.03 of the Plan shall not be applicable to any Indenture Trustee Fee Claim or any Restructuring Support Agreement Professional Fees,

which Fee Claims shall be paid pursuant to Sections 10.07 and 17.02 of the Plan, respectively. FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND EXTINGUISHED.

Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Bankruptcy Court.

Upon final allowance by the Bankruptcy Court of any Fee Claim, PTL shall pay from the PTL Assets the amount of all Allowed but unpaid Professional Fees promptly and directly to the applicable Professional.

4.10.    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the sole option of PTL, either (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim. Any Claim or demand for fines or penalties related to a Priority Tax Claim shall be disallowed and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect any such fine or penalty from PTL, the Chief Officer or the Liquidation Trustee.

## Classification and Treatment of Classified Claims Against and Interest in PWI (Debtor 1).

4.11.    Class 1A – Non-Tax Priority Claims.

(a)    Impairment and Voting. Class 1A is unimpaired by the Plan. Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment. Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Allowed Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

4.12.    Class 2A – Other Secured Claims.

36

(a)    <u>Impairment and Voting</u>.  Class 2A is unimpaired by the Plan.  Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

4.13.    <u>Class 3A – General Unsecured Claims</u>.

(a)    <u>Impairment and Voting</u>.  Class 3A is impaired by the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>.  Subject to the terms of the Plan and the PTL LLC Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Class B Units, in full and final satisfaction, settlement, release, and compromise of and in exchange for its Allowed General Unsecured Claim against the PWI Estate,  payable from the Net Distributable Assets of the PWI Estate.  Distributions under Section 4.03(b), 4.04(b)(ii) and 4.05(b) of the Plan shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Deficiency Claims, and Allowed Convertible Note Claims.

4.14.    <u>Class 4A – Second Lien Note Claims</u>.

(a)    <u>Impairment and Voting</u>.  Class 4A is impaired by the Plan.  Each Holder of a Second Lien Note Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>.  On or as soon as practicable after the applicable Distribution Date, subject to the terms of the Plan and the PTL LLC Agreement, each Holder of an Allowed Second Lien Note Claim against PWI shall receive its Pro Rata share of Class A Units, in full and final satisfaction, settlement, release and compromise of and in exchange for, (i) its Allowed Second Lien Note Secured Claim against the PWI Estate, to the extent of the value of the security granted by PWI, and (ii) its Allowed Second Lien Note Deficiency Claim, payable from the Net Distributable Assets of the PWI Estate.  Distributions under Section 4.03(b), 4.04(b)(ii) and 4.05(b) of the Plan shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Deficiency Claims, and Allowed Convertible Note Claims.

37

4.15.    Class 5A – Convertible Note Claims.

(a)    Impairment and Voting.  Class 5A is impaired by the Plan.  Each Holder of a Convertible Note Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  On or as soon as practicable after the applicable Distribution Date, subject to the terms of the Plan and the PTL LLC Agreement, each Holder of an Allowed Convertible Note Claim against PWI shall receive its Pro Rata share of Class B Units, in full and final satisfaction, settlement, release and compromise of and in exchange for its Allowed Convertible Note Claim against the PWI Estate, payable from the Net Distributable Assets of the PWI Estate.  Distributions under Section 4.03(b), 4.04(b)(ii) and 4.05(b) of the Plan shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims, Allowed Second Lien Note Deficiency Claims, and Allowed Convertible Note Claims.

4.16.    Class 6A – Intercompany Claims.

(a)    Impairment and Voting.  Class 6A is impaired by the Plan.  Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan., pursuant to section 1126(g) of the Bankruptcy Code.

(b)    Treatment.  On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

4.17.    Class 7A – Securities Law Claims.

(a)    Impairment and Voting.  Class 7A is impaired by the Plan.  Each Holder of a Securities Law Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each Holder of an Allowed Securities Law Claim as of the Distribution Record Date shall not receive any distributions on account of such Allowed Securities Law Claims, provided, however, that, to the extent that asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Securities Law Claims, then after the payment in full of all Allowed Claims of the Holders of the Class A Units and the Class B Units (plus, where applicable, post-petition interest due thereon until payment in full), PTL will distribute amounts then available to the Liquidation Trust as the Holder of the Class D Units for the benefit of the Holders of Securities Law Claims against the PWI Estate, payable from the Net Distributable Assets of the PWI Estate.  Notwithstanding the foregoing proviso, if distributions on account of the Class D Units do not commence prior to the Class D Expiration Date, the Class D Units shall be cancelled and the Net Distributable Assets of the PWI Estate shall continue to be distributed to the Holders of Class A Units and Class B Units in proportion to the Allowed Unsecured Claims of such Holders after payment of any applicable secured claims.  Distributions to Holders of Securities Law Claims on account of such Holders' Class D Units shall be in accordance with the priorities of the Bankruptcy Code.

38

4.18.    Class 8A – Equity Interests.

(a)    Impairment and Voting.  Class 8A is impaired by the Plan.  Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  The Holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, to the extent that asset recoveries exceed current expectations in an amount that would permit a Distribution to a Class of Equity Interests, then after the payment in full of all Allowed Claims of the Holders of the Class A Units and the Class B Units (plus, where applicable, post-petition interest due thereon until payment in full), PTL will distribute amounts then available to the Liquidation Trust as the Holder of the Class D Units for the benefit of the Holders of Equity Interests in PWI, payable from the Net Distributable Assets of the PWI Estate.  Notwithstanding the foregoing proviso, if distributions on account of the Class D Units do not commence prior to the Class D Expiration Date, the Class D Units shall be cancelled and the Net Distributable Assets of the PWI Estate shall continue to be distributed to the Holders of Class A Units and Class B Units in proportion to the Allowed Unsecured Claims of such Holders after payment of any applicable secured claims.  On the Effective Date, all Equity Interests in PWI shall be deemed cancelled.  Distributions to Holders of Equity Interests on account of such Holders' Class D Units shall be in accordance with the priorities of the Bankruptcy Code.

**Classification and Treatment of Classified Claims Against and Interests in PFSI (Debtor 2).**

4.19.    Class 1B – Non-Tax Priority Claims.

(a)    Impairment and Voting.  Class 1B is unimpaired by the Plan.  Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

4.20.    Class 2B – Other Secured Claims.

(a)    Impairment and Voting.  Class 2B is unimpaired by the Plan.  Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

Doc#: US1:8414841v9

(b) Treatment. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

4.21. Class 3B – General Unsecured Claims.

(a) Impairment and Voting. Class 3B is impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b) Treatment. Subject to the terms of the Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust, plus, to the extent solvent (excluding the Subordinated Note Claims and Intercompany Claims), post-Effective Date interest on the amounts outstanding on such Allowed General Unsecured Claims as of six months after the Effective Date at a rate equal to 5% per annum, such interest to begin accruing six months after the Effective Date, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim against the PFSI Estate. Distributions shall be payable from the Net Distributable Assets of the PFSI Estate.

4.22. Class 4B – Subordinated Loan Claims.

(a) Impairment and Voting. Class 4B is impaired by the Plan. Each Holder of an Allowed Subordinated Loan Claim is entitled to vote to accept or reject the Plan.

(b) Treatment. Subject to the terms of the Plan and the PTL LLC Agreement, and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Subordinated Loan Claim, each Holder of an Allowed Subordinated Loan Claim shall receive, after payment in full of all Allowed General Unsecured Claims against the PFSI Estate (including post-Effective Date interest), its Pro Rata share of the Net Distributable Assets of the PFSI Estate. Such Distributions will constitute property of the PWI Estate and the SAI Estate, as applicable, and will be distributed in accordance with Article IV and Article VI of the Plan, respectively, and the PTL LLC Agreement.

4.23. Class 5B – Intercompany Claims.

(a) Impairment and Voting. Class 5B is impaired by the Plan. Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

40

(b)  <u>Treatment</u>. On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

4.24.  <u>Class 6B – Equity Interests</u>.

(a)  <u>Impairment and Voting</u>. Class 6B is impaired by the Plan. Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>. The Holders of Equity Interests shall not receive any distributions on account of such interests, <u>provided</u>, <u>however</u>, that, to the extent that, after payment in full of all Allowed General Unsecured Claims and Allowed Subordinated Loan Claims against the PFSI Estate, asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests in PFSI, such Distributions will be paid to the SAI Estate (on account of its Equity Interests in PFSI), and will otherwise constitute property of the SAI Estate, and will be distributed in accordance with Article VI of the Plan.

**<u>Classification and Treatment of Classified Claims Against and Interests in Guarantor Debtors – SAI and PHI (Debtors 3 and 4).</u>[5]**

4.25.  <u>Class 1C – Non-Tax Priority Claims</u>.

(a)  <u>Impairment and Voting</u>. Class 1C is unimpaired by the Plan. Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)  <u>Treatment</u>. Except to the extent that a Holder of an Allowed Non-Tax Priority Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Allowed Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, or as soon thereafter as is practicable.

4.26.  <u>Class 2C – Other Secured Claims</u>.

(a)  <u>Impairment and Voting</u>. Class 2C is unimpaired by the Plan. Each Holder of an Other Secured Claim, including a Promissory Note Claim, is not entitled to vote to accept

---

[5]  The inclusion of SAI and PHI in the same class is for convenience purposes only. Notwithstanding the inclusion of SAI and PHI in the same class, nothing in the Plan shall be deemed to substantively consolidate these Debtors. All votes shall be tabulated on a Debtor by Debtor basis and all claims shall be paid only from the assets of the applicable Debtor that is obligated on account of such Allowed Claim.

or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Other Secured Claim, including a Holder of an Allowed Promissory Note Claim, agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim and Allowed Promissory Note Claim, each Holder of an Allowed Other Secured Claim and Allowed Promissory Note Claim, shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Claim; (ii) the collateral securing any such Allowed Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, provided, that in full satisfaction of the Promissory Note Claim, 40% of all proceeds from the Illiquid Instruments, up to $3,500,000, shall be distributed to the PFSI Estate and no further distributions on account of the Promissory Note Claim will be made.

4.27.    Class 3C – General Unsecured Claims.

(a)    Impairment and Voting.  Class 3C is impaired by the Plan.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  Subject to the terms of the Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim against the SAI and PHI Estates.  PTL shall make Pro Rata Distributions to the Liquidation Trust as the Holder of the Class C Units from the Net Distributable Assets of the SAI and PHI Estates, as applicable.  Distributions under Section 6.03(b) and 6.04(b)(ii) of the Plan shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims and Allowed Second Lien Note Guarantee Deficiency Claims.

4.28.    Class 4C – Second Lien Note Guarantee Claims.

(a)    Impairment and Voting.  Class 4C is impaired by the Plan.  Each Holder of a Second Lien Note Guarantee Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment.  On or as soon as practicable after the applicable Distribution Date, subject to the terms of the Plan and the PTL LLC Agreement, each Holder of an Allowed Second Lien Note Guarantee Claim against SAI and PHI shall receive its Pro Rata share of Class A Units, in full and final satisfaction, settlement, release and compromise of and in exchange for, (i) its Allowed Second Lien Note Guarantee Secured Claim against the SAI and PHI Estates, to the extent of the value of the security granted by SAI and PHI, and (ii) its Allowed Second Lien Note Guarantee Deficiency Claim against the SAI and PHI Estates, payable from the Net Distributable Assets of the SAI and PHI Estates, as applicable.  Distributions under Sections

42

6.03(b) and 6.04(b)(ii) of the Plan shall be shared Pro Rata among the Holders of Allowed General Unsecured Claims and Allowed Second Lien Note Guarantee Deficiency Claims.

4.29.    Class 5C – Intercompany Claims.

(a)    Impairment and Voting.  Class 5C is impaired by the Plan.  Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan., pursuant to section 1126(g) of the Bankruptcy Code.

(b)    Treatment.  On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

4.30.    Class 6C – Equity Interests.

(a)    Impairment and Voting.  Class 6C is impaired by the Plan.  Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  The Holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, to the extent that, after payment in full of all Allowed General Unsecured Claims and Allowed Second Lien Note Guarantee Claims against the SAI and PHI Estates, asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests in SAI and PHI, such Distributions will be paid to the PWI Estate (on account of its Equity Interests in SAI) and the SAI Estate (on account of its Equity Interests in PHI), will constitute property of the PWI Estate and SAI Estate, as applicable, and will be distributed in accordance with Article IV and Article VI of the Plan, respectively.

**Classification and Treatment of Classified Claims Against and Interests in Nexa (Debtor 5).**

4.31.    Class 1D – Non-Tax Priority Claims.

(a)    Impairment and Voting.  Class 1D is unimpaired by the Plan.  Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    Treatment.  Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

43

4.32.   Class 2D – Other Secured Claims.

(a)   Impairment and Voting. Class 2D is unimpaired by the Plan. Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)   Treatment. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

4.33.   Class 3D – General Unsecured Claims.

(a)   Impairment and Voting. Class 3D is impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)   Treatment. Subject to the terms of the Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust on the later of the Effective Date and the date such Claim becomes an Allowed General Unsecured Claim, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim against the Nexa Estate. Distributions shall be payable from the Net Distributable Assets of the Nexa Estate within thirty (30) days of the Effective Date or as reasonably practicable thereafter.

4.34.   Class 4D – Intercompany Claims.

(a)   Impairment and Voting. Class 4D is impaired by the Plan. Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan., pursuant to section 1126(g) of the Bankruptcy Code.

(b)   Treatment. On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

4.35.   Class 5D – Equity Interests.

44

(a) _Impairment and Voting_. Class 5D is impaired by the Plan. Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b) _Distributions_. The Holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, after payment in full of all Allowed General Unsecured Claims against the Nexa Estate, asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests in Nexa, such Distributions will be paid to the SAI Estate (on account of its Equity Interests in Nexa), will constitute property of the SAI Estate, and will be distributed in accordance with Article VI of the Plan.

**Classification and Treatment of Classified Claims Against and Interests in Remaining Filed Subsidiary Debtors (Debtors 6 Through 10).[6]**

4.36.  Class 1E – Non-Tax Priority Claims.

(a) _Impairment and Voting_. Class 1E is unimpaired by the Plan. Each Holder of an Allowed Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b) _Treatment_. Except to the extent that a Holder of an Allowed Non-Tax Priority Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release and compromise of each Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive Cash in an amount equal to such Allowed Non-Tax Priority Claim on the later of the Effective Date and the date such Claim becomes an Allowed Non-Tax Priority Claim, or as soon as reasonably practicable thereafter.

4.37.  Class 2E – Other Secured Claims.

(a) _Impairment and Voting_. Class 2E is unimpaired by the Plan. Each Holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

---

[6]  Remaining Filed Subsidiary Debtors are Penson Execution Services, Inc., Penson Financial Futures, Inc., GHP1, Inc., GHP2, LLC and Penson Futures. The inclusion of the remaining Filed Subsidiary Debtors in the same class is for convenience purposes only. Notwithstanding the inclusion of the remaining Filed Subsidiary Debtors in the same class, nothing in the Plan shall be deemed to substantively consolidate these Debtors. All votes shall be tabulated on a Debtor by Debtor basis and all claims shall be paid only from the assets of the applicable Debtor that is obligated on account of such Allowed Claim.

(b)    Treatment. Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a different treatment, subject to the terms of the Plan and in exchange for full and final satisfaction, settlement, release, and compromise of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors (and after the Effective Date, at the option of PTL), receive (i) Cash in an amount equal to such Allowed Other Secured Claim; (ii) the collateral securing any such Allowed Other Secured Claim; or (iii) other treatment rendering such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

4.38.    Class 3E – General Unsecured Claims.

(a)    Impairment and Voting. Class 3E is impaired by the Plan. Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    Treatment. Subject to the terms of the Plan, the PTL LLC Agreement and the Liquidation Trust Agreement, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Sub-Trust, in full and final satisfaction, settlement, release, and compromise of, and in exchange for, its Allowed General Unsecured Claim. Distributions shall be payable from the Net Distributable Assets of the Estate against which the Holder's claim is Allowed.

4.39.    Class 4E – Intercompany Claims.

(a)    Impairment and Voting. Class 4E is impaired by the Plan. Each Holder of an Allowed Intercompany Claim is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code.

(b)    Treatment. On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors, or between and among the Debtors and one or more of the non-Debtor Affiliates or the Canadian Debtor, shall be Allowed in the amount of $0.

4.40.    Class 5E – Equity Interests.

(a)    Impairment and Voting. Class 5E is impaired by the Plan. Each Holder of an Equity Interest is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. The Holders of Equity Interests shall not receive any distributions on account of such interests, provided, however, that, after payment in full of all Allowed General Unsecured Claims against Estates of the Filed Subsidiary Debtors, asset recoveries exceed expectations in an amount that would permit a Distribution to a Class of Equity Interests in the remaining Filed Subsidiary Debtors, such Distributions will be paid to

46

SAI Estate, as the parent of the remaining Filed Subsidiary Debtors, will constitute property of the SAI Estate, and will be distributed in accordance with Article VI of the Plan.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

5.1.    No Substantive Consolidation of the Debtors.

Notwithstanding anything to the contrary set forth in the Plan, although the Plan is presented as a joint plan of liquidation, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and that Debtor's Estate, even after such Debtor's assets are transferred to PTL. Except as specifically set forth in the Plan, nothing in the Plan, the Plan Documents or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate and the secured portion of such Claim will be determined based on the value of the assets pledged by that Debtor, for all purposes including, but not limited to, voting and distributions made by PTL or the Liquidation Trust; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim except upon the Class D Expiration Date if there are sufficient Distributions to provide for such recovery.

5.2.    Limited Liability Company and Liquidation Trust.

(a)    Formation of Limited Liability Company. On or before the Effective Date, PTL will be formed as a Delaware limited liability company and all assets of the Debtors will be conveyed and transferred to PTL. In connection with the vesting and transfer of the PTL Assets, including the Causes of Action, any attorney-client privilege, work-product protection, common interest privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to PTL shall vest in PTL. The Debtors and the Chief Officer are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities. The Limited Liability Company Agreement of PTL (the "PTL LLC Agreement") will provide for the creation of four classes of membership interests: (i) Class A Units, (ii) Class B Units, (iii) Class C Units, and (iv) Class D Units (collectively "Units"). The PTL LLC Agreement shall be in form and substance reasonably acceptable to the Required Consenting Second Lien Noteholders, the Required Consenting Convertible Noteholders and the Committee. PTL will be managed by a board of managers (the "Board of Managers") selected by the Holders of Class A Units , Class B Units and the Committee, in accordance with the terms of the PTL LLC Agreement. The initial Board of Managers will consist of one member appointed by the Committee, one member appointed by the Convertible Noteholders Committee and two members appointed by the Second Lien Noteholders Committee. Class A Units will be distributed to the Second Lien Notes Indenture Trustee, or if the Second Lien Notes Indenture Trustee consents to the direct

47

distribution to Holders through the facilities of the DTC, to each Holder of an Allowed Second Lien Note Claim, in exchange for their Second Lien Note Claims; provided, that without constituting a waiver of its Charging Lien, the Second Lien Notes Indenture Trustee Fee Claim shall be paid in accordance with Section 10.07 of the Plan. Class B Units will be distributed to and held by (A) the Holders of Convertible Notes in exchange for their Convertible Note Claims; and (B) the Holders of General Unsecured Claims against PWI in exchange for such General Unsecured Claims. Class C Units will be distributed to and held by the Liquidation Trust for the benefit of Holders of General Unsecured Claims of any Debtor other than PWI in exchange for such General Unsecured Claims. Class D Units will be distributed to and held by the Liquidation Trust for the benefit of (i) the Holders of Equity Interests in PWI, in exchange for such Equity Interests, and (ii) the Holders of Securities Law Claims, in exchange for such Claims. All rights of the Holders of Class D Units and the Class D Units themselves shall expire on the Class D Expiration Date and no distributions shall be made by PTL on account of such Units after that date.

        (b)   Management of PTL.

        (1)   PTL will be managed by the Chief Officer and a Board of Managers consisting of four managers, two of whom, after the initial appointment, shall be elected by the Holders of Class A Units and one of whom shall be elected by the Holders of Class B Units, and a fourth member shall be elected by the Committee, in accordance with the terms of the PTL LLC Agreement. After payment in full of all amounts payable to the Holders of the Class A Units and Class B Units in connection with such Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full), the Board of Managers of PTL will be appointed by the Liquidation Trust in accordance with the PTL LLC Agreement; provided, however, that the Liquidation Trust shall have no rights to appoint the Board of Managers if such power does not vest prior the Class D Expiration Date. With the exception of amounts distributable to the Holders of Class C Units, which amounts shall be distributed as soon as reasonably practicable after receipt by PTL, the Chief Officer shall have the discretion to determine the timing and amount of any Distributions to the various Holders of Units and to determine the amount of any reserves or other amounts to be retained to fund operating and other expenses of PTL; provided, however, that the Chief Officer shall make Distributions at the timing and in the amount as directed by majority vote of the Board of Managers, as provided in the PTL LLC Agreement. PTL will have authority to retain, on behalf of PTL, any counsel, financial advisors, claims agents, auditors, or other such professionals as PTL deems appropriate at all times. PTL may select any of the foregoing professionals in PTL's sole discretion, and prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtors and the Debtors' estates shall not preclude PTL's retention of such professionals. The relative duties and responsibilities of the Board of Managers and the Chief Officer shall be set forth in the PTL LLC Agreement.

        (2)   After the Effective Date, all property of PTL shall be managed and administered by PTL in a manner reasonably designed to maximize values. PTL is authorized to prosecute the Assigned Causes of Action for the benefit of any Holders of Allowed Claims who shall be entitled to receive a Distribution under the Plan. If PTL, in the discretion of the

48

Chief Officer, decides not to sell any non-Cash property or if such property cannot, in the judgment of the Chief Officer, be sold or liquidated in a commercially reasonable manner prior to the Final Distribution Date, PTL shall have the right to abandon or otherwise dispose of such property with the prior approval of the Bankruptcy Court. Absent willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against PTL, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, or the Debtors, or their respective directors, officers, employees, consultants, trustees or professionals arising from or related to the disposition of non-Cash property in accordance with Section 9.02(b)(ii) of the Plan.

(c)    Distributions With Respect to PTL Units. The PTL LLC Agreement will provide that:

(1)    Subject to the allocation of those amounts payable in connection with (A) the Class B Units and (B) the Class C Units, the Holders of Class A Units will be entitled to receive from PTL, out of amounts available for Distributions, their Pro Rata share from the liquidation of applicable PTL Assets in an amount not to exceed the Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full); provided, however, that upon the occurrence of the Class D Expiration Date, Holders of the Class A Units shall be entitled to additional distributions as provided in the Plan;

(2)    Subject to the allocation of those amounts payable in connection with (A) the Class A Units and (B) the Class C Units, the Holders of Class B Units will be entitled to receive from PTL, out of amounts available for Distributions, their Pro Rata share from the liquidation of applicable PTL Assets in an amount not to exceed the Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full); provided, however, that upon the occurrence of the Class D Expiration Date, Holders of the Class B Units shall be entitled to additional distributions as provided in the Plan;

(3)    Subject to the allocation of those amounts payable in connection with (A) the Class A Units and (B) the Class B Units, the Holders of the Class C Units will be entitled to receive from PTL, out of amounts available for Distributions and payable to the Liquidation Trust on each Holders' behalf, their Pro Rata share from the liquidation of applicable PTL Assets in an amount not to exceed the Holders' Allowed Claims (plus, where applicable, post-petition interest due thereon until Payment in Full); and

(4)    The Holders of Class D Units will be entitled to receive any amounts received by PTL from the liquidation of PTL Assets after the payment in full of all Allowed Claims of the Holders of the Class A Units and the Class B Units; provided, however, that after the Class D Expiration Date, any amounts received by PTL from the liquidation of the PTL Assets shall be distributed to the Holders of Class A Units and Class B Units in proportion to the Allowed Unsecured Claims of the Holders of Class A Units and the Holders of Class B Units after payment of any applicable secured claims.

(d)    Creation of the Liquidation Trust. On or before the Effective Date, the Liquidation Trust shall be formed pursuant to the Liquidation Trust Agreement and the filing of

49

a certificate of trust with the Delaware Secretary of State. The Liquidation Trustee will have authority to retain, on behalf of the Liquidation Trust, any counsel, financial advisors, claims agent, auditors, or other such professionals as it deems appropriate at all times. The Liquidation Trust may select any of the foregoing professionals in the Liquidation Trustee's sole discretion, and prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtors and the Debtors' estates shall not preclude the Liquidation Trust's retention of such professionals. The Liquidation Trust Beneficiaries' interests in the Liquidation Trust shall be uncertificated and, subject to applicable law, shall only be transferrable upon the death of the applicable Liquidation Trust Beneficiary or pursuant to applicable law.

(e)  Purpose of the Liquidation Trust. On the Effective Date, (i) the Claims of Holders of General Unsecured Claims against the Debtors other than PWI shall be deemed to be transferred to the Liquidation Trust and the Liquidation Trust shall, in turn, exchange such Claims for the Class C Units in PTL; and (ii) all Securities Claims and Claims with respect to Equity Interests in PWI shall be deemed to be transferred to the Liquidation Trust and the Liquidation Trust shall, in turn, exchange such Claims for the Class D Units in PTL. The Liquidation Trust shall be established as a liquidation trust for the primary purpose of monetizing and distributing the Liquidation Trust Assets to the Liquidation Trust Beneficiaries. Under the terms of the Liquidation Trust, the Liquidation Trustee will establish two sub-trusts: (i) a sub-trust to hold the Class C Units of PTL (the "Creditor Sub-Trust") and (ii) a sub-trust to hold the Class D Units of PTL (the "Equity Interest Sub-Trust"). Amounts held in the Creditor Sub-Trust will be distributed in accordance with the Liquidation Trust Agreement to Liquidation Trust Beneficiaries who formerly held unsecured claims against Debtors other than PWI. The Liquidation Trust shall not distribute any Class C Units thereunder but will only distribute the applicable Distributions received on account of such Class C Units to the applicable Holders of the beneficial interest in the Creditor Sub-Trust. Amounts held in the Equity Interest Sub-Trust, if any, shall be distributed in accordance with the Liquidation Trust Agreement, with payments first made Pro Rata to the Holders of Securities Claims, until Paid in Full, and thereafter Pro Rata to the former Holders of Equity Interests in PWI. The Liquidation Trust shall not distribute any Class D Units thereunder but will only distribute the applicable Distributions received on account of such Class D Units to the applicable Holders of the beneficial interest in the Equity Interest Sub-Trust.

(f)  Transfer Taxes. Any transfer of the PTL Assets to PTL or the Liquidation Trust Assets to the Liquidation Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code.

(g)  Federal Income Tax Treatment.

(1)  PTL shall be taxable as a partnership for all federal and state income tax purposes and no member or manager of PTL shall be permitted to make any election inconsistent with such treatment.

(2)  The Liquidation Trust will be established for the sole purpose of distributing the Liquidation Trust Assets, and any proceeds therefrom, in accordance with

50

Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust is intended to qualify as a liquidation trust for U.S. federal income tax purposes. In general, a liquidation trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, i.e., pass-through entity. All parties must treat the transfer of the portion of the Liquidation Trust Assets attributable to the Liquidation Trust Beneficiaries as a transfer of such assets directly to the Liquidation Trust Beneficiaries. Consistent therewith, all parties must treat the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Subject to the terms of the Liquidation Trust Agreement, the Liquidation Trustee will determine the fair market value of the Liquidation Trust Assets as soon as possible after the Effective Date, and the Liquidation Trust Beneficiaries and the Liquidation Trustee must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis.

(h)     Reserves. PTL shall establish a PTL Reserve on account of Claims against any Debtor that are Disputed. PTL may, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulation section 1.468B-9 to treat the PTL Reserve as a "disputed ownership fund" within the meaning of that section, (ii) allocate taxable income or loss to the PTL Reserve, with respect to any given taxable year (but only for the portion of the taxable year with respect to which such Claims are Disputed), and (iii) distribute assets from the PTL Reserve as, when, and to the extent, such Claims that are Disputed cease to be Disputed, whether by virtue of becoming Allowed or otherwise resolved. Unit Holders shall be bound by such election, if made by the Board of Managers of PTL, and as such shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently therewith.

(i)     Dissolution.

(1)     PTL shall continue in existence until such time as PTL is dissolved in accordance with the terms of the PTL LLC Agreement.

(2)     The Liquidation Trust shall be dissolved no later than five (5) years from the Effective Date; provided, however, that the term of the Liquidation Trust may be extended if the Class D Unit Expiration Date does not occur on the fifth anniversary of the Effective Date.

(j)     Securities Law Matters. To the extent the interests in PTL or the Liquidation Trust are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

(k)     Transferred Third-Party Cause of Action. Any Holder of a Claim may elect to assign to PTL, by written instrument executed by such Holder, any Third-Party Cause of Action that such Holder may have (such Holder a "Third-Party Cause of Action

51

Transferor"). A Third-Party Cause of Action Transferor executing such instrument shall be deemed to transfer any Third-Party Cause of Action such Holder may have to PTL as of the date of such transfer. PTL shall not be obligated to pursue any transferred Third-Party Cause of Action and, as assignee of such Transferred Third-Party Causes of Action, all decisions with respect to such Transferred Third-Party Causes of Action, including, without limitation, decisions with respect to the prosecution and settlement of such Transferred Third Party Causes of Action, shall belong solely to PTL. For purposes of distributions, the proceeds of any transferred Third-Party Causes of Action shall be deemed general property of PWI's estate and any proceeds thereof shall be distributed in accordance with Article IV of the Plan without regard to the identity or status of the Third-Party Cause of Action Transferor. For avoidance of doubt, after the transfer a Third-Party Cause of Action, Transferor shall have no direct interest in the Transferred Third-Party Cause of Action, and any right to distributions of proceeds from such Transferred Third-Party Cause of Action by a Third-Party Cause of Action Transferor will be solely by virtue of the terms of the Plan and such Third-Party Cause of Action Transferor's status as a Unit holder in PTL.

5.3.  Approval of Plan Documents.

        The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder. Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions. On the Effective Date, the PTL shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

5.4.  Settlement of Claims and Controversies.

        (a)    Settlement Under the Plan:  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all released claims against the Released Parties, and the Plan constitutes a request for the Bankruptcy Court to authorize and approve such compromise and settlement, to release all of the released claims belonging to the Debtors' Estates and any other Person that is deemed to have given a release pursuant to Section 14.06 of the Plan against each and every and all Released Parties (the "Settlement"). Distributions to be made pursuant to the Plan shall be made on account of and in consideration of the Settlement. Entry of the Confirmation Order shall confirm the Bankruptcy Court's approval, as of the Effective Date of the Plan, of all components of the Settlement and the Bankruptcy Court's finding that the Settlement is in the best interests of the Debtors, their respective Estates, PTL, the Liquidation Trust, and the Holders of Claims and interests, and is fair, equitable and reasonable.

        (b)    Intercompany Claims Settlement Under the Plan. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, provisions of the Plan constitute a good faith compromise and settlement of all Intercompany Claims, including, without limitation, the PWI Subordinated Loan Claim, the SAI Subordinated Loan Claim, and Promissory Note Claim

(the "Intercompany Claims Settlement"), and the Plan constitutes a request to authorize and approve the Intercompany Claims Settlement. Pursuant to the Intercompany Claims Settlement, in full satisfaction of the Promissory Note Claim, 40% of all proceeds from the Illiquid Instruments, up to $3,500,000, shall be distributed to the PFSI Estate. No further distributions on account of the Promissory Note Claim will be made. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date of the Plan, of the Intercompany Claims Settlement and the Bankruptcy Court's finding that the Intercompany Claims Settlement is in the best interests of the Debtors, their respective Estates, PTL, the Liquidation Trust and the Holders of Claims and interests, and is fair, equitable and reasonable.

## ARTICLE VI.

## CORPORATE GOVERNANCE AND ACTIONS

6.1.    Post-Effective Date Corporate Existence.

On the later of the Effective Date and the transfer of all the Debtors' assets to PTL as provided in Section 9.02 of the Plan, except to the extent that the Debtors or the Chief Officer determine otherwise, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that each Debtor shall file with the Office of the Secretary of State for the state of its incorporation or formation, a certificate of dissolution which may be executed by an officer of such Debtor or the Chief Officer on behalf of such Debtor without the need for approval by any board of directors, stockholders, members, or managers, as applicable. From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, or obtain any approval from any Debtor's board of directors, stockholders, members, or managers to withdraw such Debtor's business operations from any states in which the Debtors previously conducted the Company's business operations.

6.2.    Corporate Action.

On or prior to the Effective Date, any Debtor and, after the Effective Date, PTL, may enter into or undertake any corporate transactions or other entity transactions (collectively, "Corporate Transactions") and may take such actions as may be determined by such Debtor or PTL to be necessary or appropriate to effect such Corporate Transactions. The actions to effect the Corporate Transactions may include, without limitation: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, conversion, restructuring, recapitalization, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, disposition, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, conversion or dissolution (or similar instrument) pursuant to applicable law; and (iv) all other actions which the applicable entities may determine to be

53

necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with such Corporate Transactions. The Corporate Transactions may include one or more mergers, consolidations, conversions, restructurings, recapitalizations, dispositions, liquidations or dissolutions, as may be determined by the applicable Debtors or Chief Officer to be necessary or appropriate to effect the purposes of such Corporate Transactions for the benefit of PTL. In each case in which the surviving, resulting or acquiring Person in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring Person will perform the obligations of the applicable Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Person, which may provide that another Debtor will perform such obligations. Implementation of the Corporate Transactions shall not affect any distributions, discharges, exculpations, releases or injunctions set forth in the Plan. On or prior to, or as soon as practicable after, the Effective Date, the Debtors or PTL may take such steps as the Debtors or PTL may deem necessary or appropriate to effectuate any Corporate Transactions that satisfy the requirements set forth in this Section 10.02. The corporate transactions shall be authorized and approved by the Confirmation Order pursuant to, among other provisions, sections 1123 and 1141 of the Bankruptcy Code and Titles 6 and 8 of the Delaware Code, if applicable, without any further notice, action, third-party consents, court order, or process of any kind, except as otherwise set forth in the Plan or in the Confirmation Order.

6.3.    Officers and Boards of Managers.

Effective as of the Effective Date, the Board of Managers of PTL shall be comprised of two members appointed by the Second Lien Noteholders Committee, one member appointed by the Convertible Noteholders Committee and one member appointed by the Committee. The Chief Officer may be removed by majority vote of the Board of Managers. The relative duties and responsibilities of the Board of Managers and the Chief Officer shall be set forth in the PTL LLC Agreement. Effective as of the Effective Date, members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Debtor(s) or PTL on or after the Effective Date.

6.4.    Payment of Wind-Down Expenses.

PTL Wind-Down Expenses shall be paid by the Chief Officer from the PTL Assets, as set forth in the PTL LLC Agreement, and Liquidation Trust Wind-Down Expenses shall be paid by the Liquidation Trustee from the Liquidation Trust Assets, as set forth in the Liquidation Trust Agreement.

6.5.    Cancellation of Existing Securities and Agreements.

On the Effective Date, any document, agreement or instrument evidencing any Claim (including, but not limited to, the Indentures and the Notes (except to the extent otherwise provided in the Plan)) or Equity Interests in PWI and Filed Subsidiary Debtors shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or

54

rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged.

6.6.    Second Lien Notes and Convertible Notes.

Notwithstanding anything in the Plan to the contrary, the applicable provisions of the Indentures shall continue in effect solely for the purposes of permitting the Indenture Trustees to: (i) make the distributions to be made to Holders of Allowed Second Lien Note Claims and Allowed Convertible Note Claims, as contemplated by Article IV and Article VI of the Plan; and (ii) preserving the rights of the applicable Indenture Trustee under the applicable Indenture, including, without limitation: (a) such Indenture Trustee's rights to pursue claims or actions against non-Debtors, (b) such Indenture Trustee's Charging Lien, and (c) such Indenture Trustee's rights with respect to compensation, reimbursement of expenses (including attorney's fees), and indemnity under the applicable Indenture; provided, however, that, except as set forth in Section 10.07 of the Plan, such rights against the Debtors and Charging Liens are limited to the distributions, if any, to the Holders of the Allowed Second Lien Note Claims and Allowed Convertible Note Claims, as applicable. The Holders of or parties to such cancelled (or converted, as applicable) instruments, securities and other documentation will have no rights against the Debtors arising from or relating to such instruments, securities and other documentation or the cancellation (or conversion, as applicable) thereof, except the rights provided pursuant to the Plan.

6.7.    Rights of the Indenture Trustees.

(a)    In full satisfaction of any Allowed Indenture Trustee Fee Claims for fees and expenses incurred through the Effective Date, including to the extent such Allowed Indenture Trustee Fee Claims are secured by any Charging Liens under the Indentures, PTL will distribute to the Indenture Trustees on the Effective Date, or as soon thereafter as practicable, Cash equal to the amount of the Allowed Indenture Trustee Fee Claims; provided, however, that with respect to Claims to which the Debtors or PTL shall have objected as set forth in subsection 10.07(b) of the Plan, no distribution, solely in respect of the disputed portion of such Claim, shall be payable by the Debtors or PTL hereunder until such objection has been resolved. To the extent the Indenture Trustees incur fees or expenses after the Effective Date, the Indenture Trustees shall be compensated and reimbursed for such fees and expenses as Wind-Down Expenses, subject to the conditions set forth in subsection 10.07(b) of the Plan.

(b)    As a condition to receiving payment thereof from the Debtors or PTL, each Holder of an Indenture Trustee Fee Claim shall deliver to the Debtors (or, if after the Effective Date, the Chief Officer), written copies of invoices in respect of such claims, with narrative descriptions of the services rendered (including appropriate redactions to preserve privileged matters) and itemization of expenses incurred in such detail and with supporting documentation as is customary for an Indenture Trustee. An Indenture Trustee Fee Claim shall be deemed Allowed and shall be promptly paid, except to the extent the Debtors (or, if after the Effective Date, the Chief Officer) object within fifteen (15) business days after receipt of such invoices and supporting documentation based upon a "reasonableness" standard in accordance with the applicable Indenture. If the Debtors or the Chief Officer timely object to the request

55

for payment of any Indenture Trustee Fee Claim, the undisputed amount of any Indenture Trustee Fee Claims with respect to which such objection(s) are pending shall be Allowed and paid by PTL on the Effective Date or as soon thereafter as reasonably practicable. PTL shall not be required to make any payments with respect to the disputed portion of an Indenture Trustee Fee Claim as to which the Debtors (or the Chief Officer) have objected until resolved or determined by the Bankruptcy Court. In the event such objector(s) are unable to resolve a dispute as to an Indenture Trustee Fee Claim, each Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Bankruptcy Court for resolution by application requesting payment of the disputed portion of the Indenture Trustee Fee Claims in accordance with the reasonableness standards set forth in the applicable Indenture (and not subject to the requirements of sections 503(b)(3) and (4) of the Bankruptcy Code, which shall not apply) or (ii) assert its Charging Lien to obtain payment of a disputed portion of the Indenture Trustee Fee Claim in lieu of Bankruptcy Court resolution described in subsection (i).

(c)     As soon as practicable after the Effective Date, the applicable Indenture Trustee or the Claims and Voting Agent shall transmit a notice to holders of Notes via DTC, advising such holders of the effectiveness of the Plan and providing instructions to such holders to tender their Notes in accordance with the applicable Indenture in exchange for the Distributions to be made pursuant to the Plan. Delivery of any Note will be effected, and risk of loss and title thereto shall pass, only upon delivery of such Note to the applicable Indenture Trustee in accordance with the terms and conditions of such notice to holders of Notes, such notice to holders of Notes to be in such form and have such other provisions as the Debtors may reasonably request. Each holder of any Note shall surrender such Note to the applicable Indenture Trustee. No Distribution hereunder shall be made to or on behalf of any such holder unless and until such Note is received by the relevant Indenture Trustee, or the loss, theft or destruction of such Note is established to the satisfaction of the relevant Indenture Trustee, including requiring such holder (i) to submit a lost instrument affidavit and an indemnity bond, and (ii) to hold the Debtors and the relevant Indenture Trustee harmless in respect of such Note and any Distributions made in respect thereof. Upon compliance with this Section by a holder of any Note, such holder shall, for all purposes under the Plan, be deemed to have surrendered such Note. Any such holder that fails to surrender such Note or satisfactorily explain its non-availability to the applicable Indenture Trustee within three (3) months of the Effective Date shall be deemed to have no further Claim against the Debtors, the Debtors' estates, the Debtors' property, PTL or the applicable Indenture Trustee in respect of such Claim and shall not participate in any Distributions under the Plan, and the Distribution that would otherwise have been made to such holder shall be distributed by the applicable Indenture Trustee to all applicable holders who have surrendered their Notes or satisfactorily explained their non-availability to the applicable Indenture Trustee within three (3) months of the Effective Date.

(d)     All Distributions to be made under the Plan (i) to Holders of Allowed Convertible Note Claims shall be made to the Convertible Notes Indenture Trustee and (ii) to Holders of Allowed Second Lien Note Claims shall be made to the Second Lien Notes Indenture Trustee, unless the applicable Indenture Trustee consents to the direct distribution through DTC, and, subject at all times to the applicable Indenture Trustee's Charging Lien, the Indenture Trustees shall transmit such Distributions to their respective Holders of such Allowed

Claims, to be applied as follows: first, to any principal or premium then outstanding on the relevant Notes, and second, to any interest or other amounts then outstanding on such Notes. Notwithstanding the foregoing, nothing in the Plan shall modify or impair any Indenture Trustee's rights relating to such Indenture Trustee's Indenture Trustee Fee Claims. All payments to such Holders shall only be made after the surrender by each such holder of the Note certificates representing such Claim, or in the event that such certificate is lost, stolen, mutilated or destroyed, upon the holder's compliance with the requirements set forth in §10.07(c) of the Plan. Upon surrender of such Note certificates, the applicable Indenture Trustee shall cancel and destroy such Notes. As soon as practicable after surrender of Note certificates evidencing such Allowed Note Claims, the applicable Indenture Trustee shall distribute to the holder thereof such holder's pro rata share of the Distribution, but subject to the rights of such Indenture Trustee to assert its Charging Lien against such Distribution.

(e)    Consistent with Bankruptcy Rule 3003(c), the Debtors shall recognize a proof of claim filed by any Indenture Trustee (or if no proof of claim is filed, the applicable Allowed Claims described in the Plan), in respect of any of the Notes, and any proof of claim which is filed by the registered or beneficial holder of such Notes may be disallowed as duplicative of the Claim of the applicable Indenture Trustee without need for any further action or order by the Bankruptcy Court.

## ARTICLE VII.

## PROVISIONS REGARDING VOTING
## AND DISTRIBUTIONS UNDER THE PLAN

7.1.    Nonconsensual Confirmation.

If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors shall have the right to amend the Plan in accordance with Section 17.09 of the Plan or to ask the Bankruptcy Court to confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to impaired Classes of Claims and Equity Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

7.2.    Elimination of Vacant Classes.

Any Class of Claims or Equity Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

7.3.    Voting Classes.

57

Except for Holders of Claims or Interest in Classes that are deemed to have accepted or rejected the Plan pursuant to the terms of the Plan, if, at the time of the Confirmation Hearing, there are any Holders of Claims or Interests in a particular Impaired Class of Claims or Interests that were given the opportunity to vote to accept or reject the Plan and were notified that a failure of any Holders of Claims or Interests in such Impaired Class of Claims or Interests to vote to accept or reject the Plan would result in such Impaired Class of Claims or Interests being deemed to have accepted the Plan, but no Holders of Claims or Interests in such Impaired Class of Claims or Interests voted to accept or reject the Plan, then the Debtors reserve the right to seek, on reasonable notice to parties in interest with an opportunity to object and be heard, to have such Class of Claims or Interests deemed to have accepted the Plan. If there is no impaired accepting Class with respect to any of the Filed Subsidiary Debtors 6 through 10, the Debtors reserve the right to effect mergers and dissolutions with respect to Filed Subsidiary Debtors 6 through 10 and to take and cause to be taken such actions in order to carry out such mergers and dissolutions, on such terms and conditions the Debtors may deem necessary or desirable.

7.4.    Distributions.

Pursuant to the terms and provisions of the Plan, PTL or the Liquidation Trustee or, with respect to Second Lien Note Claim, the Second Lien Notes Indenture Trustee and with respect to Convertible Note Claim, the Convertible Notes Indenture Trustee, shall make the required Distributions specified under the Plan, on or as soon as practicable after the Initial Distribution Date, Interim Distribution Date, or Final Distribution Date, as the case may be, under the Plan. Any payment of Cash made by PTL or the Liquidation Trustee pursuant to the Plan shall, at the option of PTL or the Liquidation Trustee, as applicable, be made by check drawn on a domestic bank or wire transfer.

7.5.    Insurance Claims.

That portion of each Allowed Claim that is an Insurance Claim shall be paid by PTL solely and exclusively: (a) from the proceeds of insurance relating to such Insurance Claim as and when such proceeds are received; or (b) by the applicable insurance carrier to the extent of such insurance. Notwithstanding the foregoing, an Allowed Claim, or any portion thereof, for which insurance coverage may be available shall not be treated as an Insurance Claim under the Plan until the Holder of such Allowed Claim has actually received payment from the applicable insurance carrier, its assignee, successor or affiliate (collectively, the "Insurer"), in respect of such Claim or portion thereof. If the Holder of an Allowed Claim does not receive payment from the applicable Insurer for any reason (other than as a result of the Holder's willful misconduct or gross negligence), distributions under the Plan to such Holder, if any, shall not be reduced on account of the insured portion of such Claim; provided, that, as a condition to any distribution from PTL to the Holder of an Allowed Claim, all or some of which may be covered by insurance, the Holder of such Claim shall be deemed to have assigned to PTL such Holder's right to receive payments on the Claim from the Insurer to the extent of the distribution under the Plan and shall pay to PTL any amounts paid by the Insurer to or on behalf of such Holder to the extent of the distribution (except to the extent such amounts have been paid by the Insurer to PTL). If a Holder reasonably determines to abandon attempts to collect insurance from an Insurer, the Holder shall give 10 Business Days' notice thereof to PTL, and at the expiration of

58

such notice period may abandon attempts to collect such amounts from the Insurer and PTL shall thereupon be entitled to all rights of the Holder against the Insurer with respect to such amounts.

7.6.    Timing of Distributions.

In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any requirement under the Plan that PTL or Liquidation Trustee make a payment or distribution on a date shall mean that such party is required to commence the process of making a payment or distribution on such date or as soon as reasonably practicable thereafter.

7.7.    Holders as of the Distribution Record Date.

As of the close of business on the Distribution Record Date: (i) the claims register maintained in the Chapter 11 Cases shall be closed; (ii) the transfer of books and records of the Notes as maintained by the applicable Indenture Trustee or its agent shall be closed; and (iii) any transfer of any Claim or any interest therein, including, without limitation, any of the Notes, shall be prohibited. Neither the Debtors, PTL, nor the Indenture Trustees, if applicable, shall have any obligation to recognize any transfer of any Claim or any interest therein, including, without limitation, any of the Notes, occurring after 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, and instead may, in their sole discretion, recognize and deal for all purposes under the Plan with only those holders of record as of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date.

7.8.    Distribution to Address of Record.

Subject to Bankruptcy Rule 9010, and except as set forth in Section 11.08 of the Plan, all distributions under the Plan to Holders of Allowed Claims shall be made to the Holder of each Allowed Claim at the address of such Holder as listed on the Schedules as of the Distribution Record Date, unless the Debtors or, on and after the Effective Date, PTL and the Liquidation Trustee, have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such Holder that provides an address for such Holder different from the address reflected on the Schedules.  In the event that any distribution to any such Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the appropriate PTL or the Liquidation Trustee, as applicable, has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such Holder without interest; provided, however, that, at the later of the expiration of one (1) year from the Effective Date and the date a Claim becomes an Allowed Claim, such distributions shall be deemed unclaimed property and shall revest in PTL or the Liquidation Trust, as applicable, and be distributed to other Holders of Allowed Claims, in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

7.9.    Minimum Distributions.

59

PTL or the Liquidation Trustee shall not be obligated to make any payment of Cash of less than one hundred dollars to any Holder of an Allowed Claim. Notwithstanding anything contained in the Plan to the contrary, if, on any Distribution Date there remains $10,000 or less available for distribution to Holders of Allowed General Unsecured Claims, in lieu of making any further distributions to the Holders of such Claims, PTL or the Liquidation Trust may distribute such Cash to the charity of its choice.

7.10.    Unclaimed Distributions.

All distributions to Holders of Allowed Claims under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and any entitlement of any Holder of any Claim to such distributions shall be extinguished and forever barred. All such unclaimed property shall revest in PTL or the Liquidation Trust and be distributed to other Holders of Allowed Claims or donated in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

7.11.    Setoffs.

PTL may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Causes of Action of any nature whatsoever that the Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or PTL of any such Causes of Action that the Debtors or PTL may have against the Holder of such Claim.

7.12.    Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

7.13.    Estimation of Claims; Certain Reserves.

For purposes of calculating and making distributions under the Plan, PTL shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims that are contingent and/or unliquidated and the maximum dollar amount of Allowed and Disputed Claims that are contingent and/or unliquidated Claims in a particular class. PTL also shall be entitled to seek one or more estimation orders from the Bankruptcy Court for such purposes, which requests may be joined with objections to the Claims that are subject to any such request. Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought. With respect to Insurance Claims, PTL shall not be required to establish a PTL Reserve on account of any portion of an Insurance Claim that in Chief Officer's good faith will be paid from available insurance coverage. Notwithstanding the foregoing or anything else in the Plan or the Confirmation Order: (i) neither PTL nor the

60

Chief Officer shall be obligated to physically segregate and maintain separate accounts for PTL Reserves; and (ii) unless otherwise ordered by the Bankruptcy Court, PTL Reserves shall not be required to be established or maintained with respect to Claims or Administrative Expense Claims filed after the applicable Bar Date. The PTL Reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time and evergreen in nature, as appropriate.

7.14.   Non Recourse.

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other Holders of Allowed Claims in the respective Class, no Claim Holder shall have recourse against PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, the Debtors, or any of their respective professionals, consultants, officers, directors, employees or members or their successors or assigns, or any of their respective property. THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

7.15.   Satisfaction of Claims and Equity Interests.

Unless otherwise provided in the Plan or the Confirmation Order, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and release of any right to distributions from the Debtors' Estates on account of such Allowed Claims.

7.16.   Withholding and Reporting Requirements.

In connection with the Plan and all distributions thereunder, PTL and the Liquidation Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. PTL and the Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms PTL or the Liquidation Trustee believe are reasonable and appropriate, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution, and (b) no Distributions shall be required to be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to PTL and

61

the Liquidation Trustee for the payment and satisfaction of such tax obligations or has, to the PTL's and the Liquidation Trustee's satisfaction, established an exemption therefrom.

## ARTICLE VIII.

### PROCEDURES RELATING TO DISPUTED CLAIMS

8.1.    Objections to Administrative Expense Claims and Claims.

Following the Effective Date, PTL, through the Chief Officer, shall be entitled to object to Administrative Expense Claims and Claims. Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of (i) one hundred and twenty (120) days after the Effective Date, and (ii) such later date as may be fixed by the Bankruptcy Court, which later date may be fixed before or after the date specified in clause (i) above. No objection shall be required with respect to a proof of Claim or proof of Administrative Expense Claim filed after the applicable Bar Date, and any and all such Claims and Administrative Expense Claims shall be deemed disallowed unless otherwise ordered by the Bankruptcy Court after notice and a hearing. Any objections to Administrative Expense Claims and Claims shall be handled by PTL through the Chief Officer.

8.2.    Amendments to Claims.

After the Confirmation Date, a proof of Claim or Administrative Expense Claim may not be amended without the authorization of the Bankruptcy Court. Any amendment to a proof of Claim or Administrative Expense Claim submitted after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtors or PTL, unless the holder of the Claim or Administrative Expense Claim has obtained prior Bankruptcy Court authorization to file the amendment.

8.3.    No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be required to be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Administrative Expense Claim becomes Allowed in its entirety.

8.4.    Resolution of Disputed Claims.

On and after the Effective Date, PTL, through the Chief Officer, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims without approval of the Bankruptcy Court. The reasonable fees and expenses (including reasonable attorneys' fees and costs) that are incurred by PTL and the Chief Officer shall be borne by PTL.

8.5.    Resolution of Disputed Insurance Claims.

62

All Insurance Claims not previously Allowed shall be considered to be Disputed Claims as of the Effective Date such that no objection to an Insurance Claim is required to be filed. All Insurance Claims shall be litigated to an order of a court of competent jurisdiction over such claim except to the extent that PTL, through the Chief Officer, in conjunction with the Debtors' applicable insurer, and the Holder of the Disputed Insurance Claim compromise, settle or otherwise resolve the respective Insurance Claim or agree to another method of claim resolution such as mediation or arbitration, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court or any other court.

## ARTICLE IX.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1.    Rejection or Assumption and Retention or Assignment.

(a)    Assumption or Rejection of Executory Contracts and Unexpired Leases. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code:

(1)    all executory contracts and unexpired leases of the Debtors shall be deemed to be rejected by the applicable Debtor as of the Confirmation Date, subject to the occurrence of the Effective Date, except for any executory contract or unexpired lease: (a) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (b) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (c) that is specifically designated as a contract or lease to be assumed and/or assigned or retained on Schedule 13.01, which schedule shall be contained in the Plan Supplement and shall list corresponding Cure Amounts;

(2)    notwithstanding anything otherwise in the Plan to the contrary, the Debtors reserve the right, on or prior to the Effective Date, to amend Schedule 13.01 to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as applicable, rejected, assumed and/or assigned or retained. The Debtors shall provide notice of any amendments to Schedule 13.01 to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 13.01 shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(b)    Approval of Assumptions, Retentions and Rejections by Confirmation Order. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to Section 13.01(a) shall vest in and be fully enforceable by PTL in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The

63

Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease.

9.2.    Cure of Defaults.

(a)    Generally.  Except as may otherwise be agreed to by the Debtors or the Chief Officer, as the case may be, and the non-Debtor party to the contract or lease, within thirty (30) days after the Effective Date, PTL shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code.  Subject to the last sentence of Section 13.02(b) of the Plan, all disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of PTL's liability with respect thereto, or as may otherwise be agreed to by the parties.

(b)    Notice of Proposed Cure.  The Debtors shall, prior to the conclusion of the Confirmation Hearing, file and serve on parties to executory contracts and unexpired leases that may be assumed pursuant to Section 13.01 of the Plan a notice (the "Cure Notice") listing the proposed Cure Amount to be paid in connection with the executory contracts and unexpired leases that may be Assumed, retained, assumed and/or assigned pursuant to Section 13.01(a) of the Plan.  The non-Debtor parties to such contracts and leases shall have until fifteen (15) days following service of the Cure Notice to object in writing to the proposed cure and to propose an alternative cure.  In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the cure proposed by the Debtors (including amounts of compensation for actual pecuniary loss) and shall be forever enjoined and barred from seeking from the Debtors, PTL, the Chief Officer and the Liquidation Trustee any additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code.  If an objection is timely filed with respect to the Cure Amount proposed by the Debtors for an executory contract or unexpired lease, the Bankruptcy Court shall hold a hearing to determine the amount of any disputed cure amount not settled by the parties.  Notwithstanding anything otherwise to the contrary, at all times through the date that is thirty (30) days after the entry of a Final Order resolving and fixing the amount of a disputed cure amount, whether such date is before or after the Effective Date, each of the Debtors and PTL shall be authorized to reject such executory contract or unexpired lease by notice to the non-debtor party to such executory contract or unexpired lease.

9.3.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 13.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors in accordance with the Bar Date Order.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates, and PTL.

## ARTICLE X.

## EFFECT OF CONFIRMATION AND INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

10.1.   Binding Effect.

From and after the Confirmation Date, but subject to the occurrence of the Effective Date, the Plan shall be binding and inure to the benefit of the Debtors, all present and former Holders of Claims and Equity Interests, and their respective assigns, including PTL.

10.2.   Vesting of Assets.

Upon the Effective Date and the transfer of the PTL Assets to PTL and the Liquidation Trust Assets to the Liquidation Trust, as applicable, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, any assets of the Debtors and Estates shall vest in PTL or the Liquidation Trust, as applicable, in each case free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan or in the Confirmation Order.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and the terms of the Plan, PTL shall retain and shall have the exclusive rights, in its discretion to enforce against any Person any and all Causes of Action that constitute PTL Assets.

10.3.   Term of Pre-Confirmation Injunctions or Stays.

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of (i) the Effective Date, (ii) the date indicated in such applicable order, (iii) the dissolution of PTL, or (iv) the dissolution of the Liquidation Trust.

10.4.   Injunction Against Interference with Plan.

Upon the entry of the Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

10.5.   Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Liens, Claims, liabilities or encumbrances against or Equity Interests in, any or all of the Debtors, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, with respect to any such

65

Liens, Claims, liabilities or encumbrances or Equity Interests, as of the Confirmation Date but subject to the occurrence of the Effective Date, from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (b) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, or any of their property (including, without limitation, the PTL Assets and the Liquidation Trust Assets, as applicable), or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, PTL, the Chief Officer, the Board of Managers, the individual members of the Board of Managers, the Liquidation Trust, the Liquidation Trustee, or any of their property (including, without limitation, the PTL Assets and the Liquidation Trust Assets, as applicable), or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; (e) taking any actions to interfere with the implementation or consummation of the Plan; and (f) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, such as commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights arising under and consistent with the terms of the Plan.

    10.6.   Releases.

        (a)   ***Releases by the Debtors.*** **Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors, in their individual capacities and as debtors in possession, and PTL shall be deemed to forever release and waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, which are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to the Debtors, PTL, the Canadian Debtor, the Chapter 11 Cases, the Plan or the Disclosure Statement, the Canadian Proceeding and that could have been asserted by or on behalf of the Debtors, or PTL, whether directly, indirectly, derivatively or in any representative or any other capacity, against any Released Party; provided, however, that in no event shall anything in this Section be construed as (i) a**

66

release of any Person's fraud, willful misconduct or gross negligence, (ii) a release or waiver of the Debtors' or PTL's right or ability to assert or raise certain claims against any Released Party as defense to a claim or suit brought against them or their assets by any Released Party, (iii) with respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates, a release or waiver of any claims, causes of action, or culpability arising out of or relating to the Apex Transaction or the Knight Transaction, (iv) with respect to Knight and its affiliates, a release or waiver of any claims, causes of action, or culpability arising out of or relating to the Knight Transaction, or (v) with respect to the Debtors and their subsidiaries, a release or waiver of claims, causes of action, or culpability arising out of or related to the improper disclosure, the failure to disclose, or insufficient disclosures of certain nonaccrual receivables collateralized by certain illiquid assets pledged to PFSI by Call Now, Inc. in relation to Call Now, Inc.'s margin trading account at PFSI, including, among other assets, the so-called Retama Park Development Corporation Bonds.

(b)    ___Releases by Holders of Claims.___  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all Holders of Claims, in consideration for the obligations of the Debtors and PTL under the Plan, and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim, as applicable, will be deemed to have consented to the Plan for all purposes and the restructuring embodied in the Plan and will be deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise from the beginning of time through and including the Effective Date in any way relating to the Debtors, PTL, the Canadian Debtor, the Chapter 11 Cases, the Plan or the Disclosure Statement, the Canadian Proceeding against the Released Parties in their respective capacities as such; provided, however, that the foregoing releases shall apply only to any Holder of a Claim that (a) is entitled to vote on the Plan and (b) "opts-in" to the releases provided in Section 14.06(b) of the Plan in a timely and properly submitted Ballot.  Notwithstanding the foregoing, in no event shall anything in this Section be construed as (i) a release of any Person's fraud, willful misconduct or gross negligence; (ii) a release or waiver of any Released Party's right or ability to assert or raise claims against any Released Party as defense to a claim or suit brought against them or their assets by any Released Party, (iii) with respect to the Debtors and their subsidiaries, a release or waiver of claims, causes of action, or culpability arising out of or related to the improper disclosure, the failure to disclose, or insufficient disclosures of certain nonaccrual receivables collateralized by certain illiquid assets pledged to PFSI by Call Now, Inc. in relation to Call Now, Inc.'s margin trading account at PFSI, including, among other assets, the so-called Retama Park Development

67

Corporation Bonds, (iv) with respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates, a release or waiver of any claims, causes of action, or culpability arising out of or relating to the Apex Transaction or the Knight Transaction, and (v) with respect to Knight and its affiliates, a release of waiver of any claims, causes of action, or culpability arising out of or relating to the or the Knight Transaction.

(c)     Notwithstanding anything otherwise to the contrary, no provision of the Plan or of the Confirmation Order, including any release or exculpation provision, shall modify, release or otherwise limit the liability of any Person not specifically released hereunder, including any Person that is a co-obligor or joint tortfeasor of a Released Party, that otherwise is liable under theories of vicarious or other derivative liability.

(d)     Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or Confirmation Order, no provision of the Plan or of the Confirmation Order shall preclude the U.S. Securities and Exchange Commission from enforcing its police or regulatory powers and no provision shall release any non-Debtor from liability in connection with any legal action or claim brought by the U.S. Securities and Exchange Commission.

(e)     Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or Confirmation Order, to the extent the Class Action Stipulation is not approved by entry of final, non-appealable orders of this Court and the United States District Court for the Northern District of Texas, nothing in the Plan or the Confirmation Order shall or is intended to (i) affect, release, enjoin or impact in any way the prosecution of the claims of the Lead Plaintiff or the Putative Class asserted or to be asserted against any non-Debtor in the Putative Class Action, or (ii) preclude Lead Plaintiff or the Putative Class from seeking discovery from the Debtors, PTL, the Liquidation Trust or any transferee of the Debtors' assets.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all Holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or Released Parties asserting any Claim or Cause of Action thereby released.

10.7.    Exculpation and Limitation of Liability.

None of the Debtors, PTL, the Board of Managers, the individual members of the Board of Managers, the Committee, the Indenture Trustees, the individual members of the Committee, or any of their respective current or former members, partners, officers, directors, employees, advisors, professionals, affiliates, or agents and advisors of any of the foregoing (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons, but solely in their capacities as such) shall have or incur any liability to any

68

Holder of any Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the Canadian Proceeding, the Prepetition Restructuring, the negotiation and execution of the Plan, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, and the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, willful misconduct or gross negligence as determined by a Final Order. Notwithstanding the foregoing, nothing in Section 14.07 of the Plan shall: (i) be construed as a release of any Person's or entity's fraud, gross negligence or willful misconduct with respect to matters set forth in Section 14.07 of the Plan; (ii) limit the liability of attorneys for the Debtors, the Indenture Trustees, PTL, the Chief Officer or the Liquidation Trust to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility; (iii) be construed as a release or waiver of the Debtors' or PTL's right or ability to assert or raise certain claims against any party as defense to a claim or suit brought against them by such party; or (iv) constitute a release, waiver, or exculpation of any claims, causes of action, or culpability arising out of or relating to the Prepetition Restructuring with respect to Peak6 Investments, L.P. and its affiliates, and Apex Clearing, Apex Holdings and their affiliates. As consideration for, and as an express condition of, the exculpation provided in Section 14.07 of the Plan, each officer and director of the Debtors receiving exculpation under Section 14.07 of the Plan agrees to provide reasonable cooperation and assistance to the Debtors, PTL, and the Chief Officer, as applicable, and their successors and assigns, in connection with the Chapter 11 Cases and the pursuit of any claims, causes of action, or liabilities. Such cooperation and assistance shall not involve or require any out-of-pocket expense by such officer or director. Notwithstanding the foregoing, in the event any officer or director of the Debtors fails to provide reasonable cooperation or assistance as requested by the Debtors, PTL, or the Chief Officer, as applicable, or their successors and assigns, the remedy shall be that all exculpations provided to such Person under the Plan with respect to the Prepetition Restructuring shall be null and void.

10.8.    Limitation on Releases and Exculpation.

Notwithstanding anything to the contrary in the Plan, nothing in Sections 14.06 or 14.07 of the Plan shall waive or release (i) any claims, causes of action, or culpability of any Person based upon or arising out of such Person's knowingly or willfully failing to disclose, knowingly or willfully improperly disclosing, or intentionally or willfully providing insufficient disclosure of, any material fact, including, without limitation, disclosures arising out of or related to any Debtor's nonaccrual receivables or disclosures arising out of or relating to the value of the so-called Retama Park Development Corporation, Cambridge, Dade County, and Will County municipal bonds; (ii) without limiting the foregoing, any claims, causes of action, or culpability of any Person arising out of or relating to any Debtor's nonaccrual receivables or disclosures arising out of or related to the so-called Retama Park Development Corporation, Cambridge, Dade County, and Will County municipal bonds  to the extent that after January 2, 2013, any Holder of a claim discovers any fact or circumstance not previously known to such Holder, which materially affects such claim, cause of action or culpability; or (iii) any claims, causes of action, or culpability of any Person arising out of or related to such Person's knowingly or

69

intentionally providing false or misleading financial information to the Holder of any claim to the extent not included in clause (i) or (ii) above.

10.9.    Injunction Related to Releases and Exculpation.

Except as otherwise provided in the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities satisfied, released or discharged pursuant to the Plan, including the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in Sections 14.06 and 14.07 of the Plan.

10.10.   Releases of Liens and Encumbrances.

(a)    Each Lien or encumbrance on the Debtors' assets, other than a permitted encumbrance (excluding a permitted encumbrance securing a financial obligation that is not an Assumed Liability), including Liens or encumbrances securing:  (w) any Second Lien Note Claim, Second Lien Note Guarantee Claim, Convertible Note Claim, Other Secured Claim or Administrative Expense Claim arising under or related to the Debtors' Indentures; (x) any Claim that is purportedly secured; or (y) any judgment, personal property or ad valorem tax, or other tax of any kind or character, mechanic's or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, regardless of whether such Claim has been scheduled or proof of such Claim has been filed:

(1)    if such Lien or encumbrance secures a Priority tax Claim or Other Secured Claim, upon payment of the consideration set forth in Article IV-VIII of the Plan, as the case may be, automatically, and without further action by the Debtors or PTL, be deemed released; or

(2)    in all other cases, automatically, and without further action by the Debtors or PTL, be deemed released immediately upon the occurrence of the Effective Date, and without further action by the Debtors or PTL, be deemed released.

(b)    The Holder of any such Lien or encumbrance shall execute such documents and instruments as PTL, the Chief Officer or the Liquidation Trustee, as the case may be, require to evidence such Claim Holder's release of such property or Lien or encumbrance, and if such Holder refuses to execute appropriate documents or instruments, the Debtors, PTL, or the Chief Officer (as applicable) may, in their discretion, file a copy of the Confirmation Order in the appropriate recording office, which shall serve to release any Claim Holder's rights in such property; and

(c)    On the Effective Date, except as expressly provided in the Plan, all right, title and interest in Estate property subject to a Lien or an encumbrance immediately prior to the Effective Date shall be transferred as a PTL Asset to PTL.

70

## ARTICLE XI.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

11.1.    Conditions to Confirmation.

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 15.03 of the Plan:

(a)    the Bankruptcy Court shall have approved the Disclosure Statement with respect to the Plan in an order in form and substance reasonably acceptable to the Debtors, the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders;

(b)    the Confirmation Order and Plan Documents shall be in form and substance reasonably acceptable to the Debtors, the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders;

(c)    in each case subject to the occurrence of the Effective Date, to the extent necessary or appropriate, the Plan Documents, including the PTL LLC Agreement and the Liquidation Trust Agreement, to be entered into by PTL shall have been entered and delivered, all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed and the Debtors shall have received all material authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are reasonably necessary to implement the Plan and that are required by law, regulation, or order.

11.2.    Effectiveness.

The Plan shall not become effective unless and until: (i) the Confirmation Order shall have been entered by the Bankruptcy Court and become final and non-appealable; (ii) the Plan Documents shall have been executed and become effective; and (iii) the order approving the SunGard Settlement Agreement shall have become final and non-appealable.

11.3.    Waiver of Conditions.

The Debtors, with the consent of the Consenting Second Lien Noteholders and the Consenting Convertible Noteholders (in each case, such consent not to be unreasonably withheld or delayed), to the extent not prohibited by applicable law, may waive one or more of the conditions precedent: (i) to effectiveness of the Plan set forth in Section 15.02 of the Plan in whole or part, upon five Business Days' notice to the Bankruptcy Court without a hearing, provided, however, that waiver of the condition precedent to effectiveness of the Plan set forth in Section 15.02(iii) of the Plan shall also require the consent of SunGard Financial Systems LLC (such consent not be unreasonably withheld or delayed); or (ii) to confirmation of the Plan set forth in Section 15.01 of the Plan prior to the Confirmation Date without any hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such conditions to be satisfied (including any action or inaction by the Debtors in their

71

sole discretion).  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XII.

## VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code; (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law; (v) the disclosure required by section 1125 of the Bankruptcy Code has been made; (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan; (viii) the Plan is in the "best interests" of all Holders of Claims or Equity Interests in an impaired Class by providing to such Holders on account of their Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim or Equity Interest in such Class has accepted the Plan; (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date; and (x) the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to confirmation pursuant to sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtors have obligated themselves to provide such benefits, provided, however, that upon motion by the Debtors, the Bankruptcy Court may enter an order pursuant to sections 1114(e)(1) and 1114(g) providing for the modification in the payment of retiree benefits, under certain circumstances.

12.1.   Parties in Interest Entitled to Vote.

Pursuant to the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims or Equity Interests of that Class are entitled are modified, other than by curing defaults and reinstating the debt.  Classes of Claims and Equity Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims and Equity Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to not have accepted the Plan.

12.2.   Classes Impaired Under the Plan.

72

The following Classes of Claims are or may be impaired under the Plan and are entitled to vote on the Plan (the "Voting Classes"):

| IMPAIRED CREDITORS ENTITLED TO VOTE | |
|---|---|
| **Class** | **Designation** |
| Class 3A | General Unsecured Claims |
| Class 4A | Second Lien Note Claims |
| Class 5A | Convertible Note Claims |
| Class 3B | General Unsecured Claims |
| Class 4B | Subordinated Loan Claims |
| Class 3C | General Unsecured Claims |
| Class 4C | Second Lien Note Guarantee Claims |
| Class 3D | General Unsecured Claims |
| Class 3E | General Unsecured Claims |

Acceptances of the Plan are being solicited only from those Holders of Claims in Impaired Classes that will or may receive a distribution under the Plan. Accordingly, the Debtors are soliciting acceptances from Holders of Claims in the Classes listed above. The Debtors are not seeking votes from the Holders of Securities Law Claims or Equity Interests in Classes 7A, 8A, 6B, 6C, 5D and 5E because those Claims and Interests are Impaired under the Plan and the Holders are receiving no distribution on account of such Claims and Interests. Theses Holders will be deemed to have voted to reject the Plan.

THE DEBTORS INTEND TO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN IN THE CHAPTER 11 CASES UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY CLASS DEEMED TO REJECT, OR AS TO ANY CLASS THAT VOTES TO REJECT, THE PLAN, AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF SUCH SECTION.

12.3.    Voting Procedures and Requirements.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

(a)    Ballots. In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost or if you have any questions concerning voting procedures, please call the Claims and Voting Agent at (877) 709-4754. Each Ballot enclosed with this Disclosure Statement has been encoded with the amount of your Claim for voting purposes and the Class in which your Claim has been classified. If your Claim is a Disputed Claim this amount may not be the amount ultimately allowed for purposes of distributions under the Plan. **PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY**.

73

(b) Returning Ballots.

**IF YOU ARE A HOLDER OF A CLASS 3A, CLASS 4A, CLASS 5A, CLASS 3B, CLASS 4B, CLASS 3C, CLASS 4C, CLASS 3D OR CLASS 3E CLAIM ENTITLED TO VOTE, YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE IN ACCORDANCE WITH INSTRUCTIONS SET FORTH IN YOUR BALLOT. IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CALL THE CLAIMS AND VOTING AGENT AT (877) 709-4754.**

**IF YOU RECEIVED A BALLOT FROM A BROKER, NOMINEE OR OTHER AGENT (COLLECTIVELY, AN "INTERMEDIARY"), RETURN THE COMPLETED BALLOT(S) TO SUCH INTERMEDIARY PROMPTLY SO THAT IT CAN RECEIVE, TABULATE AND FORWARD YOUR BALLOT TO THE DEBTORS' CLAIMS AND VOTING AGENT AT THE ADDRESS LISTED IMMEDIATELY ABOVE.**

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND VOTING AGENT NO LATER THAN **5:00 P.M. (PREVAILING EASTERN TIME) ON JULY 24, 2013,** UNLESS EXTENDED BY THE DEBTORS. YOUR BALLOT MAY BE SENT VIA U.S. FIRST CLASS MAIL, OVERNIGHT COURIER OR MESSENGER. ALL BALLOTS MUST BE SIGNED. IF YOU ARE SENDING YOUR BALLOT TO AN INTERMEDIARY FOR INCLUSION IN A MASTER BALLOT, THE *INTERMEDIARY* MUST RECEIVE YOUR PROPERLY COMPLETED BALLOT IN SUFFICIENT TIME TO PERMIT YOUR INTERMEDIARY TO DELIVER A MASTER BALLOT INCLUDING YOUR VOTE TO THE CLAIMS AND VOTING AGENT BY THE VOTING DEADLINE.

In accordance with Bankruptcy Rule 3017(d), the Debtors will send Ballots to the Intermediaries holding Claims for, or acting on behalf of, beneficial Holders of Claims in Class 4A, Class 5A, and Class 4C. Each Intermediary will be entitled to receive, upon request of the Debtors, a reasonably sufficient number of Ballots to distribute to the beneficial owners of the Claims for which it is an Intermediary, and the Debtors will be responsible for and pay each such Intermediary's reasonable costs and expenses associated with the distribution of Ballots to beneficial owners of such Claims and the tabulations of the Ballots. Additionally, each Intermediary must receive returned Ballots in sufficient time to enable them to complete the"master" ballot in a form approved by the Bankruptcy Court (the "Master Ballot") by the Voting Deadline, indicating the number and dollar amount of cast Ballots in the group of Claim Holders for which it was an Intermediary and indicating whether the Claim Holder has opted in to the releases. The Intermediaries must certify that each beneficial Holder has not cast more than one vote with respect to any given Claim for any purpose, including for determining both the number of votes and the amount of the Claim, even if such Holder holds securities of the same type in more than one account. However, persons who hold such Claims in more than one voting Class will be entitled to one vote in such Class, subject to the applicable voting rules.

74

Prior to deciding whether and how to vote on the Plan, each Holder in a voting class should consider carefully all of the information in this Disclosure Statement.

---

**IMPORTANT – VOTING BY INTERMEDIARY**

- If your vote is being processed by an Intermediary, please allow time for transmission of your Ballot to your Intermediary for preparation and delivery to the Claims and Voting Agent of a Master Ballot reflecting your vote and the votes of other Claims tabulated by the Intermediary.

- To be counted, your vote must be received *either* (a) directly by the Claims and Voting Agent on or before the Voting Deadline, or (b) if your vote is processed by an Intermediary, *by your Intermediary*, in sufficient time to permit your Intermediary to deliver a Master Ballot including your vote to the Claims and Voting Agent on or before the Voting Deadline.

- Receipt by the *Intermediary* on or close to the Voting Deadline may not allow sufficient time for the Intermediary to include your vote in the Master Ballot that it prepares and delivers to the Claims and Voting Agent by the Voting Deadline.

- If you have a question concerning the voting procedures, please contact your Intermediary directly, or the Claims and Voting Agent at (877) 709-4754.

---

12.4.    Confirmation Hearing.

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing with respect to whether the Plan and the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **July 31, 2013 at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Peter J. Walsh, United States Bankruptcy Judge, United States Bankruptcy Court, 824 N. Market Street, Wilmington, Delaware 19801. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **July 24, 2013 at 5:00 p.m. (prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned.

12.5.    Confirmation.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. As noted above, among the requirements for confirmation are that the plan (i) is accepted by the requisite Holders of Claims and Equity Interests or, if not so accepted, is "fair and equitable" and "does not discriminate unfairly" as to the non-accepting Class of Claims or Equity Interests, (ii) is in the

75

"best interests" of each Holder of a Claim or Equity Interest that does not vote to accept the Plan in each impaired Class under the Plan, (iii) is feasible, and (iv) complies with the applicable provisions of the Bankruptcy Code.

12.6.    Acceptance of Plan.

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept a plan, except under certain circumstances. See "*Confirmation Without Acceptance of All Impaired Classes*" below. A plan is accepted by an impaired class of claims if Holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan. A plan is accepted by an impaired class of interests if Holders of at least two-thirds of the number of shares in such class vote to accept the plan. Only those Holders of claims or interests who actually vote count in these tabulations. Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each Holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each Holder of a claim or interest in such class. See "*Best Interests Test*" below. In addition, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below. See "*Confirmation Without Acceptance of All Impaired Classes*" below.

12.7.    Confirmation Without Acceptance of All Impaired Classes.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly," and (b) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claim or interest before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class, (i) the Holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each Holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date or (ii) such Holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan; or (c) with respect to a class of interests, either (i) each Holder of an

76

interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such interest, or (ii) the Holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or a class of interests receives full compensation for its allowed claims or allowed interests, no Holder of claims or interests in any junior class may receive or retain any property on account of such claims or interests. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that Holders either (i) retain their liens and receive deferred cash payments with a value as of the plan's effective date equal to the value of their interest in property of the estate, or (ii) otherwise receive the indubitable equivalent of these secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank.

12.8.    Best Interests Test.

In order to confirm a plan, a bankruptcy court must independently determine that the plan is in the best interests of each Holder of a claim or interest in any such impaired class who has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the bankruptcy court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim or interest that has a value, as of the effective date, at least equal to the value of the distribution that each such member would receive if the debtor was liquidated under chapter 7 ("Chapter 7") of the Bankruptcy Code on such date.

12.9.    Liquidation Analysis.

The Debtors could be liquidated under Chapter 7 of the Bankruptcy Code. A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of the Holders of Claims is set forth in the hypothetical liquidation analysis (the "Liquidation Analysis") annexed hereto as Exhibit 5.

12.10.    Feasibility.

Under section 1129(a)(11) of the Bankruptcy Code, the Debtors must demonstrate that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. The Plan clearly complies with this requirement because on the Effective Date, the Debtors will transfer the PTL Assets to PTL. PTL will distribute the PTL Assets to Holders of Allowed Claims pursuant to the terms of the Plan and, provided that the Plan is confirmed and consummated, the Debtors' Estates will no longer exist to be subject to future reorganization or liquidation.

12.11.  Compliance with the Applicable Provisions of the Bankruptcy Code.

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

# ARTICLE XIII.

## ALTERNATIVE TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

The Debtors believe the Plan affords Holders of Claims and Equity Interests the potential for the greatest realization on the Debtors' remaining assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to Chapter 7 of the Bankruptcy Code. Neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, Holders of Claims would revert to a "race to the courthouse," the result being that claimants would not receive a fair and equitable distribution as contemplated by the Plan. As set forth in the Liquidation Analysis, the Plan provides a greater recovery to Holders of Claims than would be achieved in a case under Chapter 7 of the Bankruptcy Code. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

# ARTICLE XIV.

## RISK FACTORS AND CERTAIN FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

14.1.  Allowed Claims May Exceed Estimates.

The projected Distributions are based upon the Debtors' good faith estimate of the amount of Wind-Down Expenses that will be incurred and total amount of Claims that will ultimately be allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving disputed claims. Additionally, the actual amount of Allowed Claims in any Class could be greater than anticipated, which will impact the distributions to be made to Holders of Claims.

The Debtors reserve the right to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection. Any such creditor may not receive the estimated Distributions set forth in the Plan.

14.2.  Plan May Not Be Accepted or Confirmed.

78

While the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Court, there can be no guarantee that the Bankruptcy Court will agree.

14.3.    Certain Federal Income Tax Consequences of the Plan.

A detailed discussion of the potential federal income tax consequences of the plan can be found in the Analysis of Certain Federal Income Tax Consequences of the Plan annexed hereto as Exhibit 6.

## ARTICLE XV.

## RETENTION OF JURISDICTION

15.1.    Retention of Jurisdiction.

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the purposes set forth in Section 16.01 of the Plan.

## ARTICLE XVI.

## MISCELLANEOUS PROVISIONS

16.1.    Notices.

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**Notice Parties**

79

| | |
|---|---|
| **Young Conaway Stargatt & Taylor, LLP**<br>Pauline K. Morgan<br>Kenneth J. Enos<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 576-3312<br>*Co-Counsel for the Debtors and the Debtors in Possession* | **Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>Andrew N. Rosenberg<br>Oksana Lashko<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 492-0158<br>*Co-Counsel for the Debtors and the Debtors in Possession* |
| **Fried, Frank, Harris, Shriver & Jacobson LLP**<br>Gary Kaplan<br>Garrett Ledgerwood<br>One New York Plaza<br>New York, New York 10004<br>Telephone: (212) 859-8000<br>Facsimile: (212) 859-4000<br>Counsel for the Second Lien Noteholders Committee | **Sidley Austin LLP**<br>Larry J. Nyhan<br>Bojan Guzina<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone: (312) 853-7323<br>Facsimile: (312) 853-7036<br>Counsel for the Convertible Noteholders Committee |
| **Penson Worldwide, Inc., <u>et al.</u>**<br>Attn: Bryce Engel<br>800 Klein Road<br>Suite 200<br>Plano, Texas 75074 | **Hahn & Hessen LLP**<br>Mark T. Power, Esq.<br>488 Madison Avenue<br>New York, New York 10022<br>Telephone: (212) 478-7200<br>Facsimile: (212) 478-7400<br>Counsel for the Creditors' Committee |

## ARTICLE XVII.

## RECOMMENDATION AND CONCLUSION

THE DEBTORS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS AND THAT THE PLAN SHOULD BE CONFIRMED. THE DEBTORS ALSO BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES BECAUSE IT WILL PROVIDE RECOVERIES TO CREDITORS IN EXCESS OF THOSE WHICH WOULD OTHERWISE BE AVAILABLE IF THE CHAPTER 11 CASES WERE DISMISSED OR CONVERTED TO CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. THE DEBTORS STRONGLY RECOMMEND THAT ALL CREDITORS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.

THE COMMITTEE HAS INDEPENDENTLY CONCLUDED THAT THE PLAN IS IN THE BEST INTERESTS OF ALL UNSECURED CREDITORS AND HAS RECOMMENDED THAT UNSECURED CREDITORS VOTE IN FAVOR OF THE PLAN.

Doc#: US1:8414841v9

Dated: Wilmington, Delaware
June 6, 2013

Respectfully submitted,

**Penson Worldwide, Inc., <u>et al.</u>**

By:    <u>/s/ Bryce B. Engel</u>
       Bryce B. Engel
       Penson Worldwide, Inc., on behalf of itself
       and its affiliated Debtors

81